UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUGENE HUDSON, JR., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, <br><br> Defendant. | Civil Action No. 17-1867 (JEB) |

**MEMORANDUM OPINION**

For Plaintiff Eugene Hudson, former National Secretary-Treasurer for Defendant American Federation of Government Employees, the results of the 2016 federal election demanded immediate action. The following week, he directed an AFGE subordinate to send a blast email to hundreds of union members warning of a likely future attack on organized labor by President-Elect Trump and the new Republican-controlled Congress. Other members of AFGE leadership believed the email was inappropriate, a charge that culminated in Hudson's removal from elected office. Believing such process was infected with bias and seeking reinstatement, Plaintiff has sued and now moves for a preliminary injunction against the Union. Finding that all four injunctive factors weigh in his favor, the Court will grant the Motion and require AFGE to return Hudson to his office, at least until a full and fair hearing on his removal can take place.

**I.     Background**

As the underlying facts are largely undisputed, the Court first sets forth the conduct that led to Hudson's ouster and then details the internal Union procedures followed here.

1

A. Factual History

AFGE is a national labor organization representing federal and D.C. government employees. See ECF No. 1 (Complaint), ¶ 2. Its leadership body, the National Executive Council, consists of a National President, National Secretary-Treasurer, National Vice-President for Women and Fair Practices, and the National Vice-Presidents for the twelve AFGE districts. Id., ¶ 3. Hudson was elected to two consecutive three-year terms as National Secretary-Treasurer beginning in 2012. Id., ¶ 6. Convention delegates will vote in 2018 on, among other offices, a National President and a National Secretary-Treasurer. Id., ¶ 7. In August 2016, Plaintiff announced that he would again be running for national office at the 2018 Convention but did not specify for which position. Id., ¶ 8. He clarified in December 2016 that he would run for President. Id.

On November 15, 2016 — one week after the American presidential election — Plaintiff, using an AFGE computer and email, directed his subordinate to send an email to "several hundred AFGE officers and members." Id., ¶¶ 9, 11. The recipients included both personal and federal-government email addresses. Id., ¶ 11. The three-and-a-half-page email carried the subject line, "From the Desk of National Secretary-Treasurer Eugene Hudson, Jr.," Def. Opp., Exh. 3 at 1, and the body was entitled, "AFGE, the Trump administration, and the attack on the way." Compl., Exh. 1 at 1. It stated, in relevant part:

> For many of us, the results of the November 8th election were unexpected. There remains much to analyze about the election . . . [b]ut one thing is certain, the new administration and the Republican Congressional majority have a bull's eye planted on the backs of federal workers and the unions that represent them. The question is whether we are ready for this assault. . . .
>
> Is AFGE prepared for this? [AFGE] President Cox has spoken up on this and has reminded us all of some of the efforts that have been undertaken under the banner of "Too Big to Fail." Such efforts are

2

>important to support, though I will suggest that we need to completely rethink the battlefield terrain on which we have been operating. . . .
>
>The Trump administration, and their allies in Congress, will claim that they have a "mandate" to reconstruct the federal government and workforce. Our response should be "mandate my…" There is no mandate. Trump did not even get the majority of the popular vote!

Id. at 1-2. The email then lists four items for consideration: 1) "Recognize that we must fight; we have no choice"; 2) "Rethink the way that we operate as an organization"; 3) "We need to build our support within the larger community"; and 4) "[T]his is a time for AFGE to join with other unions operating in the federal sector in coordinated responses to the attacks." Id. at 2-3. No one reviewed the email prior to Hudson's distribution.

The next day, Hudson sent another email to a select group of AFGE members stating that the November 15 email was his "personal opinion" and was not "an official statement from AFGE." Def. Opp., Exh. 3 at 1. The email, however, had already attracted the attention of several Union officials, including President David Cox, NVP Gerald Swanke, and General Counsel David Borer. Cox was concerned that the email might constitute a "Hatch Act Violation and bring harm to AFGE and our members." Id. Swanke thought it "outrageous" that an AFGE policy statement would "be sent out to the membership without knowledge and consent of the [National Executive Council]." Id. On November 22, Borer sent a memorandum to Cox regarding legal issues surrounding the email. See Compl., Exh. 2. Of particular concern to Borer were possible legal implications under the Hatch Act, which prohibits federal employees from making partisan political statements using government resources or on government property. Although Hudson is not a federal employee, by sending the email to government addresses, Borer believed that those employees might unwittingly violate the Hatch Act by

3

further disseminating the email. The memorandum also suggested that Hudson may have misappropriated Union resources by using its assets "(the email list, staff time, AFGE email, and AFGE equipment)," id. at 6, and exposed the Union to insurance liability because AFGE annually certifies to its insurance carrier that its General Counsel Office reviews all publications.

