UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUGENE HUDSON, JR.,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN FEDERATION OF<br>GOVERNMENT EMPLOYEES,<br><br>Defendant. | Civil Action No. 17-1867 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Eugene Hudson, Jr. brought this action alleging that he was improperly removed from his position as National Secretary-Treasurer for Defendant American Federation of Government Employees. Although this litigation has featured some twists and turns — *e.g.*, Hudson's reinstatement via preliminary injunction and his subsequent removal after the Order was vacated — AFGE now files a straightforward Motion to Dismiss. The Court will largely grant the Motion, aside from one count alleging retaliatory termination in violation of Plaintiff's statutory free-speech rights.

**I. Background**

The Court first sets out the conduct for which Hudson was removed and then charts both the Union's procedures and the history of the litigation.

A. Factual History

At this juncture, the Court, as it must, treats the allegations in the Complaint as true. AFGE is a national labor organization with over 1000 affiliated local unions. Its elected national officers include a National President, National Secretary-Treasurer, and National Vice-President

1

for Women and Fair Practices.  See ECF No. 1 (Complaint), ¶ 3.  Hudson was elected National Secretary-Treasurer (NST) for consecutive three-year terms in 2012 and 2015.  Id., ¶ 6.  In August 2016, Plaintiff announced that he would again run for national office at the next Convention, to be held in August 2018.  At the time, he did not specify the position he sought, but he clarified in December 2016 that he would run for President.  Id., ¶ 8.

One week after the 2016 American presidential election, Plaintiff, using an AFGE computer and email, directed his subordinate to send an email to "several hundred AFGE officers and members."  Id., ¶¶ 9, 11.  The recipients included both personal and federal-government email addresses.  Id., ¶ 11.  The three-and-a-half-page email did not go through any formal review process before dissemination.  It was entitled, "AFGE, the Trump administration, and the attack on the way," and it stated, in relevant part:

> For many of us, the results of the November 8th election were unexpected.  There remains much to analyze about the election[,] . . . [b]ut one thing is certain, the new administration and the Republican Congressional majority have a bull's eye planted on the backs of federal workers and the unions that represent them.  The question is whether we are ready for this assault. . . .
>
> Is AFGE prepared for this?  [AFGE] President Cox has spoken up on this and has reminded us all of some of the efforts that have been undertaken under the banner of "Too Big to Fail."  Such efforts are important to support, though I will suggest that we need to completely rethink the battlefield terrain on which we have been operating. . . .
>
> The Trump administration, and their allies in Congress, will claim that they have a "mandate" to reconstruct the federal government and workforce.  Our response should be "mandate my…"  There is no mandate.  Trump did not even get the majority of the popular vote!

Id., Exh. 1 (November 15 Email) at 1-2.  The email then lists four items for consideration: 1) "Recognize that we must fight; we have no choice"; 2) "Rethink the way that we operate as an

organization"; 3) "We need to build our support within the larger community"; and 4) "[T]his is a time for AFGE to join with other unions operating in the federal sector in coordinated responses to the attacks." Id. at 2-3. According to Hudson, the "email was not part of [his] campaign for AFGE office" but rather "valid commentary on public affairs involving AFGE as an entity and AFGE's members." Compl., ¶ 10.

Regardless of its intended purpose, the email rankled several Union officials, including AFGE's General Counsel David Borer. Borer sent a memorandum to Union President David Cox on November 22 regarding potential legal implications of the email. See Compl., Exh. 2. The memorandum noted possible liability under the Hatch Act, which restricts the political activity of certain federal employees. Id. at 1. Borer also suggested that Hudson may have misappropriated Union resources by using its assets "(the email list, staff time, AFGE email, and AFGE equipment)," id. at 6, and also potentially exposed it to liability because AFGE annually certifies to its insurance carrier that its General Counsel's Office reviews all publications.

B. Procedural History

Nearly one month later, National Vice-President Keith Hill filed an internal charge against Hudson, including, among other allegations, an accusation that Plaintiff's dispatch of the November 15 email was "a supreme case of multiple violations." Compl., Exh. 3 at 1. Hill believed that, by assigning an AFGE employee the task of sending the email, Hudson had violated the "ethical conduct requirements for all NEC members" and "exposed AFGE to certain civil and/or administrative liability." Id. at 2. "In addition," Hill continued, "the use of AFGE's e-mail directories for personal use is a violation of the policies on official use of AFGE resources." Id. He did not, however, cite to any portions of the AFGE Constitution or other Union guidelines that prohibit such activity. The charge also alleged that Hudson had violated

the Union's Constitution on three other occasions, not at issue here. Id. at 1-2. Hill did not serve Hudson with a copy of the charge as required by the Constitution, but Borer sent it to him on February 22, 2017. See Compl., ¶¶ 15-17.

