**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

**EUGENE HUDSON, Jr.,**

   **Plaintiff**

                **Civil Action No.: 1:17-1867(JEB)**
 **v.**                **Judge James E. Boasberg**

**AMERICAN FEDERATION OF**
**GOVERNMENT EMPLOYEES,**

   **Defendant**

## FIRST AMENDED COMPLAINT

Plaintiff Eugene Hudson, Jr., by and through his undersigned counsel, files this First Amended Complaint alleging that the American Federation of Government Employees violated rights protected by the Labor-Management Reporting and Disclosure Act ("LMRDA") and the AFGE Constitution.

## PARTIES

1. Plaintiff Eugene Hudson, Jr., is a member in good standing of the American Federation of Government Employees ("AFGE"). Mr. Hudson resides at 12723 Parkton Street, Fort Washington, MD 20744.

2. Defendant American Federation of Government Employees ("AFGE" or "Federation") is a labor organization within the meaning of 29 U.S.C. §402(i) and 29 U.S.C. §185. AFGE maintains its principal office at 80 F Street N.W., Washington, DC 20001. AFGE is a national labor organization with approximately 1034 affiliated Local Unions.

3.      AFGE's National Executive Council is composed of the National President, the National Secretary-Treasurer, the National Vice President for Women and Fair Practices, and the National Vice Presidents for the various AFGE Districts.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, 29 U.S.C. §412, and 29 U.S.C. §185.

5.      This Court has pendent jurisdiction over this matter pursuant to D.C. Code §11-921.

6.      This Court has venue over this matter pursuant to 28 U.S.C. §1391(b)(1), 29 U.S.C. §412, and 29 U.S.C. §185(c) because Defendant AFGE maintains its principal office in the District of Columbia and the alleged violation occurred in the District of Columbia.

## FACTS

A.      **Pre-August 2016**

7.      Plaintiff Hudson was elected National Secretary-Treasurer of AFGE at its 2012 and 2015 Conventions for three year terms.

8.      The next AFGE Convention is scheduled to be held in August 2018.  Delegates to the 2018 Convention will elect a National President, a National Secretary-Treasurer, and the National Vice-President for Women and Fair Practices.

9.      On September 17, 2014, NST Hudson notified NVP George McCubbin that he had failed to submit explanations for numerous credit card vouchers. [First Amended Complaint ("FAC") Exhibit 1].

10.      On November 25, 2015, NVP Swanke filed a charge alleging that NST Hudson had committed conduct "unbecoming a union member."  On February 6, 2016, the Committee

2

recommended dismissing the charge, finding both that NST Hudson's remarks were protected by the free speech provision in the LMRDA and that the evidence presented did not support the charge. The Committee that investigated noted the "historical animosity between" the local councils (for which Swanke is the NVP) and Hudson.  On June 27, 2016, National President Cox dismissed NVP Swanke's charge. [FAC Exhibit 2; ECF Doc. 13 at 12].

11.     On June 15, 2016, NST Hudson's office questioned vouchers submitted by NVP Eric Bunn.  [FAC Exhibit 3].

12.     On July 5, 2016, NST Hudson informed the NEC of his dispute with NVP McCubbin concerning additional unvouchered credit card charges. [FAC Exhibit 4].

13.     On July 5, 2016, NST Hudson informed the NEC of his dispute with NVP Everett Kelley concerning his first class travel to meetings and his vouchers for gift expenses. [FAC Exhibit 5].

14.     The disputes over NVP Kelley's and NVP Bunn's vouchers created or exacerbated friction between NVP Kelley, NVP Eric Bunn, and NST Hudson.

15.     National President Cox convened an NEC Retreat on July 8, 2016 which turned into a discussion of objections to NST Hudson's investigation and an informal charge against him.  NST Hudson submitted an extensive memorandum to the NEC explaining his questions about expenses on the vouchers.  The charge against him was rescinded and he received the information needed for the gift expenses.  Nevertheless, on August 4, National President Cox issued a memorandum announcing that he would be the "authorized approver for all National Executive Council (NEC) members' vouchers except for the National President's vouchers."   NST Hudson's financial

responsibility was limited to signing checks authorized by the National President. [FAC Exhibit 6 at 7-8].[1]

16.     On July 29, 2016, NST Hudson sent a memorandum to NVP Kelley, questioning his vouchers listing the purchase of a $200 pen and meals for the wives of NVP Kelley and NVP Bunn. [FAC Exhibit 7].

**B.     August 2016 to August 2017**

17.     On August 19, 2016, NST Hudson declared that he would be a candidate for National office at the 2018 Convention, but did not specify which position he would seek. [FAC Exhibit 6 at 9-10].

18.     Article VIII, Section 2(b) of the AFGE Constitution provides as follows:

All declared candidates for national offices covered by this Part will be provided upon timely request the following information:
(1)     A complete list of the names, business, and home addresses and business telephone numbers of the presidents, treasurers, and delegate(s) of each local participating in the election for which the candidacy has been declared.
(2)     One set of mailing labels for the presidents, treasurers, and delegate(s) covered by subsection (1) above.
Additional sets will be supplied each candidate upon written request.  Each candidate shall be charged for each additional set on an actual cost basis.

[FAC Exhibit 8 at 16].  Appendix A provides that the labels are provided to candidates by the National Secretary-Treasurer.  [FAC Exhibit 8 at 96-97].  The Constitution did not provide any alternative when the National Secretary-Treasurer announces his own candidacy.

---

[1]FAC Exhibit 6 is a true and correct copy of the administrative file prepared by the Committee of Investigation and submitted to the National Executive Council on February 6, 2018. Bates numbering was added by counsel for Mr. Hudson.  Certain email addresses have been redacted at the request of AFGE's counsel.

4

19.     As a declared candidate, NST Hudson properly obtained one free set of mailing labels from AFGE.  The numbering on the set of labels indicates the source of the labels and the recipient of the set of labels.

20.     NST Hudson had no access to AFGE mailing labels except through the candidate protocol.  There is absolutely no evidence that he obtained the mailing labels in any improper manner.

21.     On August 23, 2016, NST Hudson drafted a letter announcing his candidacy.  The announcement letter stated that he had challenged expense accounts submitted by National Vice Presidents, that the National Vice Presidents had challenged his authority and had filed an informal charge against him, and that the charge had been withdrawn, but that the authority of the National Secretary-Treasurer to review expense vouchers had been removed.  He asserted that if elected he would seek to strengthen the Office of the National Secretary-Treasurer so that it could review Federation expenditures and challenge expenditures not in the interest of the membership.  [FAC Exhibit 6 at 7-8].

22.     NST Hudson mailed this letter on August 26, 2016 using the free set of address labels provided by AFGE.  A sample copy of the envelope used to send the letter is attached as FAC Exhibit 6 at 13, although the postmark date is unclear.  A more legible envelope is attached as FAC Exhibit 6 at 67.  Both envelopes use AFGE mailing labels.

23.     NST Hudson subsequently purchased a set of mailing labels.  On October 3, 2016, NST Hudson used thos set of labels to mail a postcard.  The postcard asserted that certain national officers had abused the AFGE credit card by using it for spousal expenses, for improper gifts such

as jewelry and Coach brand purses, and for unnecessary expenditures such as a $200 pen. [FAC Exhibit 6 at 11-12].

24.     The October 3 postcard and the August 26 letter have the same AFGE-supplied mailing label. [FAC Exhibit 6 at 12, 13, 67].

25.     During the 2016 election for President and Vice President of the United States, AFGE endorsed Hilary Clinton and Timothy Kaine, the Democratic candidates.   Nevertheless, on November 7, 2016, Donald Trump and Michael Pence were elected.

