UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUGENE HUDSON, JR., | |
| Plaintiff, | |
| v. | Civil Action No. 17-1867 (JEB) |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Eugene Hudson was elected in August 2015 to serve a second three-year term as National Secretary-Treasurer for Defendant American Federation of Government Employees. The Union's governing body, the National Executive Council, has now twice voted to remove him from office, including once after this Court reinstated him. In his First Amended Complaint, Hudson challenges both removals, alleging that they violated his member rights under the Labor-Management Reporting and Disclosure Act, the Labor Management Relations Act, and D.C. contract law. Now before the Court is his third Motion for Preliminary Injunction, again requesting reinstatement to his NST position. Because the Court finds that he is unlikely to succeed on the merits of any of his claims, it will deny the Motion.

## I. Background

Although the parties agree that only the most recent discharge is relevant to this preliminary-injunction Motion, the Court finds it necessary, in relating the history of the case, to begin at the beginning.

1

A.  Factual History

AFGE is a national labor organization representing over 1000 federal and D.C. government employees.  See ECF No. 36 (Amended Complaint), ¶ 2.  The National Executive Council (NEC) consists of a National President, National Secretary-Treasurer, National Vice-President for Women and Fair Practices, and National Vice-Presidents for each of the twelve AFGE districts.  Id., ¶ 3.  Hudson was elected to two consecutive three-year terms as National Secretary-Treasurer beginning in 2012.  Id., ¶ 7.  In August 2018, Convention delegates will elect a National President, a National Secretary-Treasurer, and the National Vice-President for Women and Fair Practices.  Id., ¶ 8.

On August 19, 2016, Hudson sent his assistant a letter declaring his intent to run for national office at the 2018 Convention, but not specifying a particular position.  Id., Exh. 6 (Committee of Investigation File) at 10.  His assistant sent the declaration of candidacy to AFGE's General Counsel on August 29.  Id. at 9.  Three communications from Hudson in 2016 subsequent to his declaration are pertinent to the case.

First, Plaintiff sent a letter announcing his candidacy to AFGE local officers on August 26.  Id. at 7-8, 13.  In addition to announcing that he "will be a candidate for National Office at the 2018 Convention," the letter sought to "outline the structural problems" Hudson had faced as NST.  Id. at 7.  These challenges mostly concerned Plaintiff's view that the NST office was not strong enough, leaving the Union open to financial abuses by officers.  Second, on October 3, Hudson sent a postcard to the same group of people, "provid[ing] some examples of expenses that have been approved," but that he did not believe served a valid Union purpose.  Id. at 11.  In the postcard, he promised to "set out a plan to correct these abuses" in "subsequent letters."  Id. Finally, one week after the American presidential election, Hudson directed an AFGE staff

member to send an email to a group of AFGE members.  See Amend. Compl., ¶ 29.  Sent from the staff member's email on behalf of Hudson, the three-and-a-half-page email was entitled, "AFGE, the Trump administration, and the attack on the way" and included as a by-line, "From the Desk of National Secretary-Treasurer Eugene Hudson, Jr."  Id., ¶ 31.  Hudson warned that the new administration would have a "bull's eye planted on the backs of federal workers and the unions that represent them."  Id.  He questioned whether AFGE was "ready for this assault" and listed four items for consideration: 1) "Recognize that we must fight; we have no choice"; 2) "Rethink the way that we operate as an organization"; 3) "We need to build our support within the larger community"; and 4) "[T]his is a time for AFGE to join with other unions operating in the federal sector in coordinated responses to the attacks."  Id.  No one reviewed the email prior to Hudson's distribution.

This last communication immediately sparked concern within AFGE leadership.  One NVP found it "outrageous" that "an Afge [*sic*] policy statement [would] be sent out to the membership without knowledge and consent of the NEC," to which Hudson responded that the email was his "personal opinion and [not] an official statement from AFGE."  COI File at 30.  AFGE's General Counsel and its President also expressed concern with the email.  Id.

B.  Procedural History

Nearly one month later, on December 21, 2016, National Vice-President Keith Hill filed an internal charge against Plaintiff pursuant to the AFGE National Constitution.  Id. at 5-6.  Hill asserted that Hudson had violated their Constitution by: (1) sending the August 2016 letter; (2) sending the October 2016 postcard; (3) maintaining a public website containing Union information; (4) directing his subordinate to send the November 15 email; and (5) referring to an AFGE staff member as the "Nigerian Nightmare" at a training.  Id.

