**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **EUGENE HUDSON, JR.,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 17-1867 (JEB) |
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

In the fall of 2016, Plaintiff Eugene Hudson, Jr., had more than one presidential election on his mind, as he had just declared his candidacy for President of Defendant American Federation of Government Employees.  Following that declaration, he sent out a series of mass communications to the Union and its officers, including an email reacting to the results of the U.S. presidential election.  In response, AFGE charged Hudson with violating a series of Union rules by distributing those communications, and it subsequently removed him as National Secretary-Treasurer.  Hudson believes that he was kicked out of office not because he violated any rules, but because his communications contained criticism of AFGE's handling of its finances.  His suit here challenges his removal as violating both the Labor Management Relations Act (LMRA) and his right to free expression under the Labor-Management Reporting and Disclosure Act (LMRDA).  The parties now cross-move for summary judgment.  Although the Court will grant AFGE's Motion as to Plaintiff's poorly pled LMRA count, it will deny the Motion as to the LMRDA counts because there remains a genuine issue of material fact as to the

true basis for the removal.  Finally, the Court will deny Hudson's Cross-Motion as largely
unsupported.

## I.    Background

This case's complicated procedural history belies the straightforwardness of its facts.
Before diving into those facts, however, the Court must decide which are disputed and which are
not.  Ordinarily, at summary judgment, "[t]he evidence of the non-movant is to be believed, and
all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 255 (1986); see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.
Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The nonmoving party's
opposition, however, must consist of more than mere unsupported allegations or denials and
must be supported by affidavits, declarations, or other competent evidence, setting forth specific
facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v.
Catrett, 477 U.S. 317, 324 (1986).

In light of that requirement, and pursuant to Local Civil Rule 7(h) and Federal Rule
56(c), the Court, in resolving summary-judgment motions, may "assume that facts identified by
the moving party in its statement of material facts are admitted, unless such a fact is controverted
in the statement of genuine issues filed in opposition to the motion."  LCvR 7(h)(1).

Despite Local Rule 7's instruction, however, Plaintiff filed no "statement of genuine
issues" in opposition to AFGE's Motion for Summary Judgment.  See ECF No. 184 (Cross-
MSJ).  Instead, he included at the start of his Opposition/Cross-Motion only his own list of
"material facts that are not in dispute," with no reference to AFGE's statement of facts and no
specification of the facts in dispute.  Id.  Armed only with Hudson's submissions (or lack
thereof), "the court would have to . . . engage in time-consuming labor that is meant to be

avoided through the parties' observance of" Local Rule 7, in order to identify material disputed

issues.  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 153 (D.C.

Cir. 1996).  But "[j]udges are not like pigs, hunting for truffles buried in" the record.  United

States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).  In accordance with Local Rule 7, the Court

for the most part declines the invitation to go hunting.  It will thus generally credit the facts in

AFGE's Separate Statement of Material Facts, unless the evidence provided by the Union reveals

genuine questions as to those facts.  See ECF 181-2 (AFGE Statement of Facts); Joe Hand

Promotions, Inc. v. Molly Malone's LLC, No. 19-3479, 2021 WL 4502073, at *1 (D.D.C. Oct. 1,

2021).

    A.  Factual Background

    In 2012, Hudson was elected to the office of National Secretary-Treasurer (NST) of

AFGE.  See AFGE SOF, ¶ 12 (citing ECF No. 36 (Am. Compl.), ¶ 7).  Three years later, he was

elected to a second term.  Id., ¶ 13.  Seeking new heights within the organization, Plaintiff

decided that at the next AFGE election (which would occur at its 2018 National Convention), he

would run for president.  Id., ¶ 17.

    That journey ostensibly began on August 18, 2016, when Hudson sent Arla Bentley, the

Executive Assistant to the NST, a handwritten "Declaration of Candidacy" for National Office at

the 2018 Convention.  See ECF No. 181-7 (Second COI Report) at 9 (Declaration of Candidacy).

The letter did not specify the office for which he was running.  Id.  That same day, Hudson also

requested from Bentley a set of mailing labels for local AFGE officers.  Bentley passed the

request to Jeanne Che (Operations Manager/Supervisor of Data Processing in the Finance

Department), who provided the labels to Hudson.  See AFGE SOF, ¶¶ 45–46 (citing ECF No.

181-5 (Deposition of Eugene Hudson, Jr.) at 320–321).

The dispute in this case revolves around several communications sent by Hudson following that declaration.  First, on or about August 23, 2016, he used the labels he got from Che to mail a letter to AFGE local officers announcing his candidacy.  See Second COI Report at 6–7 (August Letter).  The letter identified the "structural problems" he had faced as "a guardian of the membership's money," including the NST's limited authority to prevent seemingly inappropriate uses of AFGE funds and abuses of expense vouchers.  Id. at 6.  Next, on October 3, 2016, Hudson sent a postcard to the same individuals using another set of labels that he purchased from AFGE.  Id. at 10–11 (October Postcard).  He reiterated his concern about AFGE officials' uses of Union funds and vowed to "set out a plan to correct [those] abuses."  Id. at 10.

Finally, in November 2016, after the election of Donald Trump, Plaintiff sent a letter to AFGE members entitled "AFGE, the Trump administration and the attack on the way."  ECF No. 181-8 (November Email).  He drafted the letter with the help of Devlin Hillman, Bill Fletcher, Dana Duggins, and possibly Hank Urslip, although Plaintiff could not recall that with certainty.  See Hudson Depo. at 101–02.  All were members of Hudson's "support staff . . . for [his] campaign" (Urslip was his campaign manager), and none was an AFGE employee.  Id.; AFGE SOF, ¶ 26.  The letter contained the following statements, among others:

- "[O]ne thing that is certain, the new administration and the Republican Congressional majority have a bull's eye planted on the backs of federal workers and the unions that represent them. The question is whether we are ready for this assault."  November Email at 1.

- "The new Administration and Congressional majority have signaled that it wants to take us out. . . . Is AFGE prepared for this? President Cox has spoken up on this and has reminded us all of some of the efforts that have been undertaken under the banner of 'Too Big to Fail.'  Such efforts are important to support, though I will suggest that we need to completely rethink the battlefield terrain on which we have been operating."  Id.

- "So, what should we consider?  1. Recognize that we must fight; we have no choice . . . 2. Rethink the way that we operate as an organization.  . . . 3. We need to build our support within the larger community."  Id. at 2–3.

4

On November 15, 2016, Hudson asked Willie Hope, an AFGE employee and then-Field

Account for the Office of the NST, to email that letter to AFGE Local presidents and treasurers.

