**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**EUGENE HUDSON, JR.,**

      **Plaintiff,**

        **v.**

**AMERICAN FEDERATION OF**
**GOVERNMENT EMPLOYEES,**

      **Defendant.**

        **Civil Action No. 17-1867 (JEB)**

**<u>MEMORANDUM OPINION</u>**

Last October, at the parties' request, the Court referred this long-running dispute between Plaintiff Eugene Hudson and Defendant American Federation of Government Employees to Magistrate Judge Michael Harvey for mediation. Despite Judge Harvey's best efforts, what was meant to be a conflict-resolving exercise proved to be the exact opposite. The parties now disagree about whether they reached a settlement at all, with Hudson contending that they did and AFGE insisting that they did not. Hudson has now moved to enforce the terms that the parties allegedly agreed to orally at the conclusion of their mediation session. Having reviewed the relevant exchanges and conducted an evidentiary hearing on the issue, the Court concludes that the parties did not reach an enforceable agreement and will thus deny the Motion to Enforce the Settlement.

**I.**      **Background**

As usual, the parties cannot agree on the facts underlying this dispute. The background that follows is thus pieced together using the few facts that remain uncontested, the exhibits

1

submitted by the parties — namely, emails documenting their interactions — and information
revealed at the evidentiary hearing.

On March 15, 2023, the parties attended a mediation via Zoom with Magistrate Judge
Harvey.  See ECF No. 228-1 (Declaration of Rushab Sanghvi), ¶ 6.  Attending were AFGE
Deputy General Counsel Rushab Sanghvi, Associate General Counsel Rachel Steber, Hudson,
his attorney Marlene Morten, and eight members of the AFGE National Executive Council.  See
ECF No. 225-9 (Declaration of Marlene "Kemi" Morten), ¶¶ 5–7.  Both sides agree that, aside
from the initial introductory proceedings, "each party was in a separate 'break out' room and did
not have direct contact with . . . the other party."  Sanghvi Decl., ¶ 7; see also ECF No. 274
(Transcript of Hearing on July 12, 2023) at 5–6, 11.

Hudson concedes that, because he was not in the same breakout room as the AFGE
representatives, his communications with them were entirely mediated through Judge Harvey.
See Tr. at 9 (Ms. Morten explaining that she "assume[d]" Judge Harvey went to speak with
AFGE, but could not be sure because she was in a separate breakout room).  He nonetheless
alleges that after a full day of mediation, at approximately 10 p.m., "the eight AFGE NEC
members and Mr. Hudson verbally informed [Judge] Harvey that they had reached an agreement
to be bound by certain terms," including that: AFGE would pay Hudson $1.5 million; Hudson
would dismiss with prejudice his claims in this case and his appeal in another case; Hudson
would waive all claims against AFGE; and AFGE "would not reinstate Mr. Hudson's
membership but [would] not oppose it if he gain[ed] membership through other means."  Morten
Decl., p.2, ¶ 8.  According to Morten, Judge Harvey also told Hudson that he would inform this
Court that an agreement had been reached "in principle."  Id., p.3, ¶ 7.

At the evidentiary hearing, Morten clarified that Judge Harvey ended things on a tentative note that night.  In her telling, he said something to the effect of, "we will see what happens tomorrow when you get the term sheet."  Tr. at 10.  Morten also explained that she was under the impression that Judge Harvey was going to oversee the final negotiation or signing of a term sheet.  See id. at 10–11 ("I didn't get the feeling that the mediation was over when the term sheet was sent.  I was under the impression that Judge Harvey was going to oversee our negotiation of the term sheet and signing of the term sheet.").  Sanghvi describes Judge Harvey's comments as similarly tentative.  See id. at 14 ("I don't remember the words he said, but he said, you better hope they sign it, you know, when you email it.  You know, I don't know whether they will, sort of leaving open the possibility that they wouldn't sign it or agree to the terms laid out in that term sheet.").