B. Procedural History

Nearly one month later, on December 21, 2016, National Vice-President Keith Hill filed an internal charge against Plaintiff pursuant to the AFGE National Constitution. See Compl., Exh. 3. Hill accused him of various infractions under the AFGE Constitution, including three violations of Article XXIII, which proscribes certain "conduct detrimental or inimical to the best interests" of the Union. See Compl., Exh. 4 (AFGE Constitution) at 63. The allegations included the post-election email. Hill did not serve Hudson with a copy of the charge as required by the constitution, but Borer sent it to him on February 22, 2017. See Compl., ¶¶ 15-17.

The charge proceedings then followed the relevant AFGE guidelines. See AFGE Const.; Compl., Exh. 6 (Committee of Investigation Guidelines and Procedures Manual). A Committee of Investigation was appointed, which was composed of NVP Swanke and two other members, Alma Lee and Gabrielle Martin. See Compl., ¶ 21. The Committee began its investigation and asked Plaintiff a series of questions. On July 3, Hudson submitted his written response and also asked that Swanke recuse himself; because Swanke had previously filed a charge against Hudson, Plaintiff doubted his impartiality. Id., ¶ 26. The Committee met the following week and decided that Swanke would need to recuse only if they could not reach a unanimous decision. Id., ¶ 28. The three members then considered the charges against Plaintiff and dismissed two of them. With regard to the third — sending the November 15 email — they stated:

4

> The Committee finds probable cause exists for the specific charge of malfeasance of office.
> Article 23 Sec. 2(f) Engaging in gross neglect of duty or conduct constituting misfeasance or malfeasance in office as an officer[.]
>
> And
>
> Article 23 Sec.[]2(g) Incompetence, negligence, or insubordination in the performance of official duties by officers or representatives of a local or council or failure or refusal to perform duties validly assigned
>
> And
>
> Article 23 Sec[.] 2(h) Committing any act of fraud, embezzlement, mismanagement, or appropriating to one's own use any money, property, or thing of value belonging to the Federation or any affiliate.

Compl., Exh. 10 (COI Findings) at 1. Because no material facts were in dispute, the Committee then referred the charge to the National Executive Council pursuant to Article XIII, Sec. 7(b)(2) of the Constitution. See AFGE Const. at 39-40. Cox promptly informed Hudson of the Committee's decision and called a special meeting of the fifteen-member NEC for August 8, 2017, to vote on the charges referred by the Committee. See Compl., Exh. 13 (July 19, 2017, Letter from Cox to NEC).

On July 28, Hudson submitted a position statement to be included in the investigative report distributed to NEC members. See Compl., Exh. 14. He acknowledged that he had directed his subordinate to send an email to government addresses of AFGE members but maintained his innocence of any wrongdoing. Hudson's statement to the NEC substantially mirrored his arguments in this suit. Namely, he contended that the email was not campaign literature or related to his candidacy, did not violate the Hatch Act or any AFGE policy, and was protected free speech under the Labor-Management Reporting and Disclosure Act. Id. at 6-15.

Plaintiff also requested that four additional NEC members — President Cox and National Vice-Presidents Everett Kelley, Eric Bunn, and George McCubbin — recuse themselves from participating in the deliberations based on his belief that they would not be impartial. Id. at 4. Because Hudson plans to run for President in the 2018 election, he asserted that Cox, should he choose to run for reelection, would be a direct competitor. As NST, Hudson also had alleged that expense vouchers submitted by Kelley, Bunn, and McCubbin were improper uses of Union funds. See Compl., ¶¶ 36-38. Finally, Plaintiff pressed another argument he maintains here: as the Committee found probable cause only for a charge of malfeasance, the NEC should have been limited to considering Article XXIII Sec. 2(f) of the Constitution, which covers that offense. See Position Statement at 5. Plaintiff attached several documents to his position statement, including three advisory opinions from the United States Office of Special Counsel, which is authorized to investigate Hatch Act violations, id. at 18-23, and several public articles and statements made by other AFGE members and officers. Id. at 23-71. None of these items directly pertained to Hudson's charges.