The charge proceedings then followed the relevant AFGE guidelines. See Compl., Exh. Nos. 4 (AFGE Constitution); 6 (Committee of Investigation Guidelines and Procedures Manual). A three-member Committee of Investigation was appointed and, upon consideration, dismissed all the charges except the one based on the November 15 email. With regard to that, the COI found that "probable cause exists for the specific charge of malfeasance of office," and it cited three sections of the AFGE Constitution that it believed Hudson had violated. See Compl., Exh. 10 (COI Findings) at 1.

The Committee then referred the charge to the National Executive Council, the Union's governing body, which consists of the three national officers as well as the National Vice-Presidents for the twelve AFGE districts. See Compl., ¶ 3. (Plaintiff did not participate in the NEC's deliberations as he was the accused.) Cox promptly informed Hudson of the Committee's decision and called a special meeting of the NEC for August 8, 2017, to vote on the referred charges. See Compl., Exh. 13 (July 19, 2017, Letter from Cox to NEC). The NEC adopted the Committee's report, deliberated, and found Hudson guilty by a vote of 12 to 1 (Cox and Hudson did not vote). See ECF No. 8-1 (August 8 NEC Transcript) at 52-54, 70-72, 82-84. By the same margin, it then voted to remove him from his position as NST but did not restrict his union-membership rights. Id. at 94-96. The NEC has not released a written explanation of the decision. Hudson has appealed the ruling to the National Convention, which will take place in August 2018.

On September 12, 2017, Plaintiff then filed this suit, alleging four ways in which his discharge violated the Labor-Management Reporting and Disclosure Act (LMRDA). First, he asserted a claim under Section 101(a)(5) of the Act, which safeguards union members against improper disciplinary actions, for a denial of a full and fair hearing. Plaintiff next claimed that AFGE had improperly retaliated against him for exercising free-speech rights guaranteed in Section 101(a)(2). Count III also alleged unlawful retaliation, but was premised on Section 609, which prohibits unions from disciplining members for exercising their LMRDA rights. Hudson's last count invoked Section 301, which allows a union to sue or be sued for certain breaches of contract. Hudson therein alleged that Defendant had violated several provisions of the AFGE Constitution and the COI Manual.

Five days after filing the Complaint, Plaintiff filed a Motion for Preliminary Injunction, asking the Court to order Defendant to reinstate him as NST, process the charges anew, conduct a new hearing without the allegedly biased NEC members, and pay monetary damages. See ECF No. 4. After a hearing, the Court granted Hudson's Motion in a written Opinion. See Hudson v. Am. Fed. of Gov't Empls., 2017 WL 5449806 (D.D.C. Nov. 9, 2017). The Opinion began and ended with Hudson's first count, which alleged that he had been denied a full and fair hearing. Based on the "historical animosity" between Hudson and a member of the COI, the Court concluded that "a reasonable jury would likely find that [the COI member] was biased against Hudson, precluding him from receiving a full and fair hearing." Id. at *7. Along with this likely success on the merits, the Court also found that Hudson had satisfied the other three preliminary-injunction factors — i.e., irreparable harm to him, balance of the equities, and the public interest. Having determined that Plaintiff was entitled to a preliminary injunction based on Count I, the Court reinstated him without addressing the other three causes of action. Id. at *5. AFGE, as a

result, began to reprocess the charges and has called a Special National Executive Council meeting for February 6, 2018, to take action on the new Committee of Investigation Report. See ECF No. 32 (Motion to Stay Briefing), ¶¶ 3-4.

AFGE meanwhile filed this Motion to Dismiss, asserting both that the Court does not have subject-matter jurisdiction and that the Complaint fails to state a claim. See ECF No. 21. As to Count I, Defendant argued that the full-and-fair-hearing provisions of LMRDA § 101(a)(5) do not apply to a union officer's removal from office so long as his membership rights remain intact. AFGE made the same case against Count III. In his Opposition, Plaintiff agreed as to both. See ECF No. 22 (Opposition to Motion to Dismiss) at 17-18. Because the Court had relied entirely on Count I in its Opinion granting the injunction, this concession led it to vacate that injunction and accompanying Opinion. See Minute Order of Jan. 12, 2018. Given Plaintiff's withdrawal of Counts I and III, the Court here addresses only the remaining two counts below.