26.     On November 11, 2016, National Vice President George McCubbin sent the following email to members of the NEC:

> In light of what occurred this past Tuesday, I believe we need to hold an emergency meeting to discuss and/or brainstorm how we are going to proceed as a Union when the attacks start especially as it pertains to dues deductions, official time, collective bargaining etc.  I received an email from my Executive Director from the CA Labor federation that he is returning form [*sic*] the AFL-CIO after meeting with the leaders there and he will send out another email to us with more detail.  Do we know if AFGE was represented at this meeting?  I know a lot of us attended the VA National Convention so did we have staff there?  Many of our members will be asking these same questions and we need to be ahead of the curve as leaders of this federation.  Collectively we need to find out these answers and put together a "what if" game plan.  Maybe next weekend which is the weekend before Thanksgiving.  Or the weekend after Thanksgiving.
>
> Also, I think we need to clear the air on this Eugene thing regarding him putting out two mailers and a website regarding our expenditures to the federation and possibly out to mainstream America.  With the current leadership that is going to take place come January, now is not the time to have this in-house feud and we need to stop this for our membership and for our federation.  I don't like it and its causing some major problems that should be kept in-house.
>
> This is strictly my opinion but I believe everyone knows where I am with this.

[FAC Exhibit 6 at 75-76].

27.     Despite this request, National President Cox and the NEC took no action concerning the election of Donald Trump.

28.     NST Hudson believed that the incoming Trump Administration would be harmful to AFGE and to the labor movement as a whole.

29.     The Office of the National Secretary-Treasurer had two ways to communicate with Local Union officers: (1) the NST ADVISOR, a quarterly publication, and (2) a database of email addresses which the Office routinely used to communicate with Local Officers concerning changes in government policy affecting Union financial reporting and training.

30.     NST Hudson believes that as NST and as a member of the NEC he was authorized to make suggestions to Local Union officers about matters of concern to the Federation.

31.     NST Hudson drafted a statement containing his personal views of what AFGE should do to defend itself.  The three-and-a-half-page email carried the subject line, "From the Desk of National Secretary-Treasurer Eugene Hudson, Jr.," and the body was entitled, "AFGE, the Trump administration, and the attack on the way."  It stated, in relevant part, as follows:

> For many of us, the results of the November 8th election were unexpected.  There remains much to analyze about the election ... [b]ut one thing is certain, the new administration and the Republican Congressional majority have a bull's eye planted on the backs of federal workers and the unions that represent them.  The question is whether we are ready for this assault. ...

> Is AFGE prepared for this? [AFGE] President Cox has spoken up on this and has reminded us all of some of the efforts that have been undertaken under the banner of "Too Big to Fail."  Such efforts are important to support, though I will suggest that we need to completely rethink the battlefield terrain on which we have been operating. ...

> The Trump administration, and their allies in Congress, will claim that they have a "mandate" to reconstruct the federal government and workforce.  Our response

should be "mandate my…"   There is no mandate.   Trump did not even get the majority of the popular vote!

The email then lists four items for consideration: 1) "Recognize that we must fight; we have no choice"; 2) "Rethink the way that we operate as an organization"; 3) "We need to build our support within the larger community"; and 4) "[T]his is a time for AFGE to join with other unions operating in the federal sector in coordinated responses to the attacks." [FAC Exhibit 6 at 14-17; ECF Doc.13 at 2-3].

32.     On November 15, 2016, approximately a week after the presidential election, NST Hudson directed his subordinate Willie Hope to send the statement as an email attachment using the Office's email database. [FAC Exhibit 6 at 14-17 and 18-29].

33.     The email rankled several Union officials, including AFGE's General Counsel David Borer. General Counsel Borer sent a memorandum to Union President Cox on November 22, 2016 regarding potential legal implications of the email.   The email, however, had already attracted the attention of several Union officials, including President David Cox, NVP Gerald Swanke, and General Counsel David Borer.   President Cox was concerned that the email might constitute a "Hatch Act Violation and bring harm to AFGE and our members." NVP Swanke thought it "outrageous" that an AFGE policy statement would "be sent out to the membership without knowledge and consent of the [National Executive Council]."   General Counsel Borer issued a memorandum which noted possible liability under the Hatch Act, which restricts the political activity of certain federal employees.   General Counsel Borer also suggested that NST Hudson may have misappropriated Union resources by using its assets "(the email list, staff time, AFGE email, and AFGE equipment)," and also potentially exposed it to liability because AFGE annually certifies to

8

its insurance carrier that its General Counsel's Office reviews all publications. He also suggested that the AFGE Constitution be amended at the 2018 Convention to require candidates for AFGE office to file declarations of candidacy with the Office of the General Counsel to control candidate rights provided in Appendix A of the AFGE Constitution. [FAC Exhibit 6 at 68-74; ECF Doc. 34 at 3; ECF Doc. 6-3].

34.     On November 21, NST Hudson advised General Counsel Borer that

> The email blast sent last Tuesday from Willie Hope's email regarding my statement about my position on President Elect- Donald Trump was sent at my directive. It is common practice for Willie Hope to send blasts to the officers on my behalf using the same email contact listing.

[FAC Exhibit 6 at 32].

35.     Mr. Hope "assumed [the email] was of the same nature of what he would normally send out concerning Finances or Training." [FAC Exhibit 6 at 57].

36.     Mr. Hope sent the email to several hundred AFGE officers and members. Mr. Hope regularly used that list to send emails to AFGE officers and members at either their federal government email addresses or their personal email addresses. [FAC Exhibit 6 at 18-29, 57].

37.     The November 15 email was not part of NST Hudson's campaign for AFGE office. It was valid commentary on public affairs involving AFGE as an entity and AFGE's members.

38.     In early December 2016, NST Hudson announced that he would be a candidate for the position of National President, the position currently held by National President J. David Cox.

39.     On or about December 21, 2016, National Vice President Keith Hill filed an internal charge alleging that NST Hudson had committed three violations of Article XXIII of the AFGE Constitution ("Charge"). [FAC Exhibit 6 at 5-6]. The Charge stated as follows:

On, or about, September 10, 2016 NST Eugene Hudson, Jr. composed and distributed a letter to the majority of, if not all, AFGE Local Presidents and Treasurers, by utilizing AFGE's mailing lists (employer resources). While this mailing may have been completed under the pretext of campaign literature, Mr. Hudson failed to announce candidacy for a specific office. Therefore, this constitutes a violation of AFGE policy and practice.

This letter, and its content, may be protected activity, as the exercise of free speech. However, the timing of his allegations, under the supposed guise of a personal political campaign, placed the entire organization in jeopardy. By publicizing his critique during a vital presidential and congressional election, he has committed an offense against the Federation per AFGE's National Constitution, Article 23, Section 2(e) (Engaging In conduct unbecoming a union member).

When Mr. Hudson distributed similar accusations on a post card, utilizing the same mailing 1ist, he violated the same policies and practices, and placed AFGE in extreme Jeopardy during a federal election. By distributing this information without the protection of a sealed envelope, he made the Information and accusations available to management officials. This constitutes an Offense against the Federation per AFGE's National Constitution, Article 23, Section 2(d) (Making known the business of any affiliate of the Federation to management officials of any agency or other persons not entitled to such knowledge). Furthermore, his public disclosure of sensitive and unfounded financial Improprieties constitutes a direct violation of his fiduciary responsibility as National Secretary Treasurer.

This same Information, and disregard for Internal security, is publicly continuing at his website found at www.hudsondeliverstruth.com. The site is fully accessible to all. The potential consequences of this information (regardless of its inaccuracy) reaching certain entitles, is absolutely devastating.

While speech may be protected, Mr. Hudson's chosen methods of delivery; his compromising the integrity of certain information; and his exploitation of volatile information that places AFGE in a vulnerable position during a federal election (one that will undoubtedly affect the future of our entire Federation); constitutes conduct unbecoming a union member.