3

### 1. *Plaintiff's First Discharge*

Pursuant to Article 13 of the AFGE Constitution, a Committee of Investigation was appointed on February 7, 2017, to consider the charges. That Committee found that the letter, postcard, and website were forms of protected speech and that the verbal incident was not properly before it. See Amend. Compl., Exh 11 (COI Findings) at 1. The COI, conversely, did recommend that the NEC proceed on the charge related to the post-election email, "find[ing] probable cause exists for the specific charge of malfeasance of office." Id. The Committee then sent its report to the NEC, which met on August 8, 2017. Before both the COI and the NEC, Hudson maintained his innocence of any wrongdoing and asked that several NEC members be recused for potential bias because, as NST, he had challenged their reimbursements and use of AFGE financial resources. Id., Exh. 14.

With no member recusing, the NEC adopted the Committee's report, deliberated, and found Hudson guilty of the referred charge. Id., Exh. 15. It then voted to remove him from his position as NST but did not restrict his Union membership rights. Id., ¶ 55. Hudson has appealed the ruling to the National Convention, which will take place in August 2018. Id., ¶ 59.

### 2. *Initial Litigation*

Understandably unwilling to wait until the Convention, Plaintiff then filed this suit on September 12, 2017, alleging four ways in which his discharge violated the Labor-Management Reporting and Disclosure Act (LMRDA). First, he asserted a claim under Section 101(a)(5) of the Act, which protects union members from improper disciplinary actions, for the denial of a full and fair hearing. Plaintiff next claimed that AFGE had improperly retaliated against him for exercising his free-speech rights guaranteed in Section 101(a)(2). Count III also alleged unlawful retaliation, but was premised on Section 609, which prohibits unions from disciplining members for exercising their LMRDA rights. Hudson's last count invoked Section 301 of the

Labor Management Relations Act (LMRA), which allows a union to sue or be sued for certain breaches of contract. Hudson therein alleged that Defendant had violated several provisions of the AFGE Constitution and the Committee of Investigation Manual.

Five days after bringing suit, Plaintiff filed his first Motion for Preliminary Injunction, asking the Court to order Defendant to reinstate him as NST, process the charges anew, conduct a new hearing without the allegedly biased NEC members, and pay monetary damages. See ECF No. 4. After a hearing, the Court granted Hudson's Motion (apart from damages) in a written Opinion. See Hudson v. Am. Fed. of Gov't Empls., 2017 WL 5449806 (D.D.C. Nov. 9, 2017) (AFGE I). The Opinion began and ended with Hudson's first count, which alleged that he had been denied a full and fair hearing. Based on the "historical animosity" between Hudson and a member of the COI, the Court concluded that "a reasonable jury would likely find that [the COI member] was biased against Hudson, precluding him from receiving a full and fair hearing." Id. at *7. The Court also found that Hudson had satisfied the other three preliminary-injunction factors — i.e., irreparable harm to him, balance of the equities, and the public interest. Having determined that Plaintiff was entitled to a preliminary injunction based on Count I alone, the Court ordered AFGE to reinstate him without addressing the other three causes of action. Id. at *5.

Plaintiff's victory, however, was short lived. In a subsequent Motion to Dismiss, AFGE argued that § 101(a)(5), upon which the Court had solely relied in granting the injunction, did not apply to a removed officer (like Hudson) so long as his Union membership rights remained intact. See ECF No. 21 at 16-17. In his opposition, Plaintiff agreed and withdrew that count as well as his Section 609 claim. See ECF No. 22 at 18. That concession led the Court to vacate the injunction and accompanying Opinion. See Minute Order of Jan. 12, 2018. As the

injunction was no longer in force, the Union again removed Hudson from the NST position. See Amend. Compl., ¶ 73. Plaintiff then filed a second Motion for Preliminary Injunction based on the remaining two counts, see ECF No. 30, but the Court stayed briefing on that matter because of ongoing events between the parties outside of litigation. See Minute Order of February 7, 2018. The Court also ruled on Defendant's Motion to Dismiss, entering judgment in its favor on the two counts Hudson had withdrawn (Counts I and III) and finding that, in its current form, the Complaint did not state a breach-of-contract claim in Count IV. See Hudson v. Am. Fed. of Gov't Empls., 2018 WL 707431, at *5-7 (D.D.C. Feb. 5, 2018) (AFGE II). The Court found, however, that Count II — retaliation for exercising his free-speech rights —survived the motion.