See ECF No. 181-10 (Willie Hope Declaration), ¶¶ 2–3.  Hudson gave Hope a paper copy of the

letter, which Hope scanned into PDF format.  Id., ¶ 3.  Hope then retrieved the list of relevant

email addresses from the AFGE database, id., ¶ 5, and he sent four emails with the letter attached

and with the subject line "From the Desk of National Secretary Treasurer Eugene Hudson, Jr."

Id., ¶ 8(a).

    B.  Procedural History

    While the facts may not be terribly complicated, if only that were true for this case's

procedural history.  The Court begs the reader's indulgence as it narrates the various twists and

turns.  It all began in December 2016, when National Vice-President Keith Hill initiated

disciplinary proceedings against Hudson by filing an internal charge against him based on his

various communications from that fall.  See AFGE SOF, ¶ 50.  Hill alleged that those letters and

emails had violated the AFGE Constitution in myriad ways.  See Second COI Report at 4–5 (Hill

Charge Letter).  A Committee of Investigation was appointed in February 2017 to consider

whether there was probable cause for the charges (the First COI).  See AFGE SOF, ¶ 51.  The

First COI found that most of the conduct at issue fell "within the protection of the first

amendment of the US Constitution and the LMRDA."  ECF No. 181-14 (First COI Report) at 1.

It also found, however, that "probable cause exist[ed] for the specific charge of malfeasance of

office" based on the November Email.  Id.  The COI then referred the charge to the National

Executive Council (NEC) "for decision on the basis of the investigative file."  AFGE SOF, ¶ 53;

see also ECF No. 181-4 (AFGE Constitution), Article XIII, section 7(b).  The NEC is a

governing body composed of the President, NST, National Vice President for Women and Fair

Practices, and twelve National Vice Presidents.  See AFGE Constitution, Article V, section 3.

NEC members received the First COI's report and investigative file prior to their meeting on

August 8, 2017.  See AFGE SOF, ¶ 57.

At that meeting, the NEC was prompted to consider, among other things, whether

Hudson had violated "AFGE policy prohibiting the involvement of staff in union politics" and

the rule against the "use of AFGE resources for personal or campaign purposes."  ECF No. 181-

19 (August 2017 NEC Meeting Transcript) at 27.  The AFGE Constitution provides that "[n]o

monetary or other resources of AFGE or any employer shall be contributed or applied to promote

the candidacy of any candidate in an election."  AFGE Constitution, App'x A, Part 1, section

4(b) ("Campaign Speech Rule").  According to AFGE, "NEC members found that Hudson's

November 2016 emails were campaign literature and voted 'yes' on his violation of AFGE's 'No

Politics' rule."  AFGE SOF, ¶ 67 (citing ECF No. 181-16 (Declaration of NVP Gregg James);

ECF No. 181-17 (Declaration of NVP Philip Glover)).  The NEC voted to suspend Hudson for

the remainder of his NST term (the First Removal).  Id., ¶ 68 (citing ECF No. 36 (Am. Compl.)

at 15).

Roughly a month later, Hudson filed this suit, followed by a motion for preliminary

injunction.  See ECF No. 1 (Complaint); ECF No. 4 (First Motion for Preliminary Injunction).

Among his various counts was a claim that the bias of certain NEC members involved in the

First Removal violated his LMRDA right to a "full and fair hearing" before the imposition of a

misconduct charge by his union.  See Compl., ¶¶ 56–64.  This Court granted the preliminary

injunction based on that claim and ordered that Hudson be reinstated.  See Minute Order, Nov. 9,

2017.  In response to the Court's finding that AFGE's first NEC vote was likely problematic,

Defendant began to reprocess the charges against Hudson and called a second NEC meeting.

Hudson v. AFGE, 289 F. Supp. 3d 121, 125 (D.D.C. 2018).

In the interim, however, Hudson realized (apparently after reading AFGE's newly filed

motion to dismiss) that the count on which the injunction rested was infirm.  He thus withdrew

the count, which led the Court to vacate its Opinion and Order granting the injunction.  See

Minute Order, Jan. 12, 2018.  He thus had to pack up his office and leave again.

In February 2018, the NEC held its second meeting about the charges against Hudson.

This time, the COI had found that probable cause existed that he had violated AFGE rules by

sending not just the November letter, but also the August 2016 letter.  See AFGE SOF, ¶ 54

(citing Second COI Report at 2).  The NEC followed suit and found Hudson guilty of both

violations on February 6.  Id., ¶ 56 (citing ECF No. 181-15 (Second NEC Decision)).  According

to AFGE, the NEC first determined that the August letter violated the AFGE Constitution

because Hudson had obtained mailing labels "without announcing his candidacy for specific

office."  Id.  Second, the NEC concluded that because the November Email was "campaign

literature," id., "the manner in which [Hudson] distributed [it] — specifically directing his AFGE

staff subordinate to distribute campaign literature on AFGE's email server and computer system

at the Union's cost — violated AFGE policies or practices, the AFGE constitution, federal law

and/or regulation."  Second NEC Decision at 1 (citing, inter alia, AFGE Constitution App'x A,

Part 1, section 4(b)).  The NEC thus suspended Hudson from office for the remainder of his term

"[f]or each of [those] violations" (the Second Removal).  Id.

The new NEC decision prompted an Amended Complaint, which Hudson filed on

February 13, 2018, alleging this time that both the first and second NECs violated his rights

under various federal statutes.  See ECF No. 36 (Amended Complaint).  Although much has

transpired in the intervening years, this pleading remains the operative Complaint.  In Count I, he challenges the First Removal, alleging that the November Email was speech protected by the LMRDA, id., ¶ 89, that the email did not violate any "reasonable" AFGE rule, id., ¶ 92, and, therefore, that the First Removal was "retaliation for his expression of rights protected by § 101(a)(2)" of the LMRDA, id., ¶ 119, and retaliation for his criticism of AFGE's handling of certain financial matters.  Id., ¶¶ 115–17.  Count II challenges the Second Removal and so recites the same arguments as to the November Email, which formed part of the basis for that removal. Id., ¶¶ 150–59.  This count adds that the August Letter (the other basis for the Second Removal) did not violate any AFGE rules either.  Id., ¶ 127.

Count III brings an LMRA claim for violations of the AFGE Constitution.  Specifically, Plaintiff contends that Defendant denied him his right to a fair hearing because: (a) the First Removal relied on the vote of "several members who were biased against NST Hudson," id., ¶ 169; and (b) in the Second Removal, AFGE General Counsel David Borer "essentially became the prosecutor," thus ensuring that "an NVP who believed NST Hudson was innocent would have to vote against AFGE, not against former NVP Hill."  Id., ¶ 170.  Hudson also argues that the Second NEC violated section 7(b) of the AFGE Constitution because it failed to base its decision on the Second COI's investigative file.  Id., ¶¶ 172–81.  Count IV, which is no longer live, alleges violations of D.C. law.  Id., ¶¶ 182-88.