Later that night, Sanghvi emailed Morten a term sheet with the terms to which the parties had supposedly agreed in principle and asked that she and Hudson sign it.  See ECF No. 228-1 at 9–13 (Mar. 15 AFGE Term Sheet).  On March 16, however, instead of providing her signature, Morten responded with her own redlined version of the Term Sheet, which contained substantial edits.  See ECF No. 228-1 at 15–21 (Mar. 16 Hudson Redlined Term Sheet).  Among the most substantive changes were: (a) alteration of the terms of Hudson's release and waiver of claims against AFGE such that they would apply only to claims raised in this action, as opposed to claims or counterclaims of any kind; (b) addition of a term about Hudson's membership, which provided that AFGE would not reinstate Hudson but would also not oppose his membership if he "regain[ed] his membership through other means"; and (c) addition of a requirement that AFGE post a public notice on its website stating that it had entered into a confidential settlement agreement with Hudson.  Id.

A day later, Sanghvi notified Morten that AFGE would not accept her proposed changes. The union believed them to be "inconsistent with the terms [the parties] agreed on during the mediation."  ECF No. 228-1 at 23–25 (Mar. 17 AM Emails).  Over the next several days, Sanghvi and Morten corresponded about their disagreements, with Hudson eventually agreeing to make several concessions.  See ECF No. 228-1 at 27–29 (Mar. 17 PM Emails).  On March 20, however, Sanghvi explained that in reviewing the term sheet, AFGE had "encountered a few concerns" with certain of its provisions.  ECF No. 225-3 (Mar. 20 Email).  A couple of days later, Sanghvi emailed Morten a revised, unsigned term sheet that addressed those concerns.  See ECF No. 228-1 at 35–39 (Mar. 22 AFGE Term Sheet).  The key changes, according to him, were the exclusion of a confidentiality provision, a more "clearly laid out . . . process for obtaining NEC approval" of the agreement, and a clarified "provision relating to Mr. Hudson's membership."  Id.  Although Morten initially responded with a lengthy list of objections, she apparently backed down and the parties came to some form of shared understanding over the next several days.  Morten signed the resulting Term Sheet on March 24, and AFGE signed it on the 27th.  See ECF No. 228-1 at 47–49 (Signed Mar. 24 Term Sheet).

At 1:05 p.m. on the 27th, Sanghvi emailed the signed Term Sheet to Judge Harvey's clerk.  See ECF No. 228-1 at 51–53 (Mar. 27 Email).  He stated that "per the terms of the Term Sheet, AFGE intend[ed] to provide Ms. Morten a DRAFT final settlement agreement later today" and was hopeful that the parties would have a finalized agreement by April 10, 2023.  Id. As one might guess from the fact of this Court's intervention, that hope did not materialize.

As soon as Sanghvi emailed Morten a draft settlement agreement for her review, things began to unravel once more.  Morten was unhappy with the draft, and Sanghvi refused to accede to her many demanded additions and changes.  After a flurry of further emails, including a

March 28th proposed settlement agreement Hudson sent to AFGE, see Mot. at 16, AFGE decided that "further settlement discussions in this matter [would] no longer be fruitful," that it "no longer wishe[d] to pursue this mediation," and that it would "request[] that Judge Harvey consider the mediation closed."  Morten Decl., ¶ 44.  Morten replied that Hudson intended to file a motion to enforce the parties' purported settlement agreement.  Id., ¶ 46.  She of course followed through on that threat, tasking this Court with determining whether such an agreement ever was reached.

In light of several important factual disagreements in this case, this Court ordered the parties to appear for an evidentiary hearing on the Motion.  Having heard from both counsel under oath, the Court is now equipped to rule on the Motion.