The NEC adopted the Committee's report, deliberated, and found Hudson guilty of the referred charges by a vote of 12 to 1 (Cox and Hudson did not vote). By the same margin, it then voted to remove him from his position as NST but did not restrict his union-membership rights. See Compl., ¶ 49. The NEC has not released a written explanation of the decision. Hudson timely appealed the ruling to the National Convention pursuant to the AFGE Constitution, but that does not take place until August 2018.

On September 12, 2017, Plaintiff then filed this suit, alleging four ways in which his discharge violated the LMRDA: 1) denial of a full and fair hearing; 2) retaliation for exercising his free-speech rights; 3) suppressing dissent through discipline; and 4) violations of the AFGE

Constitution. Five days later, he filed this Motion for Preliminary Injunction, asking the Court to order Defendant to reinstate him as NST, process the charges anew, conduct a new hearing without the allegedly biased NEC members, and pay monetary damages. See ECF No. 4. The Court held a hearing on the Motion on October 26, 2017, and issues this Opinion on an expedited basis.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." League of Women Voters of United States v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting Pursuing America's Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016)).

Before the Supreme Court's decision in Winter, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. Davis v. PGBC, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999). This Circuit has hinted, though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable harm" standard — establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'" Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)); see League of Women Voters, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after Winter). Unresolved, too, is the related question of "whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal

7

question' on the merits." Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (citation omitted).

Regardless of the extent to which showings of irreparable harm and success on the merits can be diminished, some fundamentals of the four-factor test bear reiterating. Because "the basis of injunctive relief in the federal courts has always been irreparable harm," Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006), a plaintiff must, at minimum, "demonstrate that irreparable injury is likely in the absence of an injunction," not just that injury is a "possibility." Winter, 555 U.S. at 21; see Davis, 571 F.3d at 1292. Before and after Winter, similarly, courts in our Circuit have held that a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion. Ark. Dairy Co-op Ass'n, Inc. v. USDA, 573 F.3d 815, 832 (D.C. Cir. 2009) (citing Apotex, Inc. v. FDA, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006)). Where the plaintiff can show neither harm nor success, it is plain that no relief is warranted. See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016). A plaintiff's showing of likelihood of success and irreparable harm does not end the inquiry; rather, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." Davis, 571 F.3d at 1292.

### III. Analysis

Although Plaintiff brings four separate counts, because he requests the same relief on all of them, he need only satisfy the preliminary-injunction factors on one to prevail. Before delving into those factors, the Court considers — and rejects — Defendant's threshold position that Hudson's suit is neither ripe nor fully exhausted under the provisions of the LMRDA.

A. <u>Ripeness/Exhaustion</u>

AFGE asserts that the Court should not look at the merits here because Hudson has filed his suit prematurely. <u>See</u> Opp. at 7. In so arguing, Defendant relies on an LMRDA provision that prohibits unions from limiting their members' right to sue, provided "[t]hat any such member <u>may</u> be required to exhaust reasonable hearing procedures (<u>but not to exceed a four-month lapse of time</u>) within such organization." 29 U.S.C. § 411(a)(4) (emphasis added). Because Plaintiff filed his internal appeal less than four months ago, AFGE argues that his suit is not yet ripe under the statute. Defendant is incorrect for two reasons.

First, Hudson's internal Union appeal will not achieve a result until August 2018, nearly one year after his termination. To wait four months, as AFGE proposes, makes little sense as Hudson will know no more then than he does now. Because compliance with this waiting period would be futile, the Court will not hold Plaintiff to it. <u>See</u> <u>Semancik v. United Mine Workers</u>, 466 F.2d 144, 150-51 (3d Cir. 1972) (excusing internal union exhaustion in part because appeals structure could not give plaintiff relief).

In any event, moreover, exhaustion is not mandated by the AFGE Constitution or the LMRDA before filing suit. Rather, the Act gives the "court . . . discretion to decide whether" exhaustion of internal union procedures is appropriate. <u>Clayton v. Int'l Union</u>, 451 U.S 679, 689 (1981); <u>Massey v. AFGE</u>, 196 F. Supp. 3d 25, 35 (D.D.C. 2016) (quoting AFGE's reply brief arguing that "AFGE Constitution does <u>not</u> require exhaustion [of] internal union remedies before a member can proceed to Court") (alteration in original)). In exercising that discretion, courts should consider whether: 1) "union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim"; 2) "internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks"; and 3)

9

"exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim." Id. at 34. For the reasons just explained, the latter two weigh in favor of permitting Hudson to file his Complaint now. First, his appeal will not be decided until the August 2018 AFGE National Convention, meaning he could not be reinstated to his NST position until then. Second, forcing him to wait nine more months seriously impairs his ongoing campaign for President. The Court, consequently, finds that exhaustion is not warranted here.