## II.  Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant [P]laintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005). The pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347

6

(2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact. Sparrow, 216 F.3d at 1113.

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). The Court need not accept as true, then, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)). For a plaintiff to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

The standard to survive a motion to dismiss under Rule 12(b)(1) is less forgiving. Under this Rule, Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear his claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). A court also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)). Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253;

7

see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005).

**III.    Analysis**

AFGE now seeks dismissal of the remaining two counts — Count II, alleging that the Union removed Hudson in retaliation for exercising his free-speech rights protected under the LMRDA, and Count IV, alleging that Defendant's removal decision breached its contract with Hudson by violating the AFGE Constitution and the COI Manual. The Court takes each count in turn.

A.  Count II

Section 101 of the LMRDA includes a bill of rights, which, *inter alia*, protects every union member's "right to . . . express any views, arguments, or opinions," 29 U.S.C. § 411(a)(2), so long as the speech does not run afoul of the union's "reasonable rules and regulations." Id. § 411(a)(1). While the parties may have stipulated that § 101(a)(5)'s procedural protections are not applicable to a removed union officer whose membership rights remain intact, the case law is clear that Plaintiff's alleged "retaliatory removal state[s] a cause of action under § 102." Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 355 (1989) (removal of elected officer based on speech). As a result, while Count I does not go forward, Count II is not similarly prohibited. AFGE admits that Plaintiff "ha[d] the right to express his views and opinions" but argues that he did "not have a right to do so in a manner that violates AFGE policies." MTD at 22. According to Defendant, therefore, Hudson was removed for his "conduct," not his words. Id. At this juncture, the Court cannot agree.

In enacting § 101(a), Congress sought to provide "general protection [for] union members who spoke out against the union leadership," United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski, 457 U.S. 102, 109 (1982), allowing them to "say what they think, or perhaps

8

discuss what should be done to straighten out union affairs . . . without being punished for doing it." Id. (quoting 105 Cong. Rec. 6477 (1959) (Statement of Sen. McClellan)). The LMRDA's bill of rights is not boundless, however; a union may adopt "reasonable rules and regulations" limiting members' freedom of speech and assembly. See 29 U.S.C. § 411(a)(2). While the bill of rights was "intended . . . to restate a principal First Amendment value — the right to speak one's mind without fear of reprisal[—] . . . there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical to the scope of the First Amendment." Sadlowski, 457 U.S. at 111. Unlike government regulations, which must be narrowly tailored, "[u]nion rules . . . are valid under § 101(a)(2) so long as they are reasonable." Id.

Both sides agree that Hudson had the right to express his views on the incoming administration. See MTD at 22; Compl., ¶ 68. The only issue, then, is whether some "reasonable rule" limited that right. It is here that AFGE's argument falters. While Defendant asserts that "Plaintiff does not have a protected right to use AFGE's email system and AFGE resources to send a personal or political message," MTD at 22, the Court does not see (and in multiple briefs AFGE has not shown) where it has adopted such a rule. The only reasonable inference the Court can draw at this point, therefore, is that one does not exist. In its Reply, Defendant makes a passing reference to its insurance policy, which requires that the General Counsel's Office review certain AFGE publications, see Reply at 4, but that does not suffice here. First, courts frequently decline to consider arguments raised for the first time in a movant's reply. See, e.g., Herbert v. Nat'l Academy of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992). Even if the Court were to entertain this position, it still fails. AFGE has not connected this insurance policy to any promulgated rule, nor has it explained why an email would be considered a "publication" that necessitates GCO review.

9

Undeterred, AFGE next asserts that Count II "will soon be rendered entirely moot" because the Union is "now re-processing the internal disciplinary charges" with an unbiased panel. See MTD at 32. This Court certainly acknowledges that it may only decide live cases or controversies and that events may occur while a case is pending that wither a once-fresh suit. See Chafin v. Chafin, 568 U.S. 165, 172 (2013). "But a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" Id. (quoting Knox v. Serv. Empls., 567 U.S. 298, 307 (2012)). Even if the outcome of AFGE's second hearing somehow cures the defects that Hudson alleges in Count II, the Complaint's request for lost wages and damages means that he could still seek relief for alleged retaliation in the first hearing. See Compl., ¶ 99(b). In other words, were the Court to decide that AFGE's original hearing improperly disciplined Plaintiff for exercising his free-speech rights, Hudson could obtain a financial recovery. Count II thus survives.