Next, Mr. Hudson's e-mail on Donald Trump is a supreme case of multiple violations. Mr. Hudson has personally declared, for the record, this communication to be his own, and to be a "personal" statement. However, the record is also clear that he assigned (or ordered) a staff person to send the document. This assignment is a violation of the ethical conduct requirements for all NEC members. and has placed the staff person, himself, in the potential position of receiving disciplinary action from AFGE. Also, this email, as opined by AFGE GCO, has violated the Hatch Act, and

exposed AFGE to certain civil and/or administrative liability of unknown financial and disciplinary consequence.  Doing so as NST violates the fiduciary responsibility of any national officer, certainly as the Chief Financial officer for AFGE.  In addition, the use of AFGE's e-mail directories for personal use is a violation of the policies on official use of AFGE resources.  And finally, the making of a policy statement to our membership, without NEC consultation is unacceptable.

Finally, at the recent 5th District PORT training, Mr. Hudson referred to a tenured and respected AFGE staff person as the 'Nigerian Nightmare." This racial insult spoken to a full room of AFGE leaders is abhorrent; is In violation of AFGE's anti-discrimination policies: and is wholly unacceptable. As such, this embarrassing act, by the 2nd highest ranking leader in AFGE, has triggered an EEO complaint, likely to be found valid, and exposes AFGE to substantial financial liability. This is a clear specific violation of Article 23 section 2(f). As does the entirety of this charge letter.

40.     The AFGE Constitution ("Constitution") governs the processing of internal charges against AFGE officers.  Article XIII, Section 7(b) of the Constitution requires the National President to appoint a committee of investigation consisting of three members in good standing, only one of whom may be a national officer.  "The committee of investigation shall investigate the charges by initially interviewing orally or in writing each complainant, the officer charged, and such other persons as it deems necessary to determine if good and sufficient grounds exist for the charge and whether or not material facts concerning the charge are in dispute." [FAC Exhibit 8 at 39-40].

41.     Article XIII, Section 7(b) further sets forth the Committee's function:

If the committee of investigation determines that:
(1)     Good and sufficient grounds for a charge do not exist, it shall refer the charge to the NEC with a recommendation that it be dismissed;
(2)     Good and sufficient grounds for a charge exist, but that no material facts are in dispute, it shall refer the charge to the NEC for decision on the basis of the investigative file; and
(3)     There are material facts in dispute, it shall refer the charge to a trial committee.

[FAC Exhibit 8 at 40].

42.     The Legal Rights Committee appointed a Committee of Investigation ("Committee")

on February 7, 2017 composed of NVP Gerald Swanke, Alma Lee, and Gabrielle Martin.

43.     On July 3, 2017, NST Hudson responded to the Committee's questions and requested

that NVP Swanke recuse himself from the Committee because NVP Swanke had previously filed

charges against him and could not act impartially.  In his letter, NST Hudson acknowledged that he

had directed Willie Hope to send the Trump email and explained why he had sent the email. [FAC

Exhibit 9].

44.     The Committee met in San Diego on July 10 to consider the charges against NST

Hudson.  The Committee concluded that NVP Swanke's recusal was "unnecessary if committee

makes unanimous decision." NVP Swanke participated in the Committee's discussion of the charges.

[FAC Exhibit 10].

45.     On July 10, the Committee issued its report recommending the dismissal of two of the

charges against NST Hudson:

> In the specific issue of numerous first amendment allegations of NST Hudson:
> The original charge letter from NVP Hill cites several examples of personal opinions
> communicated by NST Hudson to various AFGE members regarding allegations of
> misuse of union property and reimbursement of charges by officers of AFGE.  These
> communications were by letter, postcard, and posted on a personal website.
>
> The Committee finds these actions and conduct to be within the protection of the first
> amendment of the US Constitution and the LMRDA which reads in part-
> Every member of any labor organization shall have the right to meet and assemble
> freely with other members; and to express any views, arguments, or opinions;
>
> In the specific issue of allegations concerning NST Hudson at the PORT training:
> There is an outstanding allegation made by AFGE staff that is currently before the
> EEOC.  The committee finds NEC policy requires third party agency appeal must
> assert a finding or dismiss the case prior to proper investigation by this committee

[FAC Exhibit 11].[2]

46.     With regard to the charge involving the November 15, 2016 email, the Committee

found that "probable cause exists for the specific charge of malfeasance of office." [FAC Exhibit 11].

47.     However, the Committee report then quoted three provisions of Article XXIII, Section

2, only one of which mentioned "malfeasance":

(f)     Engaging in gross neglect of duty or conduct constituting misfeasance or
        malfeasance in office as an officer or representative of a local.  The conflict
        resolution program is not available after the committee of investigation has
        preferred charges;

(g)     Incompetence, negligence, or insubordination in the performance of official
        duties by officers or representatives of a local or council or failure or refusal
        to perform duties validly assigned;

(h)     Committing any act of fraud, embezzlement, mismanagement, or
        appropriating to one's own use any money, property, or thing of value
        belonging to the Federation or any affiliate.  The conflict resolution program
        is not available after the committee of investigation has preferred charges;

[FAC Exhibit 11].

48.     On July 19, NP Cox transmitted the Committee report to NST Hudson.  NP Cox wrote

that the Committee

found that your actions violated Article XXIII, Sections 2(f) (engaging in gross neglect
of duty or conduct engaging in gross neglect of duty or conduct), (g) (incompetence,
negligence, or insubordination in the performance of official duties by officers or
representatives of a local or council or failure or refusal to perform duties validly
assigned), and (h) (committing an act of fraud, embezzlement, mismanagement, or
appropriating to one's own use any money, property, or thing of value belonging to the
Federation or any affiliate).

Because the Committee found that no facts were disputed, NP Cox scheduled an NEC meeting for

August 8 to address the charge and report. [FAC Exhibit 12].

---

[2]The EEOC complaint was dismissed by the Superior Court of the District of Columbia.
AFGE counsel Gony Frieder Goldberg explained that the alleged misconduct was actually praise of
the complainant, not discrimination. [FAC Exhibit 21].

49.     Also on July 19, NP Cox notified the NEC that the hearing would be conducted on August 8, 2017. [FAC Exhibit 13].

50.     On July 28, 2017 NST Hudson submitted a Position Statement to the NEC. [FAC Exhibit 14].

51.     NST Hudson stated that several members of the NEC were biased and should recuse themselves if the NEC were to be impartial:

> I request that several NEC Members recuse themselves from participating in the deliberation of this case.  General Counsel Borer's November 22, 2016 Memorandum discussing my November 15 email repeatedly acknowledges that I am a candidate for office.  It is no secret that I plan to oppose President Cox.  In response, President Cox has repeatedly criticized my activities.  He should recuse himself.

> As National Secretary-Treasurer, I have criticized the expense accounts of NVP Everett Kelley and NVP Eric Bunn for charging to the Union a trip to the Virgin Islands and gifts to AFGE staff and others.  I have criticized NVP George McCubbin for failing to file timely expense reports.  As a result of my criticism, President Cox removed my authority to review expense accounts.  I do not believe that NVP Kelley, NVP Bunn, and NVP McCubbin can be impartial in their deliberations of this case.

> If there is any dispute about these matters, I will be happy to submit hundreds of pages of documents supporting my financial concerns and the hostile response from the officers I criticized.

> I believe that an impartial panel will dismiss the charge against me.  But certain members of the NEC are not likely to be impartial.

[FAC Exhibit 14 at 4-5].

52.     NST Hudson's Position Statement challenged NP Cox's determination that the Committee had found probable cause that NST Hudson had violated three provisions of Article XXIII, Section 2:

> The Committee's Report is confusing. The Report stated that "The Committee finds probable cause exists for the specific charge of malfeasance of office."  The

Committee, however, cited to three provisions in Article XXIII, Section 2 of the AFGE Constitution.  These three provisions are:

(f)     Engaging in gross neglect of duty or conduct constituting misfeasance or **malfeasance** in office as an officer or representative of a local.  ...;

(g)     Incompetence, negligence, or insubordination in the performance of official duties by officers or representatives of a local or council or failure or refusal to perform duties validly assigned; and/or

(h)     Committing any act of fraud, embezzlement, mismanagement, or appropriating to one's own use any money, property, or thing of value belonging to the Federation or any affiliate.  ...

[emphasis supplied].  The Committee's limited finding implicitly, if not explicitly, rejected any argument that I violated Section 2(g) or 2(h).