3. *Plaintiff's Second Discharge*

The parties were just as busy outside of the courtroom as in. Following AFGE I, the Union began to reprocess the charges against Hudson. It appointed a new Committee of Investigation, which found probable cause on two of Hill's five charges. First, the COI determined that Hudson's "use of resources" in sending the August 2016 letter "violated AFGE Policy and Practice." COI File at 1. Second, regarding the November 2016 email, it found that "probable cause exists for the specific charge of malfeasance of office." Id. The Committee concluded that Plaintiff had violated three provisions of the Constitution by directing an AFGE staff member to distribute the email on his behalf. Id. On February 6, 2018, the NEC again held a special meeting on the referred charges. See ECF No. 35 (February 6, 2018, NEC decision). After voting to accept the report, the Council deliberated, and then voted, on each charge. It found that the August 2016 letter "was protected speech [and] that it was campaign speech," but that Hudson's conduct in receiving the mailing labels was "conduct unbecoming a union member" in violation of Article 23, § 2(e) of the Constitution. See Amend. Compl., Exh. 8 (AFGE Constitution). The NEC also found that the November email was protected campaign

6

speech, but again found that Hudson's conduct violated §§ 2(f), (g), and (h) of the same article. See NEC Decision. The decision condemned "the manner in which [Plaintiff] distributed the letter — not the content of the letter . . . . Specifically, the NEC found [the email] to be campaign literature as it was his third mass distribution in the brief period following his" candidacy announcement. Id. Because the November email "focused on a political topic" and he directed a Union staff member to distribute it "on AFGE's email server and computer system at the [U]nion's cost," the NEC found Hudson had violated the AFGE Constitution and Department of Labor regulations. Id. The Council then voted to suspend Hudson from office as NST for the rest of his term.

### 4. *Subsequent Litigation*

In light of the second NEC decision and AFGE II, the Court denied Plaintiff's second Motion for Preliminary Injunction as moot and granted his Motion to file an Amended Complaint. See Minute Order of February 20, 2018. In Counts I and II of the Amended Complaint, Hudson alleges that the August and February discharges were retaliation for exercising his statutory free-speech rights under Section 101(a) of the LMRDA. See Amend. Compl., ¶¶ 80-159. Counts III and IV respectively allege breach of contract under the LMRA and D.C. common law. Id., ¶¶ 160-188. Hudson has now filed a third Motion for Preliminary Injunction, again asking to be reinstated as NST. Id., ¶ 189. The Court held a hearing on March 7, 2018, and, for the reasons described below, will deny the Motion.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with

the public interest." League of Women Voters of United States v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting Pursuing America's Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016)).

Before the Supreme Court's decision in Winter, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. Davis v. PGBC, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999). Both before and after Winter, however, one thing is clear: a failure to show a likelihood of success on the merits alone is sufficient to defeat the motion. Ark. Dairy Co-op Ass'n, Inc. v. USDA, 573 F.3d 815, 832 (D.C. Cir. 2009) (citing Apotex, Inc. v. FDA, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006)); Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 2017 WL 6314142, at *5 (D.D.C. Dec. 8, 2017).

III. **Analysis**

To prevail on his Motion, therefore, Hudson must show a likelihood of success on at least one claim at issue here. Count I, which seeks damages for his first discharge, cannot form a basis for the instant Motion. The Court thus addresses Counts II, III, and IV in turn. Finding that Plaintiff is unlikely to succeed on any of them, it does not evaluate the other preliminary-injunction factors.

A. Count II

As described above, Count II alleges discharge in retaliation for the exercise of Hudson's free-speech rights, a violation of the LMRDA. That Act protects a union member's "right to . . . express any views, arguments, or opinions," so long as the speech does not run afoul of the union's "reasonable rules as to the responsibility of every member toward the organization . . . and to his refraining from conduct that would interfere with its performance of its legal or

8

contractual obligations." 29 U.S.C. § 411(a)(2). The limitation at issue here is a prohibition

against using union resources "to promote the candidacy of any candidate in a[] [union]

election." AFGE Constitution, App. A, § 4(b); 29 U.S.C. § 481(g). Off-limits resources include

"facilities, office equipment, union or employer email, stationery, or other supplies." AFGE

Constitution, App. A, § 4(b). There is no *de minimis* exception to this proscription; any

expenditure "showing [a] preference" for a candidate, or that "criticize[s] or praise[s] any

candidate," "regardless of the amount" is prohibited. See 29 C.F.R. § 452.75; Solis v. Local

9477, 701, 704 (D. Md. 2011); Marshall v. Office of Prof. Emp. Union, 505 F. Supp. 121, 123

(D.D.C. 1981) (finding that using union resources to duplicate campaign flyers amounting to

$6.40 violated LMRDA). As relevant here, under AFGE campaign rules, "[a]ll declared

candidates for national offices . . . will be provided upon timely request . . . [o]ne set of mailing

labels" with the addresses of local officers. See AFGE Constitution, Part II, § 4(b)(2). Whether

union means were improperly used for a candidate is a matter of law for the court to decide. See

Dole v. Drywall Tapers & Finishers Local Union 1976, 733 F. Supp. 864, 866 (D.N.J. 1990).