In keeping with tradition, Hudson promptly followed that Complaint with another motion for a preliminary injunction.  See ECF No. 37 (Third Motion for Preliminary Injunction).  This Court denied the motion in April, finding that Plaintiff was unlikely to succeed on the merits. Hudson v. AFGE, 308 F. Supp. 3d 121, 123 (D.D.C. 2018).  AFGE filed a motion to dismiss the Amended Complaint, which the Court granted with respect only to count IV.  Hudson v. AFGE,

318 F. Supp. 3d 7, 15 (D.D.C. 2018).  As a result, two LMRDA and one LMRA cause of action remain.

The parties then embarked on a tumultuous discovery journey memorialized in a litany of motions and orders on the docket.  The Court may spare the reader those details and will jump straight to the main event: AFGE's Motion for Summary Judgment and Hudson's Cross-Motion for the same.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Liberty Lobby, Inc., 477 U.S. at 247–48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248.  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, Inc., 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

## III.    Analysis

The Court will begin by considering AFGE's jurisdictional objections to Hudson's suit. Finding no barrier to the exercise of its jurisdiction, the Court will then proceed to the separate merits of the LMRDA and LMRA claims.

A.  Jurisdiction

1.  *CSRA Preemption*

AFGE first contends that this Court lacks jurisdiction to consider Hudson's claims because they are all preempted by the Civil Service Reform Act (CSRA).  See ECF No. 181 (MSJ) at 3–7.  The CSRA provides "a system for review and resolution of federal employment disputes" and certain union disputes.  Filebark v. U.S. Dep't of Transp., 555 F.3d 1009, 1010 (D.C. Cir. 2009); 5 U.S.C. § 7116.

A court may conclude that "Congress intended [for] a litigant [to] proceed exclusively through a statutory scheme . . . when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'"  AFGE v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019) (quoting Jarkesy v. SEC, 803 F.3d 9, 15 (D.C. Cir. 2015)).  Decisions from this Circuit make clear that the CSRA was intended to establish such an exclusive remedial scheme.  See, e.g., AFGE v. U.S. Sec'y of Air Force, 716 F.3d 633, 636 (D.C. Cir. 2013) ("[T]he CSRA provides 'the exclusive avenue for suit' to a plaintiff whose claims fall within its scope."); id. at 637 ("[T]he FSLMRS's remedial regime is exclusive.").

The Court concludes, however, that the CSRA's preemptive effect does not extend to Hudson's claims in this case because they are not "of the type Congress intended to be reviewed within" the CSRA's structure.  See AFGE v. Trump, 929 F.3d at 754–55.  As AFGE itself argues, "[A]n individual is required to pursue their claims through CSRA's statutory scheme" when "a remedy is available under [the] CSRA."  MSJ at 3.  When courts assess whether a certain claim is preempted by the CSRA, they generally consider, among other factors, whether particular provisions of the Act cover that "kind[] of claim."  Filebark, 555 F.3d at 1010

("Congress, through the [CSRA,] . . . intentionally provid[ed] . . . particular forums and procedures for particular kinds of claims."); see also, e.g., Elgin v. Dep't of Treasury, 567 U.S. 1, 22 (2012) (noting that petitioners' challenges were "precisely the type of personnel action regularly adjudicated . . . within the CSRA scheme").

AFGE, however, fails to identify a single CSRA provision that addresses — even indirectly — the sort of grievance Hudson brings here.  Nor does Defendant point to any other evidence that Congress intended for Plaintiff's various counts to be reviewed within the Act's structure.  The Union simply reasons that because those counts "revolve around rights derived solely from his membership in a CSRA-covered union," he must adjudicate them via the CSRA. See MSJ at 5.  While that is certainly relevant to the preemption analysis, the aforementioned cases suggest that Hudson's status as a member of a CSRA-covered union cannot alone answer the preemption question.  It is also relevant whether Congress intended for grievances of the kind he raises to be adjudicated through the CSRA.  See Hudson v. AFGE (Hudson Membership II), No. 22-289, 2022 WL 3786919, at *11 (D.D.C. Aug. 30, 2022) (finding no CSRA preemption for claim arising out of relationship between two labor organizations, and noting CSRA's silence as to said relationship was relevant to preemption analysis).  Yet the CSRA does not appear to speak to a union's decision to remove a national officer from his post, nor does it directly regulate the internal governance procedures of a CSRA-covered union or the relationship between a union and its officers.  Instead, the relevant portion of the Act primarily concerns itself with grievances that arise from the more regular trials and tribulations of membership in a union. See, e.g., 5 U.S.C. § 7116 (listing unfair labor practices related to membership and negotiations, but not mentioning conduct of kind being challenged here).  The Court thus concludes that

Hudson's challenges to his removal from AFGE national office on the basis of allegedly protected speech are not of the kind that Congress intended to be adjudicated through the CSRA.

Followers of the long-running battle between these parties will recall that this Court, in a previous case about a different series of events, reached the opposite conclusion about the CSRA's preemptive effect on Hudson's claims against AFGE.  Hudson v. AFGE (Hudson Membership I), No. 19-2738, 2020 WL 3035039, at *5 (D.D.C. June 5, 2020) (finding CSRA preemption of membership-related claims because CSRA "expressly addresses membership in a federal-sector union"); see also Hudson Membership II, 2022 WL 3786919, at *11 (finding issue preclusion applied to question of CSRA preemption of membership-related claims after Hudson Membership I).  The counts in that case, though, related to Hudson's membership grievances.  Plaintiff arrives here with a very different set of claims from what he presented in his membership case, and so the Court reaches a different conclusion.

In reaching that decision, however, the Court does not purport to define the line between CSRA-preempted and non-preempted claims, nor does it suggest that the CSRA's failure to address a particular type of claim definitively answers the preemption question.  Rather, this Court reaches a narrow conclusion in the context of Hudson's particular grievances in this case, and in light of AFGE's failure to point to any CSRA provision or caselaw that would suggest that preemption exists.  That approach is consistent with this Court's analysis in the Hudson Membership cases.  See generally Hudson Membership I, 2020 WL 3035039 (dismissing host of challenges to Hudson's removal from AFGE membership as preempted); Hudson Membership II, 2022 WL 3786919, at *7–10 (dismissing claims that were nominally different from those in Hudson Membership on grounds that they asserted same type of membership-related grievances and prior decision precluded relitigation of preemption question as to such claims).