## II.    Legal Standard

"It is well established that federal district courts have the authority to enforce settlement agreements entered into by the litigants in cases pending before them."  Demissie v. Starbucks Corp. Off. & Headquarters, 118 F. Supp. 3d 29, 34 (D.D.C. 2015), aff'd, 688 F. App'x 13 (D.C. Cir. 2017) (citation omitted).  "The moving party bears the burden of proving by clear and convincing evidence that" such an agreement was reached.  Id.  And whether that burden has been satisfied — that is, whether a settlement was reached — is a question of local contract law, which here is D.C. law.  See Makins v. Dist. of Columbia, 277 F.3d 544, 547 (D.C. Cir. 2002); Simon v. Circle Assocs., Inc., 753 A.2d 1006, 1012 (D.C. 2000) ("Generally, settlement agreements are determined according to principles of contract law.") (citation omitted); ECF No. 225 (Mot. to Enforce) at 15, ECF No. 228 (Opp.) at 3 (both looking to D.C. law for standard on enforceability of settlement agreement).

D.C. law provides that a settlement agreement, like any contract, is enforceable if there was "(1) an agreement to all material terms, and (2) intention of the parties to be bound." Duffy v. Duffy, 881 A.2d 630, 634 (D.C. 2005). "Which of the parties' agreement terms are material is a question of fact." Demissie, 118 F. Supp. 3d at 34. The agreement, moreover, need not be written to be enforceable. It is enough that "both parties [intended] to be bound by their oral representations alone." Steven R. Perles, P.C. v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007). In assessing that intent, courts will consider various factors including, for example, whether the "parties contemplate[d] a writing" as "evidence . . . that they [did] not intend to bind themselves by an oral agreement." Id.

### III.    Analysis

As a threshold matter, it is worth clarifying what exactly Hudson seeks to enforce, as his brief is characteristically muddled. According to his Motion, he would like this Court to enforce the parties' verbal agreement from March 15, the terms of which he believes are contained in the Settlement Agreement he proposed (and which AFGE refused to sign) on March 28. See Mot. at 1 (titling pleading as "Motion to Enforce March 15, 2023 Settlement Agreement"); Mot. at 16 ("Mr. Hudson's March 28th Settlement Agreement contains the material terms . . . by which the parties verbally agreed to [be] bound on March 15th . . . ."); id. at 19 ("[W]e ask the Court to enforce the March 28th Settlement Agreement that Mr. Hudson signed and emailed to AFGE."). As a result, this Court need not decide, for example, whether the version of the term sheet that was signed by the parties on March 24 and 27 — which differs in several respects from the March 28 settlement agreement — is binding, as neither party asks for it to be enforced. The sole question for this Court is whether the parties formed an enforceable settlement agreement on

6

March 15 at the close of the mediation.  For two independent reasons, the Court concludes that the answer is no.

    A.  <u>Agreement to Material Terms</u>

    First, the record makes clear that the parties did not reach an agreement on all material terms during the March 15 mediation.  That is fatal to Hudson's Motion because "[i]f the parties did not agree about [a given] material issue, then they had no agreement at all."  <u>Simon</u>, 753 A.2d at 1012; <u>see also</u> <u>Duffy</u>, 881 A.2d at 634.

    To begin, once substantive negotiations commenced, the parties were never together on Zoom; instead, Judge Harvey shuttled between breakout rooms, meeting with each side one at a time.  <u>See</u> Tr. at 6.  Morten thus has no firsthand knowledge of any statements that AFGE made to Judge Harvey, including anything to suggest that AFGE verbally agreed to all material terms. <u>See, e.g.</u>, <u>id.</u> at 9; <u>see also</u> <u>id.</u> at 14 (Sanghvi describing Judge Harvey as "sort of leaving open the possibility that they wouldn't sign it or agree to the terms laid out in that term sheet"). Combined with Morten's recollection that Judge Harvey commented something to the effect of, "we will see what happens tomorrow when you get the term sheet," <u>id.</u> at 10, it is clear that the parties did not actually reach a final agreement on the 15th.