B. Likelihood of Success

In analyzing Hudson's Motion, the Court begins with his likelihood of success on the merits of at least one claim. See Winter, 555 U.S. at 20; League of Women Voters, 838 F.3d at 6. When that success depends on a factual rather than a legal determination, a court may review both parties' evidence to determine whether the plaintiff has shown it is more likely than not that the jury would find in his favor. In re Navy Chaplaincy, 697 F.3d 1171, 1180 (D.C. Cir. 2012). Here, the Court is persuaded that Plaintiff's first count — that the Union denied him the right to a full and fair hearing — is sufficiently likely to prevail that it need not address the other three.

The LMRDA contains a bill of rights for union members, including the right to a "full and fair hearing" before any discipline may be imposed. See 29 U.S.C. § 411(a)(5). That procedural protection includes the rights guaranteed under internal union rules as well as those encompassed by "fundamental and traditional concepts of due process." Ritz v. O'Donnell, 566 F.2d 731, 735 (D.C. Cir. 1977) (quoting Tincher v. Piasecki, 520 F.2d 851, 854 (7th Cir. 1975)). The right to an impartial tribunal is one of the most fundamental aspects of due process. See Tincher, 520 F.2d at 854. "Impartiality may be affected by a 'personal or financial stake' in the outcome or 'personal animosity.'" James v. Indepe. Sch. Dist. No. I-050 of Osage Cty., No. 10-

5124, 2011 WL 3836444, at *3 (10th Cir. Aug. 31, 2011) (quoting Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 491-92 (1976)).

Hudson argues that his disciplinary process was not fair for several reasons, but the Court confines its discussion here to his accusation that the Committee of Investigation included a member — NVP Swanke — whose bias infected the entirety of the proceeding. Notably, likelihood of success on this issue does not require Plaintiff to show actual bias or prejudgment. See Goodman v. Laborers' Int'l Union of N. Am., 742 F.2d 780, 784 (3d Cir. 1984) (prejudgment not a necessary condition to find impartial tribunal). Rather, he need only put forth evidence that the "risk of bias" was "too high to be constitutionally tolerable." Wildberger v. Am. Fed'n of Gov't. Emps., 86 F.3d 1188, 1196 (D.C. Cir. 1996); see Loekle v. Hansen, 551 F. Supp. 74, 83 (S.D.N.Y. 1982) (plaintiff can show bias through instances of "specific prejudice or a high probability of actual bias on the part of at least some members of the tribunal") (citation omitted); Curtis v. Int'l All. of Theatrical Stage Emps., 687 F.2d 1024, 1030 (7th Cir. 1982) (plaintiff can show bias by pointing to union procedures that "seriously increase[d] the risk that the decision-maker will reach an erroneous determination"). This evidence can be direct or circumstantial, Biggerstaff v. Davis, No. 79-133, 1984 WL 49033, at *6 (N.D. Ind. Mar. 27, 1984), and partiality "by a single decisionmaker in a tribunal of limited size is sufficient to taint the proceedings and constitute a denial of the right to a full and fair hearing under the LMRDA." Goodman, 742 F.2d at 784; cf. Cinderella Career & Finishing Schools, Inc. v. FTC, 425 F.2d 583, 592 (D.C. Cir. 1970) (vacating agency decision because biased chairman took part in the fact-finding and deliberations).

Here, the Committee of Investigation included three people, with Swanke as the chair. After deliberating, those three decided whether to refer charges to the NEC, which only had

thirteen voting members for this case. The Committee — and especially the chair — therefore had an immense amount of power over whether a member was ultimately disciplined. Indeed, AFGE never contends in its papers that the NEC's rendering of the final verdict somehow purges the taint of Committee bias.