B. Count IV

AFGE next attacks Count IV, an LMRDA breach-of-contract claim. Section 301 of the Act provides a federal cause of action for "violation of contracts" in certain circumstances. See 29 U.S.C. § 185(a). The Complaint alleges that, in removing Plaintiff from his elected position, AFGE breached two sections of both its Constitution and its Committee of Investigation Manual. In his Opposition, Hudson also argues that Defendant violated the "implicit premise that internal discipline proceedings be free of bias." Opp. at 16. The Court addresses each separately and ultimately finds them all lacking in merit.

1. *AFGE Constitution*

Article 23 of the AFGE Constitution provides certain procedural rights for accused Union members, including the right to a hearing transcript and a written decision. See AFGE

Constitution, Art. 23, §§ 5, 8. The Complaint alleges that AFGE violated the Constitution by not delivering either of these to Hudson. See Compl., ¶¶ 84-98. As to the first, the Court notes that AFGE has since provided him with a transcript of the proceedings, see ECF No. 8, rendering that claim moot. As to his right to a written decision, AFGE argues that Article 23, which governs the processing of internal disciplinary charges for regular members and local officers, is inapplicable to Plaintiff's hearing process. As a national officer, the Union argues, the procedural protections available to Hudson are embodied in Article 13, not Article 23.

Courts defer to "an interpretation of a union constitution rendered by officials of a labor organization . . . unless the court finds that the interpretation was unreasonable or made in bad faith." Noble v. Sombrotto, 525 F.3d 1230, 1235 (D.C. Cir. 2008) (quoting Monzillo v. Biller, 735 F.2d 1456, 1458 (D.C. Cir. 1984)). In determining whether the union's construction is reasonable, courts can consider a wide variety of factors including "the rationale underlying the interpretation" and "avoidance of conflict between different provisions of the constitution." Laborers' Dist. Council v. Laborers' Int'l Union, 306 F. Supp. 2d 22, 26 (D.D.C. 2004) (citation omitted). Here, the Court finds that AFGE's interpretation is reasonable.

First, Article 13 states that "[a]ny officer of the Federation may have a charge filed against him or her for violations of Article 23." AFGE Const., Art. 13, § 7. It then goes on to outline how charges against such officers should be processed. Id., §§ 7(a)-(d). Article 23, by contrast, plainly states that its "due process provisions . . . shall govern at the council level when a council officer is charged and tried in his or her capacity as a council officer." Id., Art. 23, § 1. Implicit in that statement is that any due-process provisions of Article 23 do not attach to charges against national officers like Hudson. Reading these two articles together, AFGE's interpretation — namely that Article 23 details only the offenses for which a national officer can be accused,

11

but the actual hearing process for national officers is fully embodied in Article 13 — is reasonable and entitled to deference.

Second, Articles 13 and 23 detail similar, but not identical, charge procedures. For example, charges filed against a national officer "must be filed in writing with the National President and a copy thereof served by registered mail or personal service upon the officer charged." AFGE Const., Art. 13, § 7(a). Article 23, by contrast, requires a member to file written charges "with the local of which the accused is a member" and serve them "upon the accused by registered or certified mail at his or her last known address[,] and the local of which the accused is a member also shall be served at its office or address of its highest ranking officer." Id., Art. 23, § 3. If Article 23 applied *in toto* to charges against national officers, it would make little sense for each article to have its own slightly different service provision. The Court thus finds that AFGE's interpretation should be credited, and, as Plaintiff does not suggest this interpretation is made in bad faith, the only procedural protections he can rely on are those contained in Article 13. Because the right to a written decision does not appear there, the Constitution does not support his breach-of-contract claim.

### 2. *Committee of Investigation Manual*

Count IV's second set of claims alleges violations of the Committee of Investigation Guidelines and Procedures Manual, a document prepared by AFGE's GCO and provided to members who have been appointed to a Committee of Investigation. See COI Manual at 1. Defendant responds that (1) the Manual is not a "contract" within the meaning of 29 U.S.C. § 185; (2) even if it were, it does not apply to Article 13 proceedings; and (3) even if it did apply, Hudson does not allege any violation of the Manual. The Court, finding the first argument persuasive, goes no further.