Because the Committee's finding of probable cause was limited to malfeasance, the references to Section 2(g) and 2(h) are irrelevant.  Equally irrelevant is the portion of National President Cox's July 19, 2017 letter stating that the Committee found that my actions violated Article XXIII, Sections 2(f), (g), and (h) of the AFGE Constitution.  President Cox cannot expand the Committee's limited finding of probable cause.

The NEC is limited to consideration of the malfeasance portion of Section 2(f).  Article XIII, Section 7(b)(3) allows referral to the NEC only where the Committee finds "Good and sufficient grounds for a charge ...."  Because the finding of probable cause was limited to malfeasance, the NEC is equally limited.

[FAC Exhibit 14 at 5-6].

53.     NST Hudson's counsel Justin Keating attended the August 8, 2017 hearing and spoke on his behalf.

54.     At the conclusion of the hearing, the NEC went into Executive Session.

55.     After a short period of deliberation, the NEC returned to the hearing and announced that it had found NST Hudson guilty and that the penalty would be discharge from office as the National Secretary-Treasurer.  The NEC did not restrict Mr. Hudson's rights as an AFGE member.

15

56.     After announcing the decision, a group of three National Vice Presidents escorted Mr. Hudson to his former office, watched silently as he packed his personal material, and escorted him from the AFGE building.

57.     The NEC has not issued an opinion explaining its decision or the penalty.

58.     ECF Doc. 8-1 is a copy of the transcript of the August 8, 2017 NEC Hearing, including both the presentations by NST Hudson and Mr. Keating and the Executive Session in which the NEC discussed the Charge and the degree of discipline for the violation.

59.     Mr. Hudson has appealed the "decision" to the 2018 Convention.

60.     On August 11, 2017, NP Cox sent an "Important Announcement" to AFGE members. The Announcement stated, in pertinent part, as follows:

> We want to inform you Eugene Hudson was removed from the office of National Secretary Treasurer by the National Executive Council (NEC) pursuant to Articles XIII and XXIII of the AFGE Constitution. The matter had first been referred to a Committee of Investigation which, after conducting its investigation, unanimously found that good and sufficient grounds for a charge existed, and that no facts were in dispute. The Committee of Investigation was appointed by the NEC Legal Rights Committee.
>
> In those circumstances, Article XIII, Sec. 7(b)(2) refers the matter to the NEC for a decision on the basis of the investigative file. In removing Mr. Hudson from office the NEC determined, under a requirement of a 2/3 majority vote, that he was guilty of offenses for violations of policies and regulations in connection with use of AFGE staff and email for campaign or personal purposes. We hope you understand that AFGE is not in a position to share more details at this time due to privacy and legal considerations.

[FAC Complaint Exhibit 15].

61.     AFGE conducted a series of meetings in Puerto Rico in mid-August 2017. Responding to membership disapproval of the NEC decision, on August 16, NVP Swanke distributed the following statement:

16

Hi Everyone.  I expect by now you have seen NP Cox s recent emails on the article 23 charges heard last week by the NEC.

Most of the charges recently filed against Mr. Hudson were dismissed as protected speech.  However, Mr. Hudson assigned a HQ staff person to send a personal email to hundreds of AFGE members.  At least 30 of those emails were sent to government email addresses.  The content of the message was a personal and partisan political message by Mr, Hudson.  Guilty charges were a finding of malfeasance, misfeasance, and conversion of AFGE resources to personal use.

NEC vote of 12-1 sustained guilt on 3 counts, and the NEC approved an appropriate remedy of removal of office for the duration of term for Mr. Hudson.

Certainly, the media and administration is likely to twist the facts of this story in unfavorable context. But here are the facts:

1. AFGE was exposed to certain liability of potential Hatch Act violations. We also exposed those on the recipient list to the same liability.

2. The use of staff and AFGE resources to express a personal political position cannot be tolerated.

3. For both reasons, AFGE had to take actions to demonstrate an administrative remedy.

[FAC Exhibit 16].

62.     NVP Swanke's leaflet and President Cox's mass email are the only "official" explanations for the NEC decision.

63.     . After the NEC dismissed NST Hudson, NVP Swanke accused NST Hudson of being "a Master Grifter that can blow $800k overbudget [*sic*] and accuse others of fiscal irresponsibility." [FAC Exhibit 17].

## C.     September 2017 to February 2018

64.     On September 12, 2017, Plaintiff Hudson filed a complaint alleging that his termination violated the Landrum-Griffin Act and the AFGE Constitution. [ECF Doc. 1].

17

65.     On September 17, 2017, Plaintiff Hudson filed a Motion for a Preliminary Injunction.

[ECF Doc. 4].

66.     On November 9, 2017, the Court issued a Preliminary Injunction requiring AFGE to

reinstate Mr. Hudson as National Secretary-Treasurer. [ECF Doc. 12].

67.     In its Memorandum, the Court stated as follows [ECF Doc. 13 at 11-13]:

the Committee of Investigation included three people, with Swanke as the chair. After deliberating, those three decided whether to refer charges to the NEC, which only had thirteen voting members for this case.  The Committee — and especially the chair — therefore had an immense amount of power over whether a member was ultimately disciplined.  Indeed, AFGE never contends in its papers that the NEC's rendering of the final verdict somehow purges the taint of Committee bias.

Plaintiff introduces three pieces of evidence to show Swanke's bias: (1) a previous charge Swanke filed against him; (2) a tweet where Swanke accused him of financial impropriety; and (3) the August 8 NEC-meeting transcript. While not crystal-clear evidence of partiality, the first two show a sufficient likelihood of bias such that injunctive relief is warranted.  ...

The instant *contretemps* is not the first between Swanke and Hudson.  In 2015, Swanke and another AFGE member filed a charge against Plaintiff, alleging that he had acted in a way unbecoming a union member while at a local meeting.  See Compl., Exh 8 (2016 COI Report) at 2.  The Committee that investigated that charge ultimately recommended that it be dismissed as baseless but noted the "historical animosity between" the local councils (for which Swanke is the NVP) and Hudson. Second, Plaintiff attached to his Complaint a tweet written by Swanke accusing Hudson of being a "Master Grifter that can blow $800k overbudget [*sic*] and accuse others of fiscal irresponsibility." Compl., Exh. 21.  As AFGE noted at argument, this tweet was sent after the Committee investigation, but the Court finds it is still probative of bias.  The Court also finds it telling that AFGE did not rebut any of Plaintiff's claims regarding Swanke's bias in its Opposition.  Based on the undisputed evidence here, a reasonable jury would likely find that Swanke was biased against Hudson, precluding him from receiving a full and fair hearing.

In so concluding, the Court believes that the Committee's small size and Swanke's position are compelling factors.  Having Swanke chair the three-member Committee — particularly in light of Hudson's request for recusal — created "circumstances that could create a significant risk of actual bias."  ...

68.     Pursuant to the Court's Order, AFGE reinstated Mr. Hudson as National Secretary-Treasurer on or about November 14, 2017.

69.     AFGE decided to reprocess the Hill Charge and announced that a new decision would be expected by January 2, 2018.

70.     In a related case, AFGE conceded that "this stated ground for vacatur does not undermine the validity of the factual recitation in the Memorandum Opinion, which rests on facts that the Court noted were 'largely undisputed.'" *Hudson v. AFGE*, 1:17-cv-02094-JEB ECF Doc. 8-1 at 4, n. 4.  This concession is based on the Court's finding of bias.

71.     On November 13, 2017, AFGE instructed its Legal Rights Committee to appoint a new Committee of Investigation to reprocess the Charges filed by former NVP Hill against Eugene Hudson.  NVPs Swanke, McCubbin, and Bunn recused themselves per Mr. Hudson's request during the previous processing of the charge.  NVP Cheryl Eliano was appointed Chair of the new Committee. [ECF Doc. 14-1].  The other members of the Committee were Fredna White and Kurt Rhodes.