Defendant based the February 6th discharge on two independent alleged infractions:

(1) the August 2016 letter and (2) the November 2016 email. While Hudson concedes the

former constituted campaign speech, he disagrees that his use of Union resources — *i.e.*, mailing

labels — was improper. As to the November email, conversely, there is no dispute that he

employed Union resources, but he denies that the missive was campaign literature. Because the

Union can substantiate Plaintiff's removal for either communication, the Court need only look at

the second for purposes of this Motion.

That three-and-a-half page email begins by expressing surprise and dismay over the

results of the 2016 American presidential election. According to Hudson:

[O]ne thing is certain, the new administration and the Republican Congressional majority have a bull's eye planted on the backs of federal workers and the unions that represent them. The question is whether we are ready for this assault. . . .

Is AFGE prepared for this? [AFGE] President Cox has spoken up on this and has reminded us all of some of the efforts that have been undertaken under the banner of "Too Big to Fail." Such efforts are important to support, though I will suggest that we need to completely rethink the battlefield terrain on which we have been operating. . . .

So what should we consider?

COI File at 14-15. Hudson suggests four responses: 1) "Recognize that we must fight; we have no choice"; 2) "Rethink the way that we operate as an organization"; 3) "[B]uild our support within the larger community"; and 4) "[J]oin with other unions operating in the federal sector in coordinated responses to the attacks." Id. at 15-16. Plaintiff argues that this email was not part of his campaign for national office because it did not "focus[] on internal union politics." Reply at 6. The Court finds otherwise.

To determine whether a communication constitutes campaign literature, courts look to "the timing, tone, and content" of the publication, as well as any "general circumstances surrounding" it. Chao v. N. Jersey Area Local Postal Workers Union, 211 F. Supp. 2d 543, 551 (D.N.J. 2002). Federal and AFGE campaign prohibitions do not apply every time an incumbent candidate speaks to union members. The question, rather, is whether the totality of the circumstances establish that the publication "exceeded the bounds of permissible reportage on union matters" that is "an unavoidable consequence of performing" the duties of elected office. See Drywall Tapers & Finishers, 733 F. Supp. at 867.

The Court initially rejects Defendant's contention that the timing of Hudson's email — two months after he declared his candidacy and following two other communications to AFGE

10

members in almost as many months— suggests that it is campaign material. The November

email was not related in content or distribution to the prior two communications. After declaring

internally that he would be running for "National Office" on August 19, 2016, Plaintiff four days

later announced the same to a list of AFGE local leaders. This "first letter" described "the

structural problems" Hudson encountered as NST. See COI File at 7. Roughly one month later,

in his second communication, he sent a postcard to the same group of people, "provid[ing] some

examples" of the financial irregularities alleged in the August letter. Id. at 11. Plaintiff

promised to "set out a plan to correct these abuses" in "subsequent letters." Id. The November

email, however, did not address AFGE's finances at all. It focused on Hudson's reaction to the

American presidential election and AFGE's ability to face a potentially hostile new

administration. Nor was the email distributed to the same people. The August letter and October

postcard were sent to a database of AFGE local presidents and treasurers, but the November

email was disseminated widely among AFGE members, including non-office-holding members.

Finally, although the email was sent shortly after Hudson's candidacy announcement, the

relevant close-in-time event here is the Trump/Clinton election. The Court therefore finds that

the timing of the email is not indicative of campaign speech.

Unfortunately for Plaintiff, the other factors tilt heavily in the opposite direction. First,

tone. The email is unquestionably political. The overarching impetus was, of course, the

American election, but Hudson also questions whether AFGE was ready for a Republican-

majority attack on labor — going so far as to compare the 2016 landscape to Nazi Germany.

The email was also critical of the Union's current strategy. Id. at 14. In Plaintiff's view,

previous efforts to stave off Republican "'artillery shells' at the federal workforce" would

"simply not be enough" in the new Republican regime. Id. at 15. He then lists his own

suggestions for how the Union can prepare itself.  The tone of the email is clear: AFGE is soon

to be under attack and Hudson is the general it needs.