2. *Scope of LMRA*

AFGE next contends that this Court lacks jurisdiction over Hudson's LMRA claim for two additional reasons. First, because AFGE is a mixed union, it is not a "labor organization" covered by section 301 of the LMRA; and second, even if this Court were to conclude that mixed unions are covered by the LMRA, Hudson, as a member of a public-sector Local, may not bring an LMRA claim because a public-sector Local is not a "labor organization" within the Act's purview. See MSJ at 7–13. The Court disagrees with AFGE on both grounds.

Section 301 provides that "[s]uits for violation of contracts between . . . labor organizations[] may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a). The LMRA defines "labor organization" as an organization that "exists for the purpose, in whole or in part, of dealing with employers concerning [employment-related] grievances." Id. §§ 142(3), 152(5). And the LMRA definition of "employer" excludes "the United States . . . or any State or political subdivision thereof." Id. § 152(2). As "AFGE is a 'mixed' union, that is, it represents both government and private sector workers," Wildeberger v. AFGE, 86 F.3d 1188, 1192 (D.C. Cir. 1996), the question is whether the LMRA applies here.

This Court has twice found that it does apply to AFGE, and it sees no reason to depart from that conclusion here. "The Department of Labor and this Circuit have interpreted the LMRDA, but not the LMRA, to apply to mixed unions. Because the two statutes define 'labor organization' in functionally equivalent terms, however," it follows from circuit precedent that the LMRA also extends to mixed unions. Hudson v. AFGE, 318 F. Supp. 3d at 14 (citing 29 C.F.R. § 451.3(a)(4) and Wildeberger, 86 F.3d at 1192); see also Hudson Membership II, 2022 WL 3786919, at *12. That conclusion is also in line with the text of the statute. As AFGE notes

in its Statement of Facts, the Union predominantly, but not exclusively, represents government employees. <u>See</u> SOF, ¶ 1. AFGE thus "exists for the purpose . . . <u>in part</u>, of dealing with employers" as defined by the LMRA. <u>See</u> 29 U.S.C. § 152(5) (emphasis added).

AFGE's second objection is trickier. The Union's position is that even if it is a mixed union, Hudson, as a member of a purely public-sector Local, is not a beneficiary of a contract between "labor organizations" and so cannot bring a § 301 claim. <u>See</u> MSJ at 9. Assuming that Hudson is indeed a member of a purely public-sector Local, the merits of AFGE's argument would turn on the scope of the AFGE National Constitution, the contract relevant to this dispute. If that Constitution were best conceived of as a contract between only AFGE and Hudson's Local, then Defendant must be correct: Hudson could not sue for a violation of that contract because the contract would not be between "labor organizations."

But that is not how courts have tended to conceive of the national constitution of a parent union. For example, the Seventh Circuit has stated that "an international's constitution is a contract between the international and its <u>locals</u>." <u>Korzen v. Local Union 705, Int'l Bhd. of Teamsters</u>, 75 F.3d 285, 288 (7th Cir. 1996) (comparing international's constitution to constitution of a local union, which is a "contract between the union and its members") (emphasis added). The Supreme Court has used similar language, suggesting that such constitutions are not a series of individual contracts between parent and local. <u>See</u> <u>Plumbers and Pipefitters v. Plumbers and Pipefitters, Local 334</u>, 452 U.S. 615, 621 (1981) ("[T]he view of a union constitution as a contract between parent and local unions was widely held in the States around the time § 301(a) was enacted."); <u>id.</u> at 624 (describing union constitution as a "document[] that prescribe[s] the legal relationship and the rights and obligations between the parent and affiliated locals"). Thus construed, the AFGE National Constitution is a contract

between AFGE and <u>all</u> of its constituent Locals.  And since at least some of AFGE's Locals must

be mixed unions, then the AFGE Constitution is a contract that has at least some "labor

organizations" as parties.  As a national officer whose roles and responsibilities are defined by

the AFGE National Constitution, Hudson is plainly a beneficiary of that Constitution.

This Court embraced that broader construction of the AFGE Constitution in an earlier

Opinion in this case.  <u>See</u> <u>Hudson v. AFGE</u>, 318 F. Supp. 3d at 14 ("It is thus irrelevant that

Plaintiff's home local does not qualify as a labor organization.  He is suing for a breach of the

AFGE Constitution, and at least some of the signatory locals to that contract represent private

employees.").  That interpretation seems particularly apt in this context, where Hudson asserts a

claim arising out of his employment by AFGE National as an officer, and not as a public-

employee member of a public-sector Local.  It also avoids the "disruptive influence" of having

"the same contract terms . . . be given different meanings based solely on the identity of the

party." <u>Wooddell v. Int'l Bhd. of Elec. Workers, Local 71</u>, 502 U.S. 903, 102 (1991).  Under

AFGE's interpretation, an officer holding a national position like Hudson's, but who is a member

of a mixed Local, could bring a § 301 claim in federal court asserting a violation of the same

AFGE-constitutional provisions as Hudson.  Yet Hudson would be relegated to state court.  <u>Id.</u>

Similarly, under AFGE's interpretation, a public-employee member of a <u>mixed</u> AFGE Local

could bring a proper § 301 suit for violation of the National Constitution in federal court, while a

public-employee member of a <u>public-sector</u> Local could not.  Hudson's reading has the benefit

of minimizing such inconsistencies.

In any event, the Court's conclusion is limited.  It finds only that a claimant in Hudson's

position — that is, an AFGE National Officer who is not a current public employee but is a

member of a public Local — asserting a violation of the National Constitution arising out of his

removal from office may proceed under § 301.  In so concluding, this Court does not opine on

the narrower issue of whether a public employee may bring an LMRA claim against a mixed

union; such circumstances may raise different issues from the ones raised by this case.  See

Richards v. Ohio Civ. Serv. Emps. Ass'n, 205 F. App'x 347, 354 (6th Cir. 2006) (answering that

narrower question in the negative).

     B.  LMRDA Claims

     Having assured itself of its jurisdiction to proceed, the Court next considers Hudson's

LMRDA counts.  Section 101(a)(2) of the LMRDA provides:

> Every member of any labor organization shall have the right . . . to
> express any views, arguments, or opinions; . . . Provided, That
> nothing herein shall be construed to impair the right of a labor
> organization to adopt and enforce reasonable rules as to the
> responsibility of every member toward the organization as an
> institution and to his refraining from conduct that would interfere
> with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).  According to AFGE, in order to prevail under the LMRDA, Plaintiff

must prove that "but for" his protected speech, the NEC would not have removed him from his

post.  See MSJ at 27–29 (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 173–76 (2009), and

Serafinn v. Local 722, Int'l Bhd. of Teamsters, 597 F.3d 908, 914–15 (7th Cir. 2010)).  As

Hudson does not contest that standard, this Court will apply a but-for causation requirement to

his LMRDA claims.