    AFGE's and Hudson's conduct after the mediation confirms that the parties were unable to reach an agreement on the 15th as to certain material terms.  This manifests most clearly in a comparison between the draft term sheets that the parties exchanged shortly after the mediation's conclusion.  Those term sheets represented AFGE's and Hudson's respective understanding of the scope of any "agreement" that was reached.  <u>See</u> Mar. 15 AFGE TS at 10–13 (Sanghvi describing draft as "outlining the terms that the parties agreed to in principle" on March 15); Mar. 17 PM Emails at 27 (Morten describing counter-proposal as "consistent with [Hudson's]

recollection of the agreements made during the mediation discussion").  They differ, however, in

important and material ways.  For one, AFGE's proposed term sheet makes no mention of

Hudson's membership, see generally Mar. 15 AFGE TS; Hudson's redline, by contrast, added an

entirely new and separate provision requiring AFGE to agree "not [to] oppose Mr. Hudson's

AFGE membership if [he] regains [it] through other means."  Mar. 15 Redlined TS, § 2.3.

      In addition, while AFGE's proposal contains a "general release and waiver [by Hudson]

of all claims against AFGE including all known and unknown claims or counterclaims of any

kind, whether or not raised in" this action, see Mar. 15 AFGE TS, § 2.1 Hudson's counter-

proposal deleted the underlined language.  See Mar. 15 Redlined TS, § 2.1.  His redline thus

transformed a general release and waiver into a narrow, specific one.

      Third and finally, Hudson's redline altered the settlement agreement's confidentiality

term.  Id., § 4.1.  While AFGE left the mediation believing that the parties had agreed not to

"discuss the existence of the settlement, the settlement amount, Term Sheet, mediation, or

Settlement Agreement," AFGE TS, § 4.1, Hudson apparently had a different impression.  See

Mar. 15 Redlined TS, § 4.1.  He understood that the agreement would require AFGE to "post a

notice to all AFGE members on its website stating that AFGE has reconciled with Mr. Hudson

for removing him as the duly elected AFGE National Secretary Treasurer (NST) by entering into

a confidential settlement agreement with him."  Mar. 15 Redlined TS, § 4.1.  That requirement is

in clear conflict with AFGE's proposed language, which would have prohibited either side from

discussing even the "existence of the settlement."  AFGE TS, § 4.1.  Indeed, in his redline,

Hudson deleted that phrase from § 4.1 of the term sheet.  See Mar. 15 Redlined TS, § 4.1.

      Each of the three aforementioned terms would "affect [the parties'] obligation to perform

under the agreement" and was thus plainly material to the settlement, a conclusion that Hudson,

for his part, does not resist.  <u>Demissie</u>, 118 F. Supp. 3d at 36 (D.D.C. 2015); <u>see generally</u> ECF

No. 231 (Reply) (never suggesting that these terms are not material); <u>id.</u> at 9 (reporting that

parties "spent about three hours discussing Mr. Hudson's [membership]," which supports

materiality conclusion).  Yet each party came away from the mediation with a substantially

different understanding of its obligations as it pertained to each one of those material issues.  As

to Hudson's waiver, Defendant understood its scope to be far broader than did Plaintiff.  As to

his membership, AFGE apparently believed the agreement did not implicate the subject at all.

Hudson, meanwhile, believed it to be at the heart of the agreement and understood AFGE to have

made a significant concession: it would not stand in his way when he inevitably sought to rejoin

the union.  And finally, whereas Hudson recalls that AFGE consented to posting a public

acknowledgment of the settlement, AFGE understood both parties to have agreed not to discuss

the settlement's existence.  <u>See</u> Mar. 16 Redlined TS, at 17.

  To put it simply, then, on at least three material terms, the record suggests that the parties

could not have been farther apart at the close of mediation on March 15.  And despite it being his

burden to do so, Hudson can muster no evidence to suggest otherwise, nor does he make any

effort to bridge the many gaps between the parties' proposed term sheets.  This Court must

therefore conclude that the parties "had no agreement at all."  <u>Simon</u>, 753 A.2d at 1012.

  B. <u>Intent to be Bound by Oral Representations</u>

  The Court also agrees with AFGE's alternative argument that Hudson's Motion to

Enforce must fail because the parties did not intend to be bound solely by their oral

representations.  Even if the parties reached an oral agreement on March 15, then, it would not be

enforceable in any event.