Plaintiff introduces three pieces of evidence to show Swanke's bias: (1) a previous charge Swanke filed against him; (2) a tweet where Swanke accused him of financial impropriety; and (3) the August 8 NEC-meeting transcript. While not crystal-clear evidence of partiality, the first two show a sufficient likelihood of bias such that injunctive relief is warranted. (Defendant has filed a Motion to Strike the NEC transcript. See ECF No. 9. Because the Court does not rely on it, that Motion will be largely denied as moot. The Court will, however, accede to the Union's request to place the transcript under seal as it includes confidential deliberations.)

The instant *contretemps* is not the first between Swanke and Hudson. In 2015, Swanke and another AFGE member filed a charge against Plaintiff, alleging that he had acted in a way unbecoming a union member while at a local meeting. See Compl., Exh 8 (2016 COI Report) at 2. The Committee that investigated that charge ultimately recommended that it be dismissed as baseless but noted the "historical animosity between" the local councils (for which Swanke is the NVP) and Hudson. Second, Plaintiff attached to his Complaint a tweet written by Swanke accusing Hudson of being a "Master Grifter that can blow $800k overbudget [*sic*] and accuse others of fiscal irresponsibility." Compl., Exh. 21. As AFGE noted at argument, this tweet was sent after the Committee investigation, but the Court finds it is still probative of bias. The Court also finds it telling that AFGE did not rebut any of Plaintiff's claims regarding Swanke's bias in its Opposition. Based on the undisputed evidence here, a reasonable jury would likely find that Swanke was biased against Hudson, precluding him from receiving a full and fair hearing.

In so concluding, the Court believes that the Committee's small size and Swanke's position are compelling factors. Having Swanke chair the three-member Committee — particularly in light of Hudson's request for recusal — created "circumstances that could create a significant risk of actual bias." Wildberger, 86 F.3d at 1196; cf. Curtis v. Int'l Alliance of Theatrical Stage Emps., 687 F.2d 1024, 1030-31 (7th Cir. 1982) (rejecting claims of bias when entire union membership rather than "select tribunal of four or five union officials" voted on disciplinary charges). When one-third of a deliberating body is potentially biased, the judgment of the entire tribunal must be met with skepticism. See Hicks v. City of Watonga, Okl., 942 F.2d 737, 748 (10th Cir. 1991) (noting that if even one member of tribunal "is found to have been biased when she cast her vote[,] . . . her presence will have tainted the tribunal and violated" accused's due-process rights). That principle is compounded when, as here, that member heads the committee.

Courts have held that similar circumstances rendered a union's hearing process unfair and a violation of the LMRDA. See, e.g., Schonfeld v. Penza, 360 F. Supp. 1228, 1238 (S.D.N.Y. 1972), aff'd, 477 F.2d 899, 904 n.8 (2d Cir. 1973) (finding likelihood of success on merits based in part on evidence of animosity between accused and tribunal chair); Bishop v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 310 F. Supp. 2d 33, 43 (D.D.C. 2004) (granting plaintiff summary judgment and finding that disciplinary tribunal was "anything but impartial" in part because one member of panel had previously filed disciplinary charges against accused). While mere unsupported allegations will not suffice to prevail on a full-and-fair-hearing claim, courts have generally been sympathetic to situations where there is evidence of prior political or personal enmity between an accused union member and his adjudicator. See Wildberger, 86 F.3d at 1196 (reversing district court's grant of summary judgment to union and

finding significant risk of bias when union president was ultimate decisionmaker in case against member who had criticized him and opposed him for election); Goodman, 742 F.2d at 784 (allegations that union-discipline-trial-board members were biased because accused removed them from their offices sufficient evidence of LMRDA violation to defeat summary judgment); Tincher, 520 F.2d at 855 (finding it "inherently improper for a person who has been charged by an accused in a collateral proceeding to participate as a committee member in the accused's disciplinary hearing"); but see Yager v. Carey, 910 F. Supp. 704, 716 (D.D.C. 1995) (rejecting bias claims based on tribunal members' loyalty to person who filed charges against accused); United States v. Int'l Bhd. of Teamsters, No. 88-4486, 2008 WL 2743695, at *6 (S.D.N.Y. July 14, 2008) (finding without merit allegation that tribunal chair, who was also under investigation for unrelated charge, was biased against accused to gain favor with union leadership).

In sum, Hudson has a likelihood of success on his claim that retaining Swanke — someone who had previously filed charges against Hudson and later referred to him as a "Master Grifter" — "presented a 'significant danger of bias'" such that he did not receive a full and fair hearing.