12

Section 301 does not provide a right of action every time a union breaks a promise to its members. It protects only those contracts that are "fundamental agreement[s] of association," United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. v. Local 334, 452 U.S. 615, 619 (1981) (citation omitted), under which both the union and its members are bound by certain terms. See Drywall Tapers & Pointers, Local 1974 v. Operative Plasterers', 537 F.2d 669, 673 (2d Cir. 1976) (§ 301 encompasses negotiated "agreement[s] of definite content") (collecting cases). These documents typically include a union's collective-bargaining agreement and constitution. See United Ass'n of Journeymen, 452 U.S. at 623-24. Courts have also included found jurisdiction based on a breach of a union's bylaws, which are "analogous to specific contract terms or to an addendum adding terms to the original contract." Gable v. Local Union No. 387 Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers, 695 F. Supp. 1174, 1177 (N.D. Ga. 1988). When considering whether a union document is included within the "contract" protected by Section 301, then, the Court assesses the extent to which it "prescribe[s] the legal relationship and the rights and obligations between" the parties and evinces a negotiated agreement. United Ass'n of Journeymen, 452 U.S. at 624; Capitol-Husting Co. v. NLRB, 671 F.2d 237, 242 (7th Cir. 1982).

The Manual fails this test in both content and form. First, it does not add any rights or obligations separate and apart from the Union's Constitution and bylaws, but merely "explains AFGE's disciplinary procedures, the operation of the committee, and [the] responsibilities as a member of the committee." COI Manual at 1; see United Ass'n of Journeymen, 452 U.S. at 624; Local Union No. 657 of United Bhd. of Carpenters & Joiners v. Sidell, 552 F.2d 1250, 1253 n.6 (7th Cir. 1977) (Section 301 jurisdiction is limited "to the situation where there is a written constitutional document creating rights and duties between two labor organizations"). Second,

13

unlike a constitution or bylaws, which are agreements between the union and its members that can be amended by majority vote, AFGE unilaterally "developed" the Manual as a "guide." COI Manual at 1; see Sidell, 552 F.2d at 1253 n.6 ("Where the claimed right is founded only on a claimed intra-union custom, jurisdiction should not be asserted."); Local Union No. 115, United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. v. Townsend & Bottum, Inc., 383 F. Supp. 1339, 1343 (W.D. Pa. 1974) (Section 301 "covers any agreement, written or unwritten, formal or informal, which purports to resolve employment controversies"). Hudson's complaints regarding departures from the Manual, then, are also not actionable.

### 3. *Fair Hearing*

Plaintiff's final § 301 claim — that he was not afforded a "fair and thorough trial of the charges" — has a basis in both the AFGE Constitution and in Article 13. See Opp. at 16 (quoting AFGE Const. Art. 13, § 7(c)). Unfortunately for Hudson, that claim does not appear in Count IV of his Complaint. While that pleading certainly alleges bias and a violation of his rights to a fair hearing, those claims appear only in Count I, which Plaintiff has since withdrawn. See Compl., ¶¶ 59-63 (alleging various ways in which "NST Hudson was denied 'a full and fair hearing'"). Count IV, by contrast, includes only the four grievances addressed above. A complaint may incorporate by reference allegations in prior counts, see Fed. R. Civ. P. 10(c), but, as Hudson withdrew Count I, those assertions can no longer support Count IV.

Plaintiff is, of course, free to seek leave to replead Count IV as part of an amended complaint and to include his full-and-fair-hearing allegations, but he should be aware of a potential jurisdictional obstacle not raised in the briefing. Count IV is premised on Section 301 of the LMRDA, which provides jurisdiction for "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . or between any such labor

14

organizations." 29 U.S.C. § 185(a). On a literal reading of the statute, Hudson seems out of luck as he is neither an employer nor a labor organization. His Opposition merely concludes that "[i]ndividual members have standing to sue for breach of that contract." Opp. at 14 (citing Wooddell v. Elec. Workers (IBEW), 502 U.S. 93, 98-103 (1991)). Wooddell, however, was a suit by an individual union member against a local union alleging a breach of the international union's constitution by the local union. Id. at 98-99. The Supreme Court concluded it had jurisdiction under § 301 because the plaintiff had "charged a violation of a contract between two unions." Id. at 100. Hudson, by contrast, only alleges that the Union breached a contract with him. Section 301 jurisdiction may well not extend that far. Id. at 98 n.3 (noting that "a union member may sue his union for a violation of the union constitution . . . only if it is charged that the breach alleged violates a contract between two labor organizations"); see Korzen v. Local Union 705, Int'l Bhd. of Teamsters, 75 F.3d 285, 288 (7th Cir. 1996) ("A suit on a contract between a labor organization and a member is not within the scope of section 301."). In any event, as it stands now, Count IV must be dismissed for failure to state a claim.

## IV. Conclusion

For the foregoing reasons the Court will grant Defendant's Motion to Dismiss as to Counts I, III, and IV. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: February 5, 2018