72.     On December 18, 2017, the Second Committee interviewed Mr. Hudson.

73.     On January l2, 20l8, this Court vacated the above-cited Memorandum Opinion on the stated ground that the preliminary injunction granted was based on an LMRDA claim subsequently withdrawn by Hudson.  That same day, AFGE terminated NST Hudson again.

74.     On January 25, 2018, the Committee issued its Report [FAC Exhibit 6 at 1-2], which stated, in pertinent part, as follows:

1.     In the Specific Issue of NST Eugene Hudson Jr. composing and distributing a letter to the majority of, if not all, AFGE Local Presidents and Treasurers, by utilizing AFGE's mailing lists (employer resources) on or about September 10, 2016.

19

While this letter content may fall under a protected activity of the first Amendment of the US Constitution. His use of resources was not. The Committee finds probable cause that he violated AFGE Policy and Practice. This action violates AFGE National Constitution Article XXIII Section 2(e) Engaging in conduct unbecoming a union member

2.     The specific issues in the charges cited by NVP Hill concerning NST Hudson distribution of a Postcard, and his personal website expressing his personal opinions to various AFGE members regarding allegations of misuse of union property and funds. NST Hudson expressions of his opinions are protected by the first amendment of the US Constitution. The Committee finds this to be within his rights.

3.     The specific issue In the charge by NVP Hill concerning NST Hudson's email on Donald Trump dated 15 November, 2016 and directed to be sent by staff member Willie Hope. The Committee finds probable cause exists for the specific charge of malfeasance of office. When NST Hudson directed a staff member to distribute the email on his behalf to a list of email addresses, including government emails obtained by using AFGE resources. By doing so put the staff member "In the potential position of receiving disciplinary action from AFGE"

The committee finds NST Hudson actions violated the following:

Article XXIII, Section 2(f) engaging in gross neglect of duty[3]

Article 23 Section 2(g) incompetence, negligence, or insubordination in the performance of official duties by officers or representatives of a local or council or failure or refusal to perform duties validly assigned

Article 23 Section 2(h) Committing any act of fraud, embezzlement, mismanagement, or appropriating to one's own use any money, property, or thing of value belonging to the Federation or any affiliate.  The conflict resolution program is not available after the committee of investigation has preferred charges.

4.     The specific Issue of allegations concerning NST Hudson at the PORT Training per Mr. Hill: "Finally, at the recent 5th district PORT training, Mr. Hudson referred to a tenured and respected AFGE staff person as the "Nigerian Nightmare". This Committee refers this Charge back to the Legal rights [*sic*] Committee.  Due to the fact that NST Hudson stated during his Interview that NVP Eliano approached him and told him he was wrong after It was reported to her what he had done.

---

[3]As amended at the February 6 hearing.

This Committee submits these findings consistent with the provisions of AFGE National Constitution Article XIII Section 7(b)(2): Where "Good and sufficient grounds for a charge exist, but that no material facts are In dispute, it shall refer the charge to the NEC for decision on the basis of the Investigative file. [*sic*]

75.  Mr. Hudson submitted his Statement of Position on February 1, 2018. [FAC Exhibit 6 at 59-76].

76.  The NEC conducted a hearing on February 6.  Mr. Hudson and his counsel Jonathan Axelrod were permitted to speak and to deny that Mr. Hudson had engaged in misconduct.

77.  At the conclusion of their presentation, the NEC went into Executive Session to deliberate and vote.  The NEC then issued the following decision [ECF Doc. 35-1]:

The Committee of Investigation found good and sufficient cause on two grounds. First, that the manner in which Mr. Hudson obtained the mailing labels for his August 2016 campaign literature was in violation of AFGE policy and practice. Second, the manner in which Mr. Hudson distributed his November 2016 letter via email was in violation of AFGE policies and practice. ....

First, the NEC found that with respect to the August 2016 letter that Mr. Hudson's speech was protected speech, that it was campaign speech, and that his conduct violated Article XXIII, Sec. 2 (e) of the AFGE Constitution. For this violation of the constitution, the NEC by a vote of 10-1 decided to suspend Mr. Hudson from office for the remainder of his unexpired term.

Second, the NEC found that with respect to the November 2016 letter that Mr. Hudson's speech was protected speech, that it was campaign speech, and that his conduct violated Article XXIII Section 2(f), (g), and (h) of the AFGE Constitution. The NEC found that the manner in which he distributed the letter- not the content of the letter - violated AFGE policies, practices, constitutional provisions, and Department of Labor statutes and regulations. Specifically, the NEC found Mr. Hudson's letter to be campaign literature as it was his third mass distribution in the brief period following his announcement of his candidacy for national office at the 2018 AFGE National Convention. The letter clearly undermined AFGE's well-established Big Enough to Win strategic plan and laid out Mr. Hudson's campaign platform for his election to national office. Furthermore, the letter focused on a political topic on which Mr. Hudson had not previously commented as National Secretary-Treasurer, as opposed to topics concerning his duties as National Secretary-Treasurer. The NEC also found that the manner in which Mr. Hudson distributed the

November 2016 letter - specifically directing his AFGE staff subordinate to distribute campaign literature on AFGE's email server and computer system at the union's cost - violated AFGE policies or practices, the AFGE constitution, federal law and/or regulation. The above- referenced actions are in violation of the AFGE Constitution Appendix A, Part 1, Sec. 4(b), 29 USC Sec. 481{g}, 29 CFR Sec. 452.73, and AFGE's long-standing "no-politics" policy. The NEC found Mr. Hudson guilty of a violation of Article XXIII Sec. 2{f} by a vote of 10-0. The NEC found Mr. Hudson guilty of a violation of Article XXIII Sec. 2(g) by a vote of 10-1. The NEC found Mr. Hudson guilty of a violation of Article XXIII Sec. 2{h} by a vote of 10-1.For each of these violations, the NEC suspended Mr. Hudson from the office of AFGE National Secretary- Treasurer for the remainder of his unexpired term.

78.     On February 7, 2018, President Cox sent an email notifying AFGE members of the

NEC decision. [FAC Exhibit 18].

79.     AFGE's retaliation against Mr. Hudson has caused him mental anguish.

## COUNT 1 - LMRDA SECTION 411(a)(2)
## RETALIATION FOR EXERCISE OF PROTECTED RIGHTS
### The August 8, 2017 Discharge

80.     The allegations in paragraphs 1 through 79 of the FAC are incorporated by reference.

81.     Although NVP Hill's Charge alleged four allegations of misconduct, the Committee

found probable cause only to conclude that NST Hudson committed malfeasance in office by sending

the Trump email and by directing Willie Hope to do so. [FAC Exhibit 11].

82.     NVP Hill's Charge alleged, in pertinent part, as follows [FAC Exhibit 6 at 5-6]:

Next, Mr. Hudson's e-mail on Donald Trump is a supreme case of multiple violations. Mr. Hudson has personally declared, for the record, this communication to be his own, and to be a "personal" statement. However, the record is also clear that he assigned (or ordered) a staff person to send the document. This assignment is a violation of the ethical conduct requirements for all NEC members. and has placed the staff person, himself, in the potential position of receiving disciplinary action from AFGE. Also, this email, as opined by AFGE GCO, has violated the Hatch Act, and exposed AFGE to certain civil and/or administrative liability of unknown financial and disciplinary consequence. Doing so as NST violates the fiduciary responsibility of any national officer, certainly as the Chief Financial officer for AFGE. In addition, the use of AFGE's e-mail directories for personal use is a violation of the policies on

22

official use of AFGE resources.  And finally, the making of a policy statement to our membership, without NEC consultation is unacceptable.

83.    The Committee found that " probable cause exists for the specific charge of malfeasance of office." [FAC Exhibit 11].

84.    The NEC did not explain its rationale for finding NST Hudson guilty, but it is clear that the decision was based on conclusions that NST Hudson had violated policies and regulations in connection with use of AFGE staff and email for campaign or personal purposes and, by sending the email to government email addresses exposed AFGE and those members receiving the email at federal email addresses to Hatch Act violations.