Relatedly, the content also likely promoted Plaintiff's candidacy.  He attempts to back

away from the strong message in the email by noting that he never said that he would challenge

President Cox or criticized him directly.  See Reply at 7.  True, Hudson did mention that Cox's

"'Too Big to Fail' efforts . . . are important to support," but in the very same sentence he stated

that he "suspect[ed]" that the Union "need[ed] to completely rethink the battlefield terrain on

which [it has] been operating."  COI File at 15.  Campaign material does not have to "explicitly

or implicitly commit[] to endorsing [a] specific candidate[] or attacking the opposition," Reich v.

Local 843, Bottle Beer Drivers, 869 F. Supp. 1142, 1148 (D.N.J. 1994) (quoting Donovan v.

Local 713, U. Auto. Workers, 561 F. Supp. 54, 58 (N.D. Ill. 1982)); "blatant or subtle

encouragement" of a candidate can also constitute campaign speech.  Donovan, 561 F. Supp. at

58.  Hudson may not have directly challenged Cox in the email, but he noted several weak areas

of AFGE leadership and then provided a series of remedies that he would provide.  By stating

that AFGE needed to "[r]ethink the way [it] operate[s] as an organization" and providing several

concrete ideas of how to do just that, Hudson promoted his candidacy.

Finally, the context also indicates that the email was campaign material.  Plaintiff

attempts to liken his email to one sent by National Vice-President McCubbin shortly after the

election.  McCubbin stated, "In light of [the election], I believe we need to hold an emergency

meeting to discuss and/or brainstorm how we are going to proceed as a Union when the attacks

start."  COI File at 75-76.  This email, sent only to the NEC, strikes a very different chord from

Hudson's, which was sent to numerous rank-and-file AFGE members.  Rather than a

brainstorming document, which might describe the NVP's internal email, Hudson's email to the

broad AFGE membership is more akin to a call to arms. Notable also is the email's digression

from Plaintiff's prescribed duties and normal activities. In contrast to the National President,

who is responsible for "plan[ning] and pursu[ing] policies which will promote the welfare of the

organization," AFGE Constitution, art. IX, the NST's duties include maintaining "custody of . . .

the papers and effects of the National Office" and keeping track of the Union's money. Id., art.

X. Indeed, Plaintiff states that his office communicated with AFGE members through (1) "the

NST Advisor, a quarterly publication" focusing on the office's duties and (2) emails "concerning

changes in government policy affecting Union financial reporting and training." Amend.

Compl., ¶ 29. While candidates are not barred from "legitimate discussions on issues

confronting the union," McLaughlin v. Am. Fed'n of Musicians, 700 F. Supp. 726, 733

(S.D.N.Y. 1988), "otherwise permissible statements may take on a different hue when viewed

against the backdrop of an election campaign." Chao, 211 F. Supp. 2d at 551 (quoting Dole v.

Fed. of Postal Police Officers Inc., 744 F. Supp. 413, 418 (E.D.N.Y. 1990)). The Court would

likely find that these comments, from a declared incumbent candidate, constitute campaign

material. As a result, it does not believe Hudson's removal violated the LMRDA.

### B. Count III

Plaintiff next alleges in Count III that AFGE breached its contract with him and thereby

violated the Labor Management Relations Act. In AFGE II, the Court *sua sponte* raised a

"potential jurisdictional obstacle" with his original LMRA breach-of-contract claim. See 2018

WL 707431, at *7. Section 301 of that Act provides a federal cause of action for suits alleging a

"violation of contracts between an employer and a labor organization representing employees . . .

or between any such labor organizations." 29 U.S.C. § 185(a). Although AFGE's Constitution

is a "contract" under the statute, see United Ass'n of Journeymen & Apprentices of Plumbing &

Pipefitting Indus. v. Local 334, 452 U.S. 615, 619-20 (1981), because Hudson is neither an employer nor a labor organization, the Court doubted whether it had jurisdiction to hear his LMRA claim. The issue was "not raised in briefing," however, so the Court did not resolve it at that time. See AFGE II, 2018 WL 707431, at *7. Now, with the benefit of briefing and argument from both sides, the Court affirms its earlier conclusion.