     Hudson submits in Count I that the First Removal "constituted retaliation" for his

"protected speech concerning AFGE expenses and vouchers submitted by AFGE National Vice

Presidents."  Am. Compl., ¶ 115.  In Count II, he alleges that his Second Removal was ultimately

retaliatory, too.  Id., ¶ 122–59.  He further appears to assert (with far from ideal clarity) that it

was nothing but a pretextual effort to justify the retaliatory First Removal.  See Cross-MSJ at 37

("A reasonable jury would likely view the second adjudicative process as a premeditated,

pretextual effort to justify Cox's January 12th termination of NST Hudson.").  AFGE now moves

for summary judgment as to both.  Its theory is that because both removals were based on

Hudson's violation of various AFGE rules, no reasonable jury could find that protected <u>speech</u>

was the but-for cause of his removal.  Specifically, per AFGE, the NEC removed Hudson in

2017 because his November email violated AFGE rules.  The NEC then removed him again in

2018 for the same reason and for the additional reason that his August letter also violated AFGE

rules.  The Court will consider each count in turn.

      1.  *Count I: First Removal*

Defendant invokes two rules violations that precipitated Plaintiff's First Removal: the

Campaign Speech Rule and the rule requiring the General Counsel's Office to review Union

publications (GCO Rule).

      a.  Campaign-Speech Rule

AFGE contends that Hudson was removed in 2017 because his November Email broke

the Union rule against using "monetary or other resources of AFGE . . . to promote the candidacy

of any candidate in an election."  AFGE Constitution, App'x A, Part 1, section 4(b).  Therefore,

AFGE submits, no reasonable jury could find that Hudson would not have been removed but for

his protected speech.

For AFGE to prevail on that theory, it must show that there is no genuine issue as to at

least two facts: first, the manner in which Hudson sent the November Email violated AFGE

rules; and second, that violation was an independent reason for his removal, thus negating

Hudson's theory that his protected speech was the but-for cause.  The parties focus on the former

question, debating whether the email was campaign speech for which Plaintiff could not use

Union resources, but the Court finds that AFGE falters on the latter.  It will thus leave for

another day the question of whether the November Email is properly considered campaign speech.

Whether Hudson's alleged violation of the AFGE Constitution was clearly the reason for his removal is a close question made even closer by his disorganized briefing. At this stage, however, AFGE has not shown the absence of a "genuine issue" as to the true basis for Hudson's removal, especially given that the Court must draw inferences in his favor. Liberty Lobby, Inc., 477 U.S. at 255. The largest obstacles for AFGE are the murkiness of the procedural record, and, relatedly, the lack of contemporaneous evidence elucidating the reasoning for the removal.

Begin with NVP Hill's charging letter, the formal starting point for the First Removal. See Hill Charge Letter. Hill's letter makes no suggestion that the November email was campaign speech, nor does the letter state that the email violated AFGE rules because it was sent to promote Hudson's candidacy. Id. at 1–2. Instead, it says that assigning Willie Hope to send the email was a "violation of the ethical conduct requirements for all NEC members, and . . . placed the staff person, himself, in the potential position of receiving disciplinary action from AFGE." Id. at 2. It does not specify why Hope was placed in that position. The letter further states that employing AFGE's email directories for "personal use" is a violation of AFGE policy on the use of Union resources. Id. (emphasis added). There is no mention of the Campaign Speech Rule.

Next, the First COI Report. See ECF No. 181-14 (First COI Report) at 1. Like Hill's letter, the portion of the Report laying out the charges against Hudson contains no suggestion that the November Email was campaign literature. Instead, it says only the following: "In the specific issue of NST Hudson's email on Donald Trump dated 15 November, 2016 (and sent by AFGE staff Willie Hope): The Committee finds probable cause exists for the specific charge of

malfeasance of office." Id. The COI then cites sections 2(f), 2(g), and 2(h) of Article XXIII of the AFGE Constitution. Id. No mention of the Campaign Speech Rule here either.

The transcript of the First Removal Meeting in August 2017, which AFGE introduces but does not dive into, muddies the waters even more. Cox (who apparently chaired the meeting) described each charge to the NEC in similar terms to those in the COI Report — that is, with no reference to the precise nature of the underlying conduct. See, e.g., ECF No. 181-19 (August 2017 NEC Meeting Transcript) at 52 ("[T]he motion was finding NST Hudson guilty of Charge 1, Article XXIII, Section 2(f), engaging in gross neglect of duty or conduct constituting misfeasance or malfeasance in office."); id. at 70 ("Charge 2, Article XXIII, Section 2. . . . the NEC sustained a finding of guilty in Article XXIII, Section 2(g), where a competence and negligence in the performance of official duties by an officer."); id. at 82 ("Charge [3], Article XXIII, Section 2(h), committing an act of appropriating to one's own use of thing of value belonging to the federation.").

When asked to clarify which policy Hudson had violated to commit "malfeasance," General Counsel David Borer suggested that the policy was "the CWA, staff collective bargaining agreement. And in that agreement, it makes clear that it is all the violation for the staff to get involved in politics, but it's also a violation for elected official to involve the staff in policy." Id. at 39. Later, Borer said that it was relevant "whether [the email] was in connection with [Hudson's] campaign," and that if the Department of Labor were reviewing the publication, it would consider the context in which it was sent (that is, "immediately after NST Hudson . . . declared himself . . . for office"). Id. at 42. Even so, Borer did not explicitly tie that conversation back to the Campaign Speech Rule.

The transcript also leaves readers wondering whether the NEC was on the same page about what, exactly, its members were voting on.  Early on, Cox stated that the questions before the NEC were "[a] violation of AFGE policy prohibiting the involvement of staff in union politics" and a violation of the policy against "use of AFGE resources for personal or campaign purposes," which is consistent with AFGE's arguments before this Court.  Id. at 27.  Things went downhill from there.  At one point in the meeting, it seemed that the NEC was being asked to vote on Hudson's "appropriation" of AFGE property for "e-mails in the self-opinion of Mr. Hudson" (i.e., personal emails), and not for campaign purposes.  Id. at 73; id. at 77 ("I just wanted to point out that on [Charge 3], it's irrelevant as to whether he was behaving in a manner to support his candidacy or whether he was just using this as an opportunity for [the great malaprop of] self-Mirandizement.").  And at another point, the issue presented was apparently the fact that the November Email exposed others to potential Hatch Act violations.  Id. at 81 ("So that's the problem here . . . that Mr. Hudson . . . exposed all those people [to whom he sent the November Email] . . . [to] Hatch Act violations.").  Finally, even when summarizing the charges against Hudson after voting was largely finished, President Cox made no reference to the campaign nature of the November Email.  See id. at 114.