Under D.C. law, "[a]n otherwise valid oral agreement does not constitute a contract if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist . . . until the whole has been reduced to . . . written form."  Perles, 473 F.3d at 1249 (citations and internal quotation marks omitted).  Here, too, it is the party seeking to enforce the purported agreement that bears the burden of proving an intent to be bound by the oral agreement alone.  Id. at 1250.

In this instance, the parties' conversations and conduct during the mediation did not evince an intent to be bound by an oral agreement.  As discussed, they did not have any substantive communication between themselves during the mediation; they communicated only through Judge Harvey.  At no point did either party make an oral offer to, or accept one from, the other.  The tenor of the conversations, too, was tentative: the parties alternatively understood the proceedings as set to resume the next day (on Morten's telling), see Tr. at 10, or as leaving the door open to non-agreement once the term sheet was circulated (on Sanghvi's).  See id. at 14. Either way, it is clear that the parties' deliberations on the 15th at no point evinced a mutual intent to be bound by any oral agreement.

Second, and more importantly, "the evidence establishes that [Hudson] and [AFGE] discussed and contemplated a written agreement."  Perles, 473 F.3d at 1250.  "Under settled principles of District of Columbia contract law[,] . . . [that fact] suggests that the parties did not intend to be bound by oral representations alone."  Id.  According to Morten, after the mediation, "AFGE agreed to immediately draft and email to Mr. Hudson a term sheet containing the material terms to which the parties had verbally agreed to be bound during the mediation." Morten Decl., p. 3, ¶ 8.  Once AFGE did as promised, Hudson responded with his own written version of the term sheet, suggesting that he, too, had intended the agreement to be reduced to

writing.  See Mar. 16 Redlined TS, at 15–21.  As AFGE points out, "[T]he fact that the parties anticipated a term sheet is especially telling."  Opp. at 13 (emphasis added).  Had they intended to be orally bound at the close of the mediation, "the next step would [have been] to discuss the language of the agreement," and there would have been less of a need for the intermediate step of a term sheet.  Id.  Instead, however, the parties deliberately chose to take that middle step.  Collectively, these facts thus imply that Hudson and AFGE did not intend to be bound by their oral representations.

In assessing intent to be orally bound, courts will also consider "the parties' post-conversation conduct."  Perles, 473 F.3d at 1250–51.  If their actions suggest that the parties failed to come to a binding agreement during the conversation, that counsels against enforcement of any purported oral agreement.  Id.  As this Court just discussed at length, the parties' post-mediation conduct suggests exactly that.  See supra section III.A (discussing Hudson and AFGE's failure to agree on several material terms).  Not only did they lack a "meeting of the minds" as to several core terms, they arguably failed to agree on the most important term for Hudson: the conditions of his membership.  What is more, the parties negotiated at length about that particular term long after the mediation concluded, and they still have yet to reach a mutual understanding on it.  D.C. courts have held that such post-conversation negotiations "reflect the parties' intention not to be bound until a formal writing [is] executed."  Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 547 (D.C. 1981).

Finally, under D.C. law, courts must also consider "whether the amount involved is large or small" in assessing whether an oral agreement is enforceable.  Jack Baker, Inc. v. Off. Space Dev. Corp., 664 A.2d 1236, 1240 (D.C. 1995).  According to the exchanged term sheets, Hudson was to be awarded $1.5 million.  See Mar. 15 AFGE TS, § 1.1, at 10.  That is no small sum.

Importantly, AFGE correctly adds, it is an especially large sum for a non-profit labor organization.  See Opp. at 13–14.  Although this factor is not dispositive, the relatively large monetary award contemplated in the parties' agreement implies that the parties may well have intended their agreement to be memorialized in writing.  This is particularly so given the myriad other material terms that the parties were negotiating.

Viewed independently, each of the aforementioned considerations suggests that the parties did not intend to be bound by any oral agreement that may have been reached on March 15th.  Hudson thus cannot prevail on his Motion.

## IV.   Conclusion

For the foregoing reasons, the Court will deny the Motion to Enforce the March 15 Settlement Agreement.  A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 17, 2023

12