    C. <u>Irreparable Harm</u>

Plaintiff has also demonstrated a strong showing of irreparable harm in the absence of an injunction. Although the Motion requests economic relief as well, Plaintiff wisely, as he must, focuses on non-monetary harms — namely, that his removal deprives him (like all AFGE members) of the representative of his choice. See Mot. at 26 (quoting Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 354-55 (1989)). Defendant weakly retorts that the Union's democracy is not at stake because the members also voted for the AFGE Constitution, which includes the procedures by which Hudson was removed. That argument, however, fails to

wrestle with Plaintiff's main gripe — that his hearing process was not what AFGE members voted for because it was led by a biased panel member.

Congress enacted the LMRDA to preserve and promote union democratic processes. See United Steelworkers of America v. Sadlowski, 457 U.S. 102, 112 (1982). A potentially biased hearing that resulted in the removal of the second-highest-ranking union officer creates a substantial likelihood of injury to that democratic process. Without an injunction, such a deprivation is "beyond remediation." League of Women Voters, 838 F.3d at 8 (citation omitted); see also Local 450 v. Int'l Union of Electronic, Elec., Salaried Machine & Furniture Workers, ALF-CIO, 30 F. Supp. 2d 574, 587 (E.D.N.Y. 1998). That irreparable injury affects Plaintiff, a dues-paying member, in the same concrete manner as non-officer union members. See Lynn, 488 U.S. at 354; Savage v. Tweedy, No. 12-1317, 2012 WL 4601281, at *4 (D. Or. Oct. 2, 2012) (union "[d]efendants' removal of [p]laintiffs from their elected offices satisfies the irreparable harm inquiry"); cf. Mason Tenders Dist. Council of Greater N.Y. v. Laborers' Int'l Union of N. Am., 884 F. Supp. 823, 833 (S.D.N.Y. 1995) (finding irreparable harm when local union officials were removed from office by trusteeship because "[a] fundamental right which LMRDA was enacted to protect is a local union's right of self-determination"). Further, because Hudson has already been removed from office and will not be able to appeal until after his term will have already expired, the harm is both "certain and great." League of Women Voters, 838 F.3d at 8 (internal quotation marks and citation omitted).

D. Balance of Equities

Harm to a plaintiff, however, is not the only injury to be considered in the preliminary-injunction equation. The Court must also assess whether an injunction would "substantially injure other interested parties," Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290,

304 (D.C. Cir. 2006) — in this case, the Union. Defendant asserts that forcing it to restore Hudson to his NST role could expose it to liability. The email, AFGE's theory goes, could be construed as campaign literature, and if Hudson won in 2018, someone could contest the results by claiming that he improperly campaigned using Union resources, possibly forcing a re-run election costing millions of dollars. See Opp. at 22. This argument, besides being built upon a host of assumptions, also depends upon AFGE's proving that the email was campaign speech, a fact hotly contested by Hudson. Defendant itself does not even fully embrace the claim, only noting that "[s]ome members of the NEC believed Plaintiff's e-mailed statement to be campaign speech." Id. (emphasis added). In addition, the Court's decision only reinstates Hudson pending the outcome of a new, fair hearing. AFGE could expeditiously conduct that process before the 2018 Convention. The clear harm to Hudson thus outweighs any speculative, unsupported injury to the Union. See League of Women Voters, 838 F.3d at 13-14 (finding balance of equities tipped in favor of plaintiffs when it was "disputable . . . whether an injunction would actually do much, if any, harm to" defendants' interest).

    E.  Public Interest

Finally, a preliminary injunction here serves the public interest. The provisions of the LMRDA at issue were born of a desire to "protect[] democratic elections and 'prevent, discourage and make unprofitable improper conduct by union officials.'" Solis v. Am. Fed'n of Govt. Emps., 763 F. Supp. 2d 154, 160 (D.D.C. 2011) (quoting Dole v. Local Union 226, Hotel & Rest. Emps., 718 F. Supp. 1479, 1485 (D. Nev. 1989)). Ensuring a fair and impartial hearing furthers that purpose.

16

**IV.     Conclusion**

For the above reasons, the Court finds that a preliminary injunction restoring the *status quo* is appropriate here.  AFGE must therefore reinstate Hudson to his position as National Secretary-Treasurer effective immediately.  Whether or not the Union decides to proceed with a renewed hearing on NVP Hill's charges is up to AFGE.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 9, 2017