85.    AFGE produced a Committee of Investigation Guidelines and Procedures Manual. The Manual provides, in pertinent part, as follows:

> Additionally non-criminal acts or omissions of officers or members which take place during an election campaign are not actionable as disciplinary offenses.  Therefore, if it is believed that a non-criminal constitutional offense has taken place during an election campaign, the sole mechanism for redress is an election appeal.

[FAC Exhibit 20 at 5 (emphasis in the original)].

86.    LMRDA Section 101(a)(2) protects freedom of speech and assembly.  It provides that

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. §411(a)(2).

87.     In a Section 411(a)(2) case, the Court does not defer to a union's internal proceedings.

88.     Speech is protected by Section 411(a)(2) if it may be fairly characterized as a matter of union concern, if the speech "relates to the general interests of the union membership at large.

89.     NST Hudson's Trump email meets this standard and is protected by Section 411(a)(2) unless AFGE has adopted "reasonable rules" prohibiting the speech.

90.     As National Secretary-Treasurer and as a member, NST Hudson had the right to speak about the impact of President Trump's election and its effect on AFGE and its members.  AFGE has no rule, reasonable or otherwise, limiting the areas on which officers such as the National Secretary-Treasurer can express an opinion.

91.     As the Court stated, "Both sides agree that Hudson had the right to express his views on the incoming administration. See MTD at 22; Compl., ¶ 68." [ECF Doc. 34 at 9].  AFGE cannot renege on this assertion.

92.     NST Hudson did not violate any "reasonable rules" when he used AFGE's email system to contact AFGE members.

93.     AFGE cites only to a form it submits to its business liability insurer in which AFGE checks a box indicating that it requires the General Counsel's pre-approval of all AFGE publications. That insurance policy form has an attached addendum listing numerous AFGE publications, which presumably are the publications covered by the legal pre-approval practice.

94.     Because the list of publications does not include email, the insurance policy does not apply to emails sent by national officers.

95.     Despite the insurance policy, AFGE has no rule concerning the distribution of email by national officers to Local Union officers.

96.     The Court stated: "the Court does not see (and in multiple briefs AFGE has not shown) where it has adopted such a rule.  The only reasonable inference the Court can draw at this point, therefore, is that one does not exist." [ECF Doc. 34 at 9].

97.     The Court also concluded that "AFGE has not connected this insurance policy to any promulgated rule, nor has it explained why an email would be considered a "publication" that necessitates GCO review."  [ECF Doc. 34 at 9].

98.     AFGE contends that [Doc. 6-0 at 13]

AFGE protocol requires AFGE National officers and staff to seek the Office of General Counsel's ("GCO") review and approval before disseminating a statement on behalf of the AFGE to membership at large or to the public. *See* Ex. 5 at 6 ("Does the Union have an attorney review all Union publications prior to release? A. Yes"); ECF Doc. 1-2 at 2 ("GCO review of all publications in advance is a requirement of our insurance.");

99.     NST Hudson's Trump email was not "a statement on behalf of the AFGE to membership at large or to the public."

100.    NST Hudson's Trump email was not disseminated "on behalf of AFGE."

101.    NST Hudson's Trump email was not "disseminated ... to membership at large or to the public."

102.    NST Hudson's Trump email did not interfere with AFGE's performance of its legal or contractual obligations.

103.    AFGE has no rule prohibiting an officer or member from criticizing decisions made by AFGE officials.

104.   The Trump email did not criticize AFGE's "Big Enough to Win" policy.  To the contrary, the email stated that the effort under this policy are "important to support." [FAC Exhibit 6 at 14].

105.   AFGE has no rule prohibiting an officer from criticizing conduct of AFGE officials.

106.   AFGE has no rule prohibiting national officers from commenting upon actual or projected actions by the federal government or its current or future officials.

107.   NST Hudson's Position Statement to the NEC argued that he did not violate the Hatch Act or endanger those AFGE members who received the email at federal government email addresses. In support of his position, NST Hudson submitted three decisions of the Office of the Special Counsel, the federal agency which enforces the Hatch Act. [FAC Exhibit 14 at 9-12].

108.   Although the United States Office of Special Counsel administers the Hatch Act, AFGE never asked the Office of Special Counsel to consider the effect of NST Hudson's email on federal employees who received the email on their federal email system.

109.   The Office of Special Counsel declared that receipt and transmittal of the Trump email did not violate the Hatch Act or subject AFGE or its members to Hatch Act liability.  [FAC Exhibit 19].

110.   NST Hudson's Position Statement argued that his email was protected free speech. [FAC Exhibit 14 at 7-9].

111.   NST Hudson's Position Statement argued that the November 15th email was not part of his campaign for Union office but was his view of how AFGE should respond to the election of President Trump.  [FAC Exhibit 14 at 8-9].

112.    NST Hudson argued that his email did not subvert, contradict or interfere with AFGE policy.  In support of his position, NST Hudson submitted evidence that both before and after the election, NP Cox had warned of potential hazards of a Trump Administration. [FAC Exhibit 14 at 12-14].

113.    Even if the Trump email is considered campaign material, the Manual provides that internal Union charges cannot be based upon alleged violations of campaign regulations.

114.    Even if the Trump email had an incidental campaign impact, incidental campaign effects are not prohibited.

115.    The NEC decision constituted retaliation for NST Hudson's protected speech concerning AFGE expenses and vouchers submitted by AFGE National Vice Presidents.

116.    The NEC decision constituted retaliation for NST Hudson's decision to oppose National President Cox at the 2018 Convention.

117.    The NEC decision constituted retaliation for NST Hudson's protected speech in the Trump email.

118.    The penalty of discharge from his elected position as National Secretary-Treasurer was retaliatory and excessive even if some level of discipline was appropriate.

119.    AFGE's decision, particularly in the context of the above stated facts, to remove NST Hudson from his duly elected position was retaliation for his expression of rights protected by §101(a)(2).

120.    In addition to suppressing NST Hudson's rights to express his views as a Union member, AFGE's conduct has substantially chilled the culture within AFGE such that many other

members reasonably and justifiably believe that the expression of their rights as members will subject

them and their supporters to retaliation.

121.    NST Hudson was not lawfully discharged.  He is entitled to back pay from the date

of his discharge on August 8, 2017 until February 6, 2018, with the amount reduced by his salary

during the period the Preliminary Injunction was in effect.

## COUNT 2 - LMRDA SECTION 101(a)
## RETALIATION FOR EXERCISE OF PROTECTED RIGHTS
## The February 6, 2018 Discharge

122.    The allegations in paragraphs 1 through 121 of the FAC are incorporated by reference.

123.    NVP Hill's Charge stated, in pertinent part, as follows [FAC Exhibit 6 at 5]:

On, or about, September 10, 2016 NST Eugene Hudson, Jr. composed and distributed
a letter to the majority of, if not all, AFGE Local Presidents and Treasurers, by
utilizing AFGE's mailing lists (employer resources). While this mailing may have
been completed under the pretext of campaign literature, Mr. Hudson failed to
announce candidacy for a specific office.  Therefore, this constitutes a violation of
AFGE policy and practice.

This letter, and its content, may be protected activity, as the exercise of free speech.
However, the timing of his allegations, under the supposed guise of a personal
political campaign, placed the entire organization in jeopardy. By publicizing his
critique during a vital presidential and congressional election, he has committed an
offense against the Federation per AFGE's National Constitution, Article 23, Section
2(e) (Engaging In conduct unbecoming a union member).

124.    The Second Committee found probable cause to believe that NST Hudson violated the

AFGE Constitution:

1.    In the Specific Issue of NST Eugene Hudson Jr. composing and distributing
a letter to the majority of, if not all, AFGE Local Presidents and Treasurers, by
utilizing AFGE's mailing lists (employer resources) on or about September 10, 2016.
While this letter content may fall under a protected activity of the first Amendment
of the US Constitution. His use of resources was not. The Committee finds probable
cause that he violated AFGE Policy and Practice. This action violates AFGE National

Constitution Article XXIII Section 2(e) Engaging in conduct unbecoming a union member

[FAC Exhibit 6 at 1].