In Wooddell v. International Brotherhood of Electric Workers, 502 U.S. 93 (1991), the Supreme Court interpreted Section 301 in a way that forecloses Hudson's ability to bring such a claim. In that case, Woddell, a member of a local union, protested increased union dues. His local filed internal disciplinary proceedings against him and allegedly later discriminated against him in job referrals. Id. at 95. Wooddell brought suit against the local and its officers in federal district court alleging, *inter alia*, "violations of the IBEW Constitution and the bylaws of Local 71, which were alleged to constitute breaches of contract redressable under § 301 of the LMRA and state law." Id. at 96. Whether the statute "extend[ed] to suits on union constitutions brought by individual union members" was contested by both sides. Id. at 98. In this instance, the answer was yes. The Supreme Court found it "clear in this case" because Woddell alleged that the local union had violated a provision in the international constitution. Id. True, Woddell also alleged that the local had violated its own bylaws, but the international constitution included a "rule requiring local unions to honor their contracts." Id. at 100 & n.6. Wooddell's ability to bring a claim against his local union, therefore, was predicated on the local's violation of the international constitution, making it a "violation of a contract between two unions within the meaning of § 301." Id. at 100. Wooddell thus allows a non-union representative of the "contract between two unions," id., to stand in the shoes of a union and enforce a violation of the contract.

For jurisdiction under § 301, "[a]s the text makes clear," the non-union party must "charge[] that the breach alleged violates a contract between two labor organizations." Id. at 98 n.3.

Against this background, it is evident that Hudson's § 301 claim must fail for lack of jurisdiction. He is not a labor organization or an employer, and he does not claim to be standing in the place of a union to defend an agreement between the local and the parent union. Cf. Bermingham v. Castro, 191 F.3d 459 (9th Cir. 1999) (unpublished) (holding suit by individual union member against his local union for violation of local constitution not actionable under § 301); Korzen v. Local Union 705, Int'l Bhd. of Teamsters, 75 F.3d 285, 288 (7th Cir. 1996) ("A suit on a contract between a labor organization and a member is not within the scope of section 301."). Because a likelihood of success on the merits "encompass[es] not only substantive theories but also establishment of jurisdiction," Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted), Plaintiff's inability to fall within the bounds of § 301 is fatal to his chances on Count III.

C. Count IV

Count IV alleges that AFGE's actions violated D.C. contract law. Although this final claim relies on state common law, federal district courts are given supplemental jurisdiction over state-law claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction. See 28 U.S.C. § 1367(a). By the same token, they "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). The decision of whether to exercise supplemental jurisdiction when a court has dismissed all federal claims is left to the court's discretion, as supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966),

quoted in Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005).  When all of the federal

claims in a case are dismissed before trial, "the balance of factors to be considered" in deciding

whether to retain a state-law claim "will point toward declining to exercise jurisdiction over" it.

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).  To decide whether Plaintiff's

D.C. contract claim can provide a basis for a preliminary injunction, therefore, the Court

considers his federal claims.

To remind the reader, Hudson's Amended Complaint includes three other claims against

AFGE: (1) its first removal decision was in retaliation for exercise of his free-speech rights

guaranteed under the LMRDA; (2) its second removal decision was retaliatory for the same

reason; and (3) it violated the LMRA by breaching certain Union constitutional provisions.  The

Court has determined that Hudson does not have a likelihood of success on the last two claims.

See Sections III.A, B, *supra*.  In addition, the discharge complained of in Count I is based on one

of the same underlying actions — the November 2016 email — that the Court determined was

likely campaign material.  See Amend. Compl., ¶¶ 80-121. As Counts I and II thus rise and fall

together, Plaintiff is unlikely to succeed on either.  Because the three claims over which the

Court has original jurisdiction would likely be dismissed, the Court also expects that it would

decline supplemental jurisdiction over Hudson's common-law claim for breach of contract.  See

Classic Cab, Inc. v. Dist. of Columbia, 2018 WL 575560, at *3 (D.D.C. Jan. 24, 2018) (denying

preliminary injunction because plaintiffs were unlikely to succeed on federal claims and court

would be "unlikely to exercise supplemental jurisdiction over, and therefore reach the merits of,"

plaintiffs' state-law claim).

*        *        *

Because the Court finds that Hudson is unlikely to succeed on any of his claims, it need not discuss the other equitable factors. See Ark. Dairy Co-op Ass'n, Inc. v. USDA, 573 F.3d 815, 832 (D.C. Cir. 2009) (citing Apotex, Inc. v. FDA, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006)); Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 2017 WL 6314142, at *5 (D.D.C. Dec. 8, 2017).

## IV.    Conclusion

For the above reasons, the Court finds that a preliminary injunction is not warranted here. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 2, 2018