At least one member of the NEC, NVP Dorothy James, was plainly confused and voiced her confusion.  Id. at 30–32 ("So I'm trying to get to what the charge is.  Is it malfeasance in office?  It can't be all of these other things.  And that . . . clouds the whole issue."); id. at 38 (NVP James asking, with respect to charge 1, "[W]hat is the violation specifically?  And what policy specifically is involved?").  In the midst of that confusion, it is hardly inconceivable — and therefore not unreasonable to believe — that members of the NEC may not have been

aligned that they were voting to remove Hudson on the ground that the November Email was campaign speech sent in violation of the AFGE Constitution's Campaign Speech Rule.

To be sure, parts of the First Removal Meeting transcript and other parts of the record suggest that some NEC members did view the November Email as campaign literature and voted in accordance with that view. See, e.g., MSJ at 33 (making this argument); ECF No. 181-11 (Borer Letter re: November Email); ECF No. 181-21 (Declaration of NVP Vincent Castellano), ¶ 12 ("I thought the Nov. 15th emails and letter attached was Mr. Hudson's campaign literature."); Glover Decl., ¶ 21 ("[Hudson] knew that there were rules that prohibited him from campaigning while using AFGE resources. He knew this and had the November 15th emails sent anyway."); G. James Decl., ¶ 16. Rendering the inquiry even more difficult, Hudson makes no effort to assist the Court in identifying portions of the record that tip the causation question in his favor.

Ultimately, though, the Court cannot quite look past the tangled and at times inscrutable procedural trail left by the First Removal — at least not at summary judgment. The *post hoc* declarations from three NEC members, while helpful to AFGE, do not close the gaps in the record of the meeting where Hudson's fate was decided. On the record as presented by AFGE, the Court concludes that there is a genuine issue as to whether the NEC removed Hudson in 2017 because it found that the November Email violated the Campaign Speech Rule.

### b. GCO Rule

AFGE briefly tacks on an additional argument. It contends that the NEC removed Plaintiff because his November Email violated another rule: "the rule requiring AFGE-GCO review of publications before distribution." MSJ at 16, 23–24. That argument suffers from the same flaws identified above. The record is not clear that Hudson's failure to abide by the GCO

was part of the original charge, see Hill Charge Letter at 2, or the ultimate NEC decision.  See generally August 2017 NEC Meeting Transcript.

More problematically for AFGE, the record reveals a genuine issue as to whether the Union even had an actually enforced rule requiring every "legitimate union publication[]" to be reviewed by the GCO.  See MSJ at 23.  Defendant does support the existence of such a rule with record evidence, including a statement to its insurance company that the Union has an "attorney review all Union publications prior to release."  Second COI Report at 42; AFGE SOF, ¶ 31.  But AFGE's own Motion then refers to this supposed rule as a "practice."  MSJ at 23.  NVP James stated during the First Removal Meeting that it is "not exactly true" "that everything is cleared through GCO."  August 2017 NEC Meeting Transcript at 56.  While the record contains evidence that Cox once sought GCO approval for one of his communications, see ECF No. 181-26 (Cox November Email GCO Review), that was for a column that was set to "run on Huffington Post, WIR, social media, and on the web."  Id.  Not to mention the fact that Cox's decision to seek GCO approval does not categorically decide the question of whether he did so pursuant to an existing rule.  At the very least, there is a genuine question as to whether the rule or policy was actually enforced, even if it existed.  See ECF No. 184-8 (Declaration of Jane Nygaard) at 2 ("When the NVPs had a discussion about [the November Email], I questioned why people were upset . . . as I had sent out to my Locals virtually the same caution . . . .  And I never had it approved by anyone nor was I expected to have it approved, since there was no policy requiring us to obtain prior approval from the General Counsel before sending out such emails.").

As such, the Court cannot grant AFGE summary judgment on the basis that the First Removal was indisputably caused by Hudson's failure to clear his November Email with the GCO.

2.  *Count II: Second Removal*

Count II presents an even closer question.  Recall that AFGE offers two separate justifications for the Second Removal: first, the November Email violated the Campaign Speech Rule; and second, Hudson violated AFGE rules by procuring "AFGE mailing labels prior to properly declaring candidacy for office" and using those labels to send a letter in August.  See MSJ at 24.  (Some AFGE documents refer to this as the September 10th letter, but the Court will call it the August Letter.  See ECF No. 181-13 (February 2018 NEC Meeting Transcript) at 18.)

To AFGE's benefit, the procedural record for the Second Removal is far clearer than the record for the First Removal.  For example, unlike in the first, the NEC issued a written explanation for its Second Removal decision, including specific reasons for finding that the November Email was campaign speech.  See ECF No. 181-15 (Second NEC Decision).  The relative formality of the February 2018 NEC Meeting is immediately evident.  See, e.g., February 2018 NEC Meeting Transcript at 34–38 (Cox canvassing NEC to ensure each member could vote fairly).  Perhaps learning from his mistakes in the First Removal process, Cox was also extremely explicit in laying out the questions before the NEC.  See, e.g., id. at 96 ("[W]as this protected speech," "was this [] campaign speech," and "did the manner in which Mr. Hudson obtained the mailing labels violate AFGE policy[?]"); id. at 110 (asking members to vote only on the question of whether November Email was campaign speech).

Still, even the transcript of the February 2018 meeting is murky at times.  For example, with respect to the August letter, there appears to have been confusion about (a) whether AFGE

already had a policy about how specific a candidate must be in announcing her candidacy, or if

such a policy would need to be developed in the future; and (b) whether such a policy was even

relevant to the charges at hand.  Id. at 90 ("[NVP] James: I thought in our deliberations that there

was discussed regarding the announcement of the candidacy and whether or not there's a policy

for that — is there a policy?  I thought that AFGE was to develop a policy or should develop a

policy. . . . Chairman Cox: I don't — I don't think that's in the charge.").  The NEC did not

return to NVP James's question before voting on whether the manner in which Hudson obtained

the mailing labels was a violation of AFGE rules.  Id. at 102.  This silence in the record is

curious, given that AFGE's current position is that "Hudson violated AFGE's rule . . . that the

candidate declare for a specific office before being provided mailing labels."  MSJ at 24.  The

NEC also voted on the November Email charge with almost no debate, despite there having been

minimal discussion about this particular charge during the August 2017 meeting.  See February

2018 NEC Meeting Transcript at 107–13.  AFGE was quick to point out that Hudson's protected

speech could not possibly have been the source of his removal since the NEC did not discuss that

speech.  See MSJ at 27.  The Court cannot help but notice that the NEC did not much discuss the

nature of Hudson's conduct either.