125.   The references to a September 10 mailing refers to NST Hudson's August 26 announcement of his candidacy.

126.   The NEC decision states as follows:

First, the NEC found that with respect to the August 2016 letter that Mr. Hudson's speech was protected speech, that it was campaign speech, and that his conduct violated Article XXIII, Sec. 2 (e) of the AFGE Constitution.  For this violation of the constitution, the NEC by a vote of 10-1 decided to suspend Mr. Hudson from office for the remainder of his unexpired term.

[ECF Doc. 35-1].

127.   The NEC did not cite any reasonable rule restricting NST Hudson's "conduct" or even identify that "conduct."

128.   AFGE's Constitution states that an announced candidate is entitled to one free set of address labels for mailing to Local Union Presidents and Secretary-Treasurers.

129.   NST Hudson informed the Second Committee and the NEC that he obtained the labels for the August 26 mailing through the normal process available to all candidates.

130.   The Second Committee Report and Documents contain no evidence that NST Hudson obtained the set of labels improperly.

131.   Because the Second Committee found that "no material facts are in dispute" [FAC Exhibit 6 at 2], the NEC could not have properly considered evidence outside the Second Committee's administrative file to find that NST Hudson obtained the mailing labels in any way except for the candidate's right to a set of address labels.

132.    Although Mr. Hudson's August 19, 2016 declaration of candidacy did not state which position he would seek at the 2018 Convention, AFGE has no policy which requires such specificity.

133.    Appendix A of the Constitution requires the National Secretary-Treasurer to provide the labels to declared candidates and includes no exception for when the National Secretary-Treasurer is the candidate.

134.    AFGE has no policy or rule requiring the General Counsel to review or approve a declaration of candidacy.

135.    In his March 22, 2016 memorandum, General Counsel Borer stated as follows:

> Furthermore, in order to ensure that potential candidates for office have their declaration of candidacy reviewed for compliance with the AFGE Constitution in a timely manner, I would recommend that the NEC recommend that the 2018 AFGE Convention adopt a resolution requiring such candidates to direct their declaration of candidacy letters to the Office  of the General Counsel, with a copy to the NST's office. Since GCO does the review, this would ensure timely action on the declaration of candidacy before a candidate is granted the rights provided in Appendix A.

[FAC Exhibit 6 at 74].

136.    After conceding that the contents of NST Hudson's announcement of his candidacy is free speech protected by Section 411(a)(2), the remaining issue is whether NST Hudson violated any reasonable rule.  There is no evidence that NST Hudson violated any reasonable rule in mailing his announcement.  The NEC's decision violated his statutory rights.

137.    NVP Hill's third Charge stated as follows:

Next, Mr. Hudson's e-mail on Donald Trump is a supreme case of multiple violations. Mr. Hudson has personally declared, for the record, this communication to be his own, and to be a "personal" statement.  However, the record is also clear that he assigned (or ordered) a staff person to send the document.  This assignment is a violation of the ethical conduct requirements for all NEC members. and has placed the staff person, himself, in the potential position of receiving disciplinary action from AFGE.  Also, this email, as opined by AFGE GCO, has violated the Hatch Act, and

exposed AFGE to certain civil and/or administrative liability of unknown financial and disciplinary consequence. Doing so as NST violates the fiduciary responsibility of any national officer, certainly as the Chief Financial officer for AFGE. In addition, the use of AFGE's e-mail directories for personal use is a violation of the policies on official use of AFGE resources. And finally, the making of a policy statement to our membership, without NEC consultation is unacceptable.

[FAC Exhibit 6 at 5-6].

138.    The Second Committee found as follows [FAC Exhibit 6 at 1]:

3.    The specific issue In the charge by NVP Hill concerning NST Hudson's email on Donald Trump dated 15 November, 2016 and directed to be sent by staff member Willie Hope. The Committee finds probable cause exists for the specific charge of malfeasance of office. When NST Hudson directed a staff member to distribute the email on his behalf to a list of email addresses, including government emails obtained by using AFGE resources. By doing so put the staff member "In the potential position of receiving disciplinary action from AFGE"

139.    The NEC found as follows [ECF Doc. 35-1]:

Second, the NEC found that with respect to the November 2016 letter that Mr. Hudson's speech was protected speech, that it was campaign speech, and that his conduct violated Article XXIII Section 2(f), (g), and (h) of the AFGE Constitution. The NEC found that the manner in which he distributed the letter- not the content of the letter violated AFGE policies, practices, constitutional provisions, and Department of Labor statutes and regulations. Specifically, the NEC found Mr. Hudson's letter to be campaign literature as it was his third mass distribution in the brief period following his announcement of his candidacy for national office at the 2018 AFGE National Convention. The letter clearly undermined AFGE's well-established Big Enough to Win strategic plan and laid out Mr. Hudson's campaign platform for his election to national office. Furthermore, the letter focused on a political topic on which Mr. Hudson had not previously commented as National Secretary-Treasurer, as opposed to topics concerning his duties as National Secretary-Treasurer. The NEC also found that the manner in which Mr. Hudson distributed the November 2016 letter - specifically directing his AFGE staff subordinate to distribute campaign literature on AFGE's email server and computer system at the union's cost - violated AFGE policies or practices, the AFGE constitution, federal law and/or regulation. The above-referenced actions are in violation of the AFGE Constitution Appendix A, Part 1, Sec. 4(b), 29 USC Sec. 481{g}, 29 CFR Sec. 452.73, and AFGE's long-standing "no-politics" policy. The NEC found Mr. Hudson guilty of a violation of Article XXIII Sec. 2{f} by a vote of 10-0. The NEC found Mr. Hudson guilty of a violation of Article XXIII Sec. 2(g) by a vote of 10-1. The NEC found Mr. Hudson guilty of a

violation of Article XXIII Sec. 2{h} by a vote of 10-1. For each of these violations, the NEC suspended Mr. Hudson from the office of AFGE National Secretary- Treasurer for the remainder of his unexpired term.

140.    The NEC decision clearly exceeded the scope of the Second Committee's finding of probable cause.  The NEC decision does not mention Willie Hope or the possibility that NST Hudson's directive could have subjected Mr. Hope to discipline.  The Committee did not find probable cause that the Trump email undermined "Big Enough to Win."  The Committee did not find probanle cause that the Trump email was campaign material.

141.    Mr. Hope told the Second Committee that he was unaware of the "No Politics" rule [FAC Exhibit 6 at 57] and could not have been disciplined for a violation of a rule he was unaware of.

142.    Because the NEC found that the content of the Trump email was speech protected by Section 411(a)(2), the only remaining question is whether its distribution violated some reasonable rule.

143.    AFGE has no rule restricting the topics upon which NST Hudson or any other official can comment.  There is no reasonable basis for the NEC's conclusion that "the letter focused on a political topic on which Mr. Hudson had not previously commented as National Secretary-Treasurer, as opposed to  topics concerning his duties as National Secretary-Treasurer."

144.    AFGE has no rule prohibiting the use of email to communicate with Local Union officers.

145.    AFGE's insurance policy is not a "rule."

146.    AFGE's insurance policy does not apply to email distribution.

147.    According to AFGE's Deputy General Counsel, AFGE's "protocol" applies only to statements made on AFGE's behalf, which the Trump email was not.

148.    AFGE's "protocol" applies only to statements to the general membership or to the public, which the Trump email was not.

149.    AFGE has no rule prohibiting an officer or member from criticizing decisions made by AFGE officials.

150.    The Trump email did not criticize AFGE's "Big Enough to Win" policy.   To the contrary, the email stated that the effort under this policy are "important to support." [FAC Exhibit 6 at 14].

151.    AFGE has no rule prohibiting an officer from criticizing conduct of AFGE officials.

152.    AFGE has no rule prohibiting national officers from commenting upon actual or projected actions by the federal government or its current or future officials.