        In any event, standing alone, and in the light of Hudson's failure to oppose AFGE's

Motion with any degree of rigor, the above facts would likely obtain summary judgment for

AFGE.  Yet, with a passing argument in his Opposition, Plaintiff can stave off this outcome.

        Hudson notes in his Opposition that a reasonable jury could "view the second [NEC

removal process] as a premeditated, pretextual effort" to justify the termination of Hudson earlier

in 2018.  See Cross-MSJ at 37.  After all, Plaintiff points out, "the second COI and NEC panel

voted after Cox" had already terminated him based on the First Removal process.  Id. at 37.  This

Court initially issued a preliminary injunction against AFGE requiring it to reinstate Hudson after the First Removal, but when the Court vacated the injunction, Cox apparently terminated Hudson again.  Id. at 36.

Plaintiff has a point.  For reasons just explained, the true basis for the First Removal is (at this stage) still a question for the jury.  Having said that, the Court cannot then ignore the timing of the Second Removal: (a) it came on the heels of the first; (b) it occurred (as Hudson notes) after his termination (from the First Removal) was already in effect and after he had filed this suit about the First Removal; (c) portions of the Second Removal meeting involved very little debate; and (d) there continues to be minimal contemporaneous evidence of exactly why the NEC voted as it did.  Taking all of those factors together, a jury might reasonably find that Hudson's concerns about the First Removal taint the Second Removal, too.  Such jury could then conclude that the rule violations were not the true reason for his removal in 2017 or in 2018.

Nor can the Court grant summary judgment to AFGE with respect to its rationale related to the August Letter.  Recall that Defendant maintained that Hudson broke its rule by acquiring his labels before clearing his candidacy with the GCO.  See MSJ at 24.  But, according to General Counsel Borer himself, who spoke to this point at the February meeting, it is simply "normal protocol" for the declaration of candidacy to start with the NST.  See February 2018 NEC Meeting Transcript at 43.  "[O]nce that happens normally," Borer continued, the declaration is passed down to his office, which would "make sure everything's legit.  Maybe check and see if the person is actually a dues-paying member."  Id. at 43–44 (emphases added).  He then admitted that he had recommended these procedures be "firm[ed up]" so that there would be no "question in the future."  Id. at 44.  Even in its own Statement of Facts, AFGE mentions that the alleged protocol for candidate declarations is just what "typically" happens.

See AFGE SOF, ¶ 41.  Those statements could be construed by a reasonable jury to mean that this is an oft-followed practice, but not a rule set in stone.

### 3.  *Evaluating Hudson's Burden*

The Court's inquiry as to the first two counts is not quite complete, however.  As AFGE points out, the burden to show an LMRDA violation remains on Hudson.  See MSJ at 26–27.  Defendant's inability to point to a legitimate basis for the removals does not necessarily mean that he could show that the basis for the removals was illegitimate.  In other words, Defendant contends that there is no genuine issue about whether Plaintiff's protected speech was the but-for cause of his removal.  See MSJ at 26–33.

That argument, while logically coherent, does not hold up in this case.  AFGE chose to rest its Motion on the theory that the removals were based on Hudson's rule violations, and so his protected speech could not have come into play.  Id. at 16.  Hudson's counter-theory has been that the rule violations were mere pretext for the true basis for his removal: his protected speech about AFGE's handling of its finances, which speech was contained in the emails and letters that the NEC was considering during both removals.  See Am. Compl., ¶¶ 115–17.  As AFGE's case weakens, Plaintiff's gets stronger by implication.  If the NEC did not remove Hudson for his conduct, why did it so act?  A jury could find that the answer is, as Hudson alleges, the messages contained in his fall 2016 communications, including his questioning of NEC Officers' expense vouchers.  Cf. Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294 –1300 (D.C. Cir. 1998) (noting, in context of employment-discrimination claim, that evidence "throwing into doubt the reason given for" rejecting a particular candidate "create[d] a jury question as to whether" employer's given explanation was false, and as to whether employer acted discriminatorily).

As the Supreme Court has stated in an admittedly different but conceptually related

context:

> Proof that the defendant's explanation is unworthy of credence is
> . . . one form of circumstantial evidence that is probative of
> intentional discrimination, and it may be quite persuasive. In
> appropriate circumstances, the trier of fact can reasonably infer from
> the falsity of the explanation that the employer is dissembling to
> cover up a discriminatory purpose. Such an inference is consistent
> with the general principle of evidence law that the factfinder is
> entitled to consider a party's dishonesty about a material fact as
> "affirmative evidence of guilt."

Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000) (citations omitted); see also

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).  Here, a trier of fact could reasonably

conclude that AFGE's purported reasons for Hudson's removal do not fully align with the

contemporaneous record of that removal.  On that basis, it could proceed to infer that AFGE is

"dissembling to cover up" an illegitimate basis for Hudson's firing.

That is not all.  Importantly, exhibits attached to Hudson's Opposition offer affirmative

evidence that the real reason for his removal was his criticism of AFGE officials' use of AFGE

funds.  For example, former NVP Shawn Petty stated:

> During one of our breaks [at an NEC meeting], I had a conversation
> with National Secretary-Treasurer, (NST) Eric Bunn, in which he
> told me that the reason J. David Cox and the NEC got rid of Eugene
> Hudson, Jr. when he was National Secretary-Treasurer [was]
> because Eugene exposed J. David Cox's unlawful expenditures,
> including his excessive non-union-related use of CCS Limo
> Services.  NST Bunn went on to say before becoming NST; he didn't
> believe what NST Hudson was saying about President Cox.
> However, when Bunn became NST, he had a chance to review the
> records, and he realized Hudson was telling the truth about J. David
> Cox's unlawful expenditures.  Bunn also said that AFGE's General
> Counsel was helping J. David Cox cover up all his illegal
> expenditures.

ECF No. 184-3 (Declaration of Shawn Petty) at 1 (emphasis added).  Petty also suggested that

Hudson "is being treated in a harsher, more disparate manner than other AFGE members,"

casting more doubt on the proffered reasoning for his removal.  Id.; see also ECF No. 184-2

(Declaration of Eugene Hudson, Jr.) at 9 (noting that AFGE has not taken action against NVP

McCubbin for similar violation of Campaign Speech Rule); ECF No. 184-5 (Charges Against

George McCubbin) at 1.  (Although the statements in Petty's Declaration are conceivably

hearsay, because AFGE does not object to them as such, the Court tables that issue for a later

day.)

Such allegations are difficult to ignore, at least at this stage of the proceedings.  Coupled

with the factual question of whether the rule violations were pretext, Hudson has done just barely

enough to survive AFGE's Motion.