153.    A fair reading of the Trump email demonstrates that it was not campaign material, but was intended to provoke discussion among Local Union officers concerning a response to the incoming Trump administration, a discussion even NVP McCubbin wanted to start.

154.    The conclusion that the Trump email was part of his campaign because "it was his third mass distribution in the brief period following his announcement of his candidacy for national office at the 2018 AFGE National Convention ... and laid out Mr. Hudson's campaign platform for his election to national office" is based on the faulty premise that once a member has declared his candidacy, every statement is part of his campaign.

155.    NST Hudson's announcement of candidacy and his subsequent postcard addressed only issues financial integrity.   The Trump email was not part of his "platform."

156.     Because the Trump email was not related to NST Hudson's candidacy, his use of the AFGE email server and address database did not violate the AFGE Constitution, the LMRDA, or Department of Labor regulations.

157.     Even if the Trump email is considered campaign material, the Manual provides that internal Union charges cannot be based upon alleged violations of campaign regulations.

158.     Even if the Trump email had an incidental campaign impact, incidental campaign effects are not prohibited.

159.     AFGE violated Section 411(a)(2) by discharging NST Hudson on February 6, 2018. Even assuming his guilt, the penalty was excessive.

## COUNT 3 - LMRA SECTION 301
## VIOLATIONS OF THE AFGE CONSTITUTION

160.     The allegations in paragraphs 1 through 159 of the Complaint are incorporated by reference.

161.     AFGE has affiliated Local Unions which represent private sector employees.

162.     AFGE and its Local Unions which represent private sector employees are "labor organizations" within the meaning of 29 U.S.C. §185(a).

163.     The AFGE Constitution is a contract between labor organizations within the meaning of 29 U.S.C. §185(a).

164.     The Manual contains official interpretations of Constitution Article XXIII, which contain the grounds for internal charges against National and Local Union officials.

165.     Article XIII, Section 7 of the Constitution governs trials against national officers. Section 7(c) of the Constitution provides that a "trial committee shall have full authority to conduct a fair and thorough trial of the charges ...."

166.     Although Section 7 does not require that a Committee of Investigation or the National Executive Council also act fairly when considering charges against a national officer, Section 7 must be interpreted to require fairness in all disciplinary matters.

167.     The covenant of good faith and fair dealing is an implicit part of the Constitution.

168.     The First Committee denied NST Hudson a fair hearing because the First Committee included one member, Chair Swanke, who was biased against NST Hudson.

169.     The NEC which conducted the August 8, 2017 hearing denied NST Hudson a fair hearing because the voting panel included several members who were biased against NST Hudson.

170.     The NEC which conducted the August 8, 2017 hearing denied NST Hudson a fair hearing because during its deliberations General Counsel David Borer essentially became the prosecutor. [ECF Doc. 8-1 at 39-112].  With General Counsel Borer as prosecutor, an NVP who believed NST Hudson was innocent would have to vote against AFGE, not against former NVP Hill.

171.     The NEC which conducted the February 6, 2018 hearing denied NST Hudson a fair hearing because during its deliberations General Counsel David Borer essentially became the prosecutor.[4]  With General Counsel Borer as prosecutor, an NVP who believed NST Hudson was innocent would have to vote against AFGE, not against former NVP Hill.

---

[4]Plaintiff Hudson has purchased a copy of the February 6 hearing and will file it under seal when it is received.

172.   Section 7(b) provides that when the Committee determines that no material facts are in dispute, NEC must decide the case "on the basis of the administrative file ...." [FAC Exhibit 6 at 40].

173.   The administrative file presented to the NEC for the February 6, 2018 hearing contained no evidence that NST Hudson improperly obtained the address list he used to distribute his announcement of candidacy.

174.   The NEC could not have found that NST Hudson improperly used AFGE resources without considering information not in the administrative file which Mr. Hudson had no opportunity to contradict.

175.   AFGE violated Section 7(b) by basing its decision on facts not in the administrative file.

176.   Section 7(b) requires that a Committee of Investigation determine whether there is probable cause or whether "good and sufficient grounds for a charge exist ...." [FAC Exhibit 6 at 40].

177.   The Second Committee found probable cause in the allegation that "When NST Hudson directed a staff member to distribute the email on his behalf to a list of email addresses, including government emails obtained by using AFGE resources, [he] ... put the staff member 'in the potential position of receiving disciplinary action from AFGE.'" [FAC Exhibit 6 at 1].

178.   The Committee abandoned much of the rationale for NVP Hill's charge.   The Committee did not allege that NST Hudson's email subjected the Union or its members to Hatch Act litigation.   The Committee did not allege that the Trump email was part of NST Hudson's campaign for Union office.   The Committee did not allege that NST Hudson violated a policy requiring the Office of the General Counsel to approve the distribution of the Trump email.   The Committee did

not allege that NST Hudson improperly set AFGE policy.  The Committee did not allege that as National Secretary-Treasurer, NST Hudson was prohibited from voicing an opinion on non-financial matters such as the incoming Trump administration.

179.    By basing its rationale on the abandoned portions of the Hill Charge and by ignoring the Second Committee's limitation to potential discipline for Mr. Hope, the NEC violated Section 7(b) by exceeding its authority.

180.    The August 8, 2017 NEC decision violated the Constitution and must be voided.

181.    The February 6, 2018 NEC decision violated the Constitution and must be voided.

### COUNT 4 - DISTRICT OF COLUMBIA CONTRACT LAW VIOLATIONS OF THE AFGE CONSTITUTION

182.    The allegations in paragraphs 1 through 181 of the Complaint are incorporated by reference.

183.    The AFGE Constitution is a contract within the meaning of the laws of the District of Columbia. *National Ass'n of Broadcast Employees & Technicians v. Timberlake*, 409 A.2d 629, 632 (D.C. 1979) ("a union's constitution and bylaws constitute a contract between the union and its members, which . . . may be enforced in state courts.").

184.    All contracts contain an implied duty of good faith and fair dealing, which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988).  If a party to the contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing. *Id.* at 987-988.

37

185.    AFGE violated its Constitution, including the duty of good faith and fair dealing, when it denied NST Hudson a fair hearing because of the composition of the First Committee and because the August 8, 2017 and February 6, 2018 hearings were tainted by bias.

186.    AFGE violated its Constitution, including the duty of good faith and fair dealing, when the NEC on February 6, 2018 exceeded the findings of the Second Committee when it decided to discharge NST Hudson.

187.    The Manual provides, in pertinent part, as follows:

Additionally non-criminal acts or omissions of officers or members which take place during an election campaign are <u>not actionable as disciplinary offenses</u>.  Therefore, if it is believed that a non-criminal constitutional offense has taken place during an election campaign, the sole mechanism for redress is an election appeal.

[FAC Exhibit 20 at 5 (emphasis in the original)].

188.    If the Committee and/or the NEC believed, as NP Cox stated in his August 11 mass email, that NST Hudson's November 15 email was part of his campaign for AFGE office, the charge should have been dismissed.

## RELIEF REQUESTED

189.   It is requested that the Court:

a.   issue an Order of preliminary and permanent injunctive relief requiring AFGE to reinstate Mr. Hudson to the position of National Secretary-Treasurer.

b.   Require AFGE to reimburse Mr. Hudson for all lost wages and benefits.

c.   Require AFGE to pay Plaintiff's litigation costs and reasonable attorneys' fees.

d.   Require AFGE to reimburse Mr. Hudson for his pain and suffering.

e.   Award such other relief deemed just and proper.

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Jonathan Axelrod
Jonathan G. Axelrod (D C Bar No. 210245)
Justin P. Keating (D.C. Bar No. 475602)
Beins Axelrod, P.C.
1030 15th Street, NW
Washington, DC 20005
telephone:      (202) 328-7222
telecopier:     (202) 328-7030
jaxelrod@beinsaxelrod.com
Jkeating@beinsaxelrod.com

Counsel for Plaintiff Eugene Hudson, Jr.

</div>

Dated: February 13, 2018