### 4.  *LMRDA Due-Process Claim*

Hudson's Opposition is so difficult to parse in part because it is obfuscated by his

assertion of an entirely new claim.  Section II.2 weaves a tangled web that appears to use Hill's

charging letter to support not just allegations of pretext (which the Court just considered and

which carry some legitimacy), but also allegations that he was denied a "full and fair"

disciplinary hearing as guaranteed to him by section 101(a)(5)(C) of the LMRDA.  See 29

U.S.C. § 411(a)(5)(C); Cross-MSJ at 37, 43–44.

The Court therefore thinks it worth clarifying that in denying AFGE's Motion as to

Counts I and II, it will not permit Hudson to slip in a separate LMRDA "due process" claim with

those counts.  The operative Complaint contains no such claim.  See Taylor v. Mills, 892 F.

Supp. 2d 124, 137 (D.D.C. 2012) ("[A] plaintiff is not permitted to raise new claims at the

summary judgment stage, where those claims were not pleaded in the complaint.").  That should

have been obvious to Hudson, who withdrew this exact claim earlier in the case after AFGE in

its motion to dismiss pointed out, and Hudson agreed, that the cited LMRDA provision does not

apply to a removal from office.  See ECF No. 186 (AFGE Reply) at 10; ECF No. 22 (Opp. to

MTD) at 17–18 ("The essence of AFGE's argument is that there can be no violation of 29 U.S.C.

§411(a)(5) because NST Hudson was suspended from office (discharged), but his membership

rights were unaffected.  We concede that AFGE is correct.").  He cannot resurrect this claim

now.

The Court thus declines to consider alleged deficiencies in the removal proceedings as

they relate to any supposed due-process or fair-hearing violation.

C.  LMRA Claim

Finally, in Count III, Hudson alleges that AFGE's actions during the two removals

violated its National Constitution and thus enable him to assert a cause of action under the

LMRA.  AFGE's primary objection is that Plaintiff has repeatedly failed to identify a specific

provision of the AFGE Constitution that was actually violated, and to the extent that he does

point to a particular provision, he never explains how AFGE's conduct violated that provision.

The Court agrees.

Hudson's briefing on this claim is frustratingly short, so the Court will return to the

Amended Complaint to identify the three instances in which he alleges that AFGE violated its

Constitution.

First, Plaintiff alleges that the initial NEC was biased, and that AFGE therefore neglected

to provide him with his constitutional right to a full and fair hearing.  See Am. Compl., ¶¶ 169–

70.  Hudson's Amended Complaint reveals precisely what is wrong with that claim, even were

the Court to assume that the NEC was not impartial (a fact that AFGE contests).  "Section 7 [of

the AFGE Constitution] does not require that a [COI] or [NEC] . . . act fairly when considering charges against a national officer," he explains.  Id., ¶ 166.  But not to worry: he assures the Court (without any citations or support) that while that may be true, "Section 7 must be interpreted to require fairness in all disciplinary matters," and the "covenant of good faith and fair dealing is an implicit part of the Constitution."  Id., ¶¶ 166–67.

Readers hoping for some elaboration of those statements will be disappointed.  Hudson's Opposition to AFGE's Motion for Summary Judgment contains no explanation for why the Constitution "must" be interpreted to require fairness in all disciplinary matters, nor does it explain why AFGE's reading to the contrary is incorrect.  Defendant, for its part, submits that to the extent the Constitution contains any requirements for NEC proceedings, AFGE properly followed all of them.  See MSJ at 37 (citing AFGE Constitution).  The Court is thus left to compare two unsupported sentences in the Amended Complaint with AFGE's responses, which are grounded in concrete provisions of its Constitution.  As its preliminary-injunction Opinion reveals, this Court is sympathetic to Hudson's claim that the First NEC may have been biased.  But given the dearth of support for the constitutional basis for this claim, along with AFGE's solid citations, the Court concludes that no reasonable jury could find for Hudson here.

Plaintiff's next argument is that AFGE violated its Constitution by permitting General Counsel Borer to act as a prosecutor during the NEC proceedings.  See Am. Compl., ¶ 170.  That contention is even more easily dealt with, since Hudson does not even purport to identify a constitutional provision prohibiting that practice.  See Cross-MSJ at 44 (asserting, without a single citation, that "General Counsel Borer owed a fiduciary duty to NST Hudson" but instead "advocated against NST Hudson's interests").  Even assuming Hudson were correct that Borer did so act, this position holds no water.

Finally, Hudson contends that the NEC violated the Constitution because it did not decide his case on the basis of the administrative file.  Of his three arguments, this one finds by far the most support in a constitutional provision, but it still succumbs.  The AFGE Constitution provides that if the COI determines that "[g]ood and sufficient grounds for a charge exist, but that no material facts are in dispute, it shall refer the charge to the NEC for decision on the basis of the investigative file."  AFGE Constitution, Article XIII, section 7(b)(2).  There are two problems with Hudson's argument, however.  For one, he provides no concrete evidence that the NEC considered evidence outside of the investigative file; in fact, Plaintiff's theory as to Counts I and II is that the NEC removed him because of the criticism contained in his fall 2016 communications, which were in the investigative file.  That alone would be sufficient to dispose of this claim.  Second, even had he produced such evidence, AFGE reasonably interprets section 7(b)(2) to permit the NEC to consider "the totality of the circumstances surrounding the investigative file."  MSJ at 43.  After all, says AFGE, the NEC allowed Hudson and his attorney to speak and rebut the investigative file.  Id. at 44.  Were Hudson's narrow reading of the Constitution correct, the NEC could not have considered any statements made outside the scope of the file.  Surely Hudson would resist that interpretation.

The Court therefore grants summary judgment to AFGE on the LMRA count.

D.  Hudson's Cross-Motion for Summary Judgment

Before concluding, the Court briefly addresses Hudson's so-called Cross-Motion for Summary Judgment.  His filing is only a Cross-Motion in name, as the portion of his brief that is supposedly dedicated to supporting his Motion is full of unsupported allegations and references to a claim that was never even pled.  See Cross-MSJ at 43 (asserting claim under section 101(a)(5)(C) of LMRDA).  Nowhere in those pages does Hudson assert a lack of genuine dispute

as to any material fact, much less provide support for such a proposition.  Nor does he argue that no reasonable jury could find for AFGE.  Instead, he says only that he is entitled to judgment because "a jury <u>could</u> reasonably find" for him.  <u>See</u> Cross-MSJ at 43 (emphasis added).  That is, of course, not enough for summary judgment.  His Cross-Motion will be denied.

## IV.    Conclusion

For the foregoing reasons, the Court will grant AFGE's Motion for Summary Judgment as to Count III and deny it as to Counts I and II.  The Court will also deny Hudson's Cross-Motion.  A separate Order so stating will issue this day.

<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>September 26, 